1 R. Patrick McCullogh, Esq. SBN 141399
Giles Townsend, Esq. SBN 169557
2 McCULLOGH & ASSOCIATES, APC
4180 La Jolla Village Drive, Suite 450
3 La Jolla, California 92037
Telephone: (858) 457-2900

4

5 Attorneys for Plaintiffs

**FILED**

OCT 2 4 2006

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**NUNC PRO TUNC**

SEP 1 8 2006

8                    UNITED STATES DISTRICT COURT

9                    SOUTHERN  DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10 GIL LAWRENCE, an individual; KEN MARINAI, an individual; MARLEE STEELE, 11 an individual; JEFFREY W. LAWRENCE, an individual; JOHN FLAXEL, an individual; 12 GEORGE BISHOP, an individual; JANET BISHOP, an individual; and GEORGE 13 BISHOP and JANET BISHOP as Trustees of the BISHOP LIVING TRUST, 14 | ) (Lead) Case No.  05 CV 1259 IEG (WMc)<br>) (Consolidated) Case No. 05 CV-1404-BEN (RBB)<br>)<br>) ~~[PROPOSED]~~ FIRST AMENDED<br>) COMPLAINT FOR FRAUD<br>)<br>) |

Plaintiffs,

v.

MIKE PARSONS, an individual; KYRO, INC., a Texas Corporation; KYRO, INC. a California Corporations and DOES 1 through 100, inclusive,

Defendants.

_____

) 1.   Violation of Rule 10b-5;
) 2.   Rescission (Unlicensed Broker-Dealer);
) 3.   Rescission (Common Law)
) 4.   Fraud;
) 5.   Negligent Misrepresentation;
) 6.   Conversion;
) 7.   Violation of California Corporations Code § 25401 et seq.;
) 8.   Violation of Washington Rev. Code §§ 21.20.010; 21.20.140 and 21.20.005;
) 9.   Violation of Virginia Code §13.1-522;
) 10.  Violation of Oregon Revised Statutes § 59.135, et seq.
) 11.  Violation of California Welfare and Institutions Code §15610.23.
)
) DEMAND FOR TRIAL BY JURY

25        Plaintiffs GIL LAWRENCE ("LAWRENCE"), KEN MARINAI ("MARINAI"),

26 MARLEE STEELE ("STEELE'), JEFFREY LAWRENCE ("J. LAWRENCE"), JOHN FLAXEL

27 ("FLAXEL") referred to collectively as "Plaintiffs," and GEORGE BISHOP, an individual;

28 JANET  BISHOP, an individual; and GEORGE BISHOP and JANET BISHOP as Trustees of the

BISHOP LIVING TRUST ("THE BISHOPS") allege as follows:

## NATURE OF THE ACTION

1. This is an action for securities fraud and related state law claims arising from the conduct of defendant Mike Parsons ("PARSONS"), an unlicensed broker-dealer, and DOES 1-100 in two related investment schemes.

2. In the first investment scheme, which commenced in 2000, PARSONS and his corporation, KYRO, INC., fraudulently induced Plaintiffs and THE BISHOPS to purchase unregistered shares in oil and gas leases (known as the Brookshire and Wyoming properties) by knowingly misrepresenting the nature, risk and value of the investments. When the Brookshire and Wyoming properties failed to produce according to PARSONS' representations, Plaintiffs and THE BISHOPS expressed their dissatisfaction to PARSONS. To avert what he perceived as a threat of litigation, PARSONS assured Plaintiffs he would settle their claims, perform on his promises, and make them whole by means of a second investment scheme. PARSONS represented to Plaintiffs that the second investment scheme was a privileged opportunity that he had negotiated specifically to compensate them for their losses in the oil and gas leases. He stated that the second investment scheme, which he called, variously, the "Kyro Payback Schedule" and "Kyro New York Soil Savers Per Ton Remedy Structure," would be a "cure" and a "remedy" that would allow them to "recoup 100% of your investment in Kyro's Brookshire properties and Wyoming properties" within " 2-3 years."

3. In the second investment scheme, proposed to Plaintiffs as a remedy, PARSONS, still an unlicensed broker-dealer, sold Plaintiffs unregistered shares in corporations known as Fuel FX, Soil Savers, Soil Savers-NY, and FX Technologies. According to PARSONS, Fuel FX and Soil Savers held the rights to revolutionary new fuel-saving and soil remediation patents. PARSONS represented that he had personally investigated these companies and their technologies, and assured Plaintiffs that the companies were so profitable, and had gathered so much future business, that Plaintiffs would receive an extraordinarily high return on their investments. PARSONS' promotion of these companies was so persuasive that Plaintiffs, despite having lost large sums of money in the Brookshire and Wyoming investments, handed

1  over yet more of their savings to PARSONS in order to obtain the benefit of the remedial scheme

2  that PARSONS said would repay their earlier losses.

3      4.     In reality, PARSONS' representations regarding Fuel FX and Soil Savers were

4  untrue.  Fuel FX and Soil Savers did not hold the patents described by PARSONS, and Plaintiffs

5  were given false accounting records, inflated sales figures, false projections of current and future

6  projects, and other documentation that misled Plaintiffs and induced them to purchase worthless

7  shares in the Fuel FX and Soil Savers companies.

8      5.     PARSONS did not offer THE BISHOPS an interest in Fuel FX and Soil Savers.

9  Instead, PARSONS concealed his fraud from THE BISHOPS by providing false explanations as

10  to why BISHOP's oil and gas investments were not productive and assuring THE BISHOPS that

11  the production problems would soon be resolved.   As a result, THE BISHOPS continued to buy

12  investments from PARSONS until 2004, and their discovery of PARSONS' fraud was delayed

13  until shortly after that time.

14      6.     In summary, the conduct of PARSONS and the other Defendants caused Plaintiffs

15  and THE BISHOPS to suffer enormous financial losses and continues to cause Plaintiffs and THE

16  BISHOPS grave and irreparable harm.

17  **JURISDICTION AND VENUE**

18      7.     This Court has original jurisdiction over this action pursuant to the Securities

19  Exchange Act of 1934 ("Exchange Act") 15 U.S.C. § 78.J(b) and SEC Rule 10(b-5) at 17 CFR

20  240.10(b-5).

21      8.     This Court has supplemental jurisdiction over the related Counts Two through Ten

22  because these claims are so related to the above federal claims that they form a part of the same

23  case or controversy and under 28 U.S.C. 1367(a).  There is also supplemental jurisdiction under

24  28 U.S.C. 1332.

25      9.     This Court has supplemental jurisdiction over the related Counts Four and Five in

26  that these claims are so related to the above federal claims that they form a part of the same case

27  or controversy.

28      10. This Court has personal jurisdiction over Defendants in that Defendants reside in

---

and/or are doing business in the State of California and in this District.  In addition, many of the acts of fraud  and misrepresentation complained of herein occurred in the State of California and in this District.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391 (a)(2) and (b)(2).

## AVERMENTS COMMON TO ALL COUNTS

## THE PARTIES

12. Plaintiff GIL LAWRENCE is, and at all times relevant was, a citizen of Washington State residing in the city of Camas.

13. Plaintiff MARINAI is, and at all times relevant was, a citizen of California, residing in the city of Oakland.

14. Plaintiff STEELE is, and at all times relevant was, a citizen of Virginia.

15. Plaintiff J. LAWRENCE  is, and at all times relevant was, a citizen of Washington State.

16.     Plaintiff FLAXEL is, and at all times relevant was, a citizen of Oregon, residing in the city of North Bend.

17. Plaintiff GEORGE BISHOPS is, and at all times relevant was, a citizen of California, residing in the city of San Diego.

18. Plaintiff JANET BISHOP is, and at all times relevant was, a citizen of California, residing in the city of San Diego.

19.     Plaintiffs GEORGE BISHOP and JANET BISHOP as Trustees of the BISHOP LIVING TRUST DATED 1/11/77 are, and at all times relevant were, a citizens of California, residing in the city of San Diego.

20. Plaintiffs are informed and believe, and on that basis allege, that defendant MIKE PARSONS is, and at all times relevant was, a resident of Bonita, California, and an officer and director of KYRO, INC.

21. Plaintiffs are informed and believe, and on that basis allege, that defendant KYRO, INC., is both a Texas and a California corporation, with its principal place of business in California and conducting business in the State of California, including the County of San Diego.

22. The true names and capacities, whether individual, corporate, associate, or otherwise, of all Defendants sued herein as DOES 1 through 100 are unknown to Plaintiffs because the fraudulent investment scheme involved corporations and limited liability companies in various states, including Texas, Oklahoma, Florida, New York, and California. Because of the complex nature of Defendants' fraudulent schemes and their covert attempts to conceal their wrongdoing, there are individuals and business entities that may have participated in Defendants' fraudulent scheme and should be included as defendants. Accordingly, Plaintiffs sue said Defendants by such fictitious names. Plaintiffs will seek leave of court to amend their Complaint to state their true names and capacities when the same have been ascertained. Plaintiffs are informed and believe and on that basis aver that said Defendants are liable to Plaintiffs as a result of their participation in all or some of the acts hereinafter set forth.

## GENERAL ALLEGATIONS

23. PARSONS, an unlicensed broker dealer, offered and sold securities to Plaintiffs and THE BISHOPS as fractionalized interests in various gas and oil leases, debentures, and other securities owned by or recommended by his corporation, KYRO. He later offered and sold securities to Plaintiffs as interests in Fuel FX, Soil Savers, and Soil Savers-related companies. In selling stock in Fuel FX and Soil Savers, PARSONS not only acted as a broker-dealer but also as a representative of these corporations. At no time did PARSONS disclose to Plaintiffs or THE BISHOPS that he was not a licensed broker-dealer.

24. PARSONS formed corporations named KYRO, Inc., in both California and Texas. Acting through KYRO, PARSONS offered Plaintiffs and BISHOP investments in oil and gas leases, including Brookshire Dome oil and gas development, Blue Ridge and Boling Fields, Nesbett oil/gas drilling, Ewing oil/gas drilling, LaReata #1 and #2, Jack Starr oil/gas drilling, Wright Twomey 2, Wyoming Groves #1 and Finley #4. These investments were made either through KYRO or Sovereign Chief Ventures, a separate corporation.

25. In offering these investment opportunities to Plaintiffs, PARSONS knowingly made false statements and concealed negative information regarding the nature, rate of return, and financial prospects of the investments to induce Plaintiffs and THE BISHOPS to purchase them.

1    Specifically, PARSONS informed Plaintiffs and THE BISHOPS that the oil and gas investments

2    were "low risk" and made numerous misleading assurances about their productivity, as set forth

3    herein below.  PARSONS also failed to disclose to Plaintiffs and THE BISHOPS all the monies

4    he was receiving from the sale of the oil and gas interests.  In reliance on PARSONS'

5    representations, Plaintiffs and THE BISHOPS purchased the investments and suffered great

6    financial damage as a result.

7            26. To placate Plaintiffs and prevent what PARSONS perceived as the threat of

8    litigation, PARSONS assured Plaintiffs he would perform on his promises and provide a "cure"

9    and a "remedy" in the form of a new investment opportunity that he had specially negotiated to

10   allow them to "recoup 100% of your investment in Kyro's Brookshire properties and Wyoming

11   properties" within " 2-3 years."  PARSONS referred to the proposed remedial investment

12   opportunity variously as the "Kyro Payback Program" and the "Kyro New York Soil Savers Per

13   Ton Remedy Structure."  Under the Kyro Payback Program/Remedy Structure, PARSONS

14   proposed that if Plaintiffs  collectively invested $1.2 million with Fuel FX/Soil Savers, they would

15   receive a "reward" in the form of per-ton royalty payments on soil remediation work performed by

16   Soil Savers until Plaintiffs had received compensation of $4.2 million.

17           27. In the schemes involving Fuel FX and Soil Savers, PARSONS acted in concert

18   with the principals of these corporations,  Larry Johnson and William Rippetoe, and represented

19   to investors that Fuel FX and Soil Savers owned the rights to revolutionary proprietary

20   technologies, including issued patents and pending patents.  Additionally, PARSONS

21   misrepresented the value, assets, client base, and work-in-progress of Fuel FX, Soil Savers, and

22   their various related corporations.

23           28.      Concerning Fuel FX, PARSONS represented that Fuel FX's technology allowed

24   the controlled restructuring of fluids, including fuels, so that they attained a molecular state more

25   susceptible to combustion.   According to PARSONS, Fuel FX was successfully marketing large

26   quantities of a "reactor," claimed to be an onboard fuel-treatment device that raised the quality of

27   diesel or gasoline fuel so that vehicles fitted with the device could travel more miles per gallon.

28   To entice Plaintiffs to invest money in Fuel FX, PARSONS offered them royalties on each Fuel

1    FX reactor unit sold by Fuel FX.  According to PARSONS, the royalties would provide Plaintiffs

2    a steady source of income.

3          29.    Concerning the Soil Savers entities, PARSONS represented that Soil Savers and its

4    related entities held ownership of various patents and pending patents for the Soil FX Treatment

5    System that allegedly treated high volumes of contaminated soil quickly and with minimal energy

6    costs.

7          30.    In reliance on PARSONS' representations, Plaintiffs purchased these investments

8    by means of various Investment Agreements and Subscription agreements.  In those agreements,

9    Fuel FX, acting through PARSONS, represented to Plaintiffs that Soil Savers had issued a license

10   to Fuel FX for the proprietary technology, and that, in return, Fuel FX made license payments to

11   Soil Savers.  The Investment Agreements purported to grant Plaintiffs royalty payments from Soil

12   Savers on units sold under the licensing agreement.  The Agreements also purported to give

13   investors who purchased stock in Fuel FX the right to purchase stock in Soil Savers and receive

14   royalties on each ton of Soil Savers work as well.

15          31. Thus, PARSONS represented to Plaintiffs: (a) that he had negotiated a favorable

16   agreement on their behalf with the principals of Fuel FX and Soil Savers, Larry Johnson and

17   William Rippetoe; and (b) this investment would entitle KYRO investors to receive not only stock

18   in these companies but also royalties on each unit sold by Fuel FX and each ton of soil processed

19   by Soil Savers.   Plaintiffs were unaware of the falsity of PARSONS' representations or that the

20   Fuel FX and Soil Savers securities were worthless.

21          32. PARSONS authored and/or disseminated numerous promotional and marketing

22   documents, some on Fuel FX letterhead, extolling the growth of these corporations and their

23   dramatic investment potential.  PARSONS further represented that several New York firms "want

24   to do an IPO" of Fuel FX stock.

25          33.    Persuaded by PARSONS' convincing account of the investment opportunity

26   presented by Fuel FX and Soil Savers, and believing that PARSONS earnestly wished to

27   compensate them for their earlier losses, Plaintiffs set aside their doubts and agreed to invest

28   additional money in these companies.  To participate in the "Kyro Payback Program," however,

---

FIRST AMENDED COMPLAINT
FOR SECURITIES FRAUD                          7                    Case No. 05 CV 1259 IEG

PARSONS required Plaintiffs to execute an agreement purporting to release him from all previous liability. The release was a backup attempt by PARSONS to prevent litigation by the KYRO investors. It was fraudulently induced, however. The FX and Soil Savers securities were worthless and therefore provided no consideration.

34. PARSONS' misrepresentations to Plaintiffs regarding Fuel FX and Soil Savers were numerous. In meeting with individual investors, PARSONS made extravagant claims for Soil Savers' alleged 18 patents and other proprietary information. PARSONS assured Plaintiffs he had investigated the Fuel FX and Soil Savers technology personally. But no patents were ever issued to Soil Savers. The U.S. Patent and Trademark Office lists William Rippetoe as the co-inventor of six patents filed between 1994 and 1997 and issued between 1996 and August 2000. But long before Soil Savers was incorporated, all six patents (Nos. 6,106,787; 6,036,849; 5,554,301; 5,538,081; 5,485,883 and 5,482,629) had been assigned by Rippetoe and his co-inventor, David Shroff, to Universal Environmental Technologies, Inc., a Florida corporation formed on January 9, 1995, of which Rippetoe was a director. Parsons was aware of these facts, a matter of public record that he claimed to have investigated, but he concealed them from Plaintiffs to induce them to purchase the securities. Instead, he announced that Soil Savers, Inc., "owns all of the rights to the 18 patents utilized by [its] subsidiary companies," and told Plaintiffs, "Our law firm Baker & Botts prepared these patents. They provide us a broad scope of protection, which will hamper the market entry of others. They are continuously protected and monitored for infringement by our law firm. We anticipate a 3-4 year minimum jump on any competition while our patents are in pending status. This will be followed by strong enforcement policies after issuance, thwarting any market entry efforts of competitors for several additional years."

35. In extolling the success of the Fuel FX reactor, PARSONS grossly overstated the number of vehicles Fuel FX had in its leasing program and made detailed, comprehensive misrepresentations about its future business. Using Fuel FX letterhead, PARSONS informed Plaintiffs in a letter dated November 2002 that "CEO of Fuel FX has over 50,000 trucks in his leasing programs" and that "our Coca Cola orders alone will return $204,168 based on domestic fleet wide implementation of 49,000 units." He told Plaintiffs that in 2003 Fuel FX expected to

place 50,000 to 100,000 reactor units in the domestic market alone, and that a $50,000 investment in Fuel FX would yield a $750,000 return. But in reality, Fuel FX had no significant sales, and the company was in fact sold at about that time. These facts were well known to PARSONS, who was working in concert with Fuel FX principals Johnson and Rippetoe. PARSONS was writing on Fuel FX letterhead and referring to Fuel FX's business orders as "our orders." Moreover, he had assured Plaintiffs he had personally investigated Fuel FX. Therefore, he could not have been unaware of the true facts. Rather, he concealed them from Plaintiffs to induce Plaintiffs to purchase the securities.

36. After Plaintiffs had invested in Fuel FX they were offered, as a "reward" for their investment, the opportunity to purchase Soil Savers stock, as originally promised by PARSONS. To draw Plaintiffs into the scheme, PARSONS transmitted to Plaintiffs documents prepared by Soil Savers stating that Soil Savers was a growing, viable, ongoing business, owning a majority of the stock in various companies with estimated total stock value of $68 million. Soil Savers made this representation via an April 8, 2003, memo from Larry Johnson to "Parties of Interest" that specifically represented that Fuel FX had an estimated value of $25 million, with Soil Savers owning 68 percent of the 25 million issued shares; that Fuel FX International, Inc., had an estimated value of $25 million, with Soil Savers owning 70 percent of the 25 million issued shares; that Soil Savers of Florida, Inc., had a current value of $5 million (which would "dramatically increase upon funding of the targeted fixed base operations in the region"), with Soil Savers owning 100 percent of the 25 million issued shares; that Soil Savers-NY had a value of $8 million, with Soil Savers owning 100 percent of the 25 million issued shares; and that FX Technologies had an estimated value of $8 million, with Soil Savers owning 100 percent of the issued shares. A true and correct copy of the April 8, 2003, memo is attached hereto as Exhibit "1" and incorporated herein by this reference.

37. In this memo Soil Savers represented that it had 25 million shares authorized and issued, and that it held the ownership of 18 provisional patents with the intellectual property valued at $50 million. These statements were false. Soil Savers had never held 18 provisional patents, nor were the company and its assets ever valued at $48 million. In addition, Soil Savers

represented that it was operating at a profit; this too was false.  In September 2003 Larry Johnson mentioned to some investors that Soil Savers, Inc., had lost $2 million during the previous two years but minimized the significance of this fact.  Moreover, this information was never disclosed to any of the Plaintiffs during the time they were investing in Soil Savers, Inc., and Fuel FX.  To the contrary, Plaintiffs received only representations, in the form of updates and memoranda, that Soil Savers, Inc., had many projects that would generate millions of dollars for Soil Savers, Inc., and Fuel FX, and would result in large royalty payments to Plaintiffs.  Parsons, who was working closely with the principals of Fuel FX and Soil Savers, was aware that these facts were untrue but concealed this from Plaintiffs to induce them to purchase additional securities.

38.     In approximately April 2003, PARSONS stated in a letter that Plaintiffs would receive a $1.50 per-ton royalty on all work performed by Soil Savers, and that Soil Savers currently had under contract approximately 3.5 million tons to be treated over the next 14-18 months.  Parsons, who was working with the principals of Fuel FX and Soil Savers, was aware that these facts were untrue but concealed this from Plaintiffs to induce them to purchase additional securities.

39. Plaintiffs relied on these representations, which were transmitted and endorsed by PARSONS.  Thus, as a result of PARSONS' actions, Plaintiffs were led to believe that Soil Savers and its subsidiaries had vast assets; had extensive past experience in completing soil remediation jobs; had current contracts for soil remediation projects; and expected a large number of future contracts for soil remediation projects.  Parsons, who was working in concert with the principals of Fuel FX and Soil Savers, was aware that these facts were untrue but concealed this from Plaintiffs to induce them to purchase additional securities.

40. PARSONS represented to Plaintiffs that Fuel FX and Soil Savers would issue royalties and royalty fee statements to Plaintiffs on a monthly basis.  But this did not occur.  For the most part, royalties were not issued at all.  When royalties were issued, they were issued in a minimal amount designed only to entice investors to make further investments in Fuel FX or Soil Savers.  Parsons, who was working in concert with the principals of Fuel FX and Soil Savers, was aware that no real royalties were being issued, but concealed this from Plaintiffs to induce them to

purchase additional securities.

41. When PARSONS represented to Plaintiffs that they were buying stock in Fuel FX, he made no distinction between domestic and international divisions of Fuel FX.  Rather, he led Plaintiffs to believe they were buying stock in the entire company for all the work it performed and all the reactors it sold, in both domestic and international markets.  Consistent with these representations, Plaintiffs received stock certificates for "Fuel FX, Inc."  Yet, after buying the stock, Plaintiffs were surprised to learn that they held only domestic stock and royalty rights in Fuel FX, and that a "Fuel FX International" had been sold to Eric Ulsteen in San Diego, California.  PARSONS was aware that the stock he represented to Plaintiffs as Fuel FX stock did not include international rights but failed to disclose this fact in order to induce Plaintiffs to purchase the stock.

42. Fuel FX International and Eric Ulsteen absorbed each investor from Fuel FX domestic at the rate of 2 shares domestic for 1 share international.  Although PARSONS had represented to Plaintiffs that they held a per unit ton royalty, Plaintiffs were now informed that total unit royalties had been over-provided, and that Fuel FX could not proceed on that arrangement.  Instead, Plaintiffs were told they must accept a revocation of their royalty and receive in its place a percentage of gross unit sales, less commissions, which would be paid every six months.

43. Plaintiffs were further led to believe by PARSONS that the money invested by Plaintiffs would be used by Soil Savers to build up its infrastructure and fixed site facilities so that Soil Savers could grow its market share and provide royalty payments to Plaintiffs. These representations too were false.  Money invested by investors was not used by Soil Savers and its subsidiaries for business purposes, such as site expansion, developing new contracts and working on projects.  Instead, some of Plaintiffs' money was received by PARSONS as undisclosed commission for inducing his KYRO oil and gas investors to purchase interests in Fuel FX and Soil Savers.  The remainder of Plaintiffs' money was diverted by Larry Johnson and William Rippetoe into their own bank accounts.  These payments to PARSONS, Johnson, and Rippetoe were not legitimate compensation for their services.  Rather, PARSONS, Johnson, and Rippetoe

1   were using Soil Savers and its assets to personally enrich themselves to the detriment of Plaintiffs.

2   Parsons, who was working in concert with the principals of Fuel FX and Soil Savers, and received

3   substantial remuneration from Johnson and Rippetoe, was aware that Plaintiffs' money was being

4   diverted to Johnson and Rippetoe's personal use but concealed this from Plaintiffs to induce them

5   to purchase additional securities.

6   44. When no more money could be extracted from investors, Larry Johnson, as

7   president of Soil Savers, entered into a licensing agreement with a business entity named Zoom,

8   under which Soil Savers agreed to transfer its intellectual property and assets, such as they were,

9   to Zoom.  On May 24, 2004, Johnson formed SSI Holdings, a Texas corporation, to hold the

10  intellectual property assets.  As a result of these actions, Plaintiffs were further deprived of the

11  assets, if any, that formed the basis of their investment in Soil Savers and Fuel FX.  Again this

12  transfer was without the benefit of notice or consent by shareholders, who have never been

13  notified of or attended a shareholders meeting.

14  45. On or about December 2004 Larry Johnson sent notice to the employees of Soil

15  Savers, Inc., stating that he was closing down the corporation.  On December 1, 2004,  Johnson

16  and Rippetoe formed Soil Savers of Florida, LLC, a Florida limited liability company.   Johnson

17  and Rippetoe are now marketing Soil Savers of Florida, LLC, to potential investors, describing the

18  same "revolutionary patented technology" they used to induce Plaintiffs to purchase shares in Soil

19  Savers.

20  **GILBERT LAWRENCE, MARLEE STEELE, AND J. LAWRENCE TRANSACTIONS**

21  46.      GIL LAWRENCE'S association with PARSONS began in 1993 when PARSONS

22  was licensed and selling initial Federal Subsidized Low Income Housing shelters and tax credits

23  for Century Pacific Corporation in Los Angeles.  PARSONS left that employment and began

24  selling gas and oil drilling programs.  GIL LAWRENCE invested through PARSONS in the year

25  1993, 1994 and 1995 with little success.  In May 1996 GIL LAWRENCE requested payment from

26  PARSONS for the losses, which were based on PARSONS' recommendation.

27  47.      PARSONS stated that he did not have the money to pay GIL LAWRENCE, but

28  would  place GIL LAWRENCE in projects that would return his investment losses.  On or about

1   March 6, 1997, PARSONS represented that he felt responsible to GIL LAWRENCE for the oil

2   and gas drilling investments in which PARSONS placed GIL LAWRENCE.  In early February

3   1998, after numerous discussions, PARSONS agreed to sign over 10,000 shares of NBO Stock

4   indicating that, when NBO went public, the increase in value would compensate GIL

5   LAWRENCE'S prior losses.

6        48.     PARSONS also promoted an investment called, informally, Casablanca Coffee.

7   PARSONS put together the venture for twelve (12) investors.  PARSONS represented that the

8   business plan consisted of building two (2) drive-thru stores. On May 1, 1998, GIL LAWRENCE

9   invested $15,000 for one unit in Casablanca Coffee.  From the beginning the business was poorly

10  managed.  On October 25, 1999, Casablanca Coffee sent an update to investors. A true and correct

11  copy of the update is attached as Exhibit "2."  On July16, 2000, GIL LAWRENCE paid a $6,000

12  assessment charge. This investment was later included by PARSONS among the losses for which

13  GIL LAWRENCE was to receive a payback.

14       49. PARSONS then approached GIL LAWRENCE in early 2000 regarding the

15  Brookshire Salt Dome investment.  This involved a ten-well development drilling prospect in

16  Waller County, Texas, involving 24.506 acres, referred to as the Williams Lease.  PARSONS,

17  through KYRO, provided GIL LAWRENCE with an investment packet.  A true and correct copy

18  of the investment packet for the Williams lease is attached hereto as Exhibit "3." Under the terms

19  of the investment, a consortium of six oil companies, which had jointly developed the oil reserves

20  on the Williams Lease, would head the effort.   PARSONS represented that KYRO owned a 6.3

21  percent working interest in the investment. Under this investment KYRO was required to invest

22  $158,240 toward the development of the property.  KYRO offered to participate in a 10% - 90%

23  split of the net revenue or sale of the lease, with participants receiving 90% of the net revenue or

24  sale price and KYRO receiving 10% of the net revenue or sale.

25       50.PARSONS provided GIL LAWRENCE a history of the leases indicating that, as of

26  March 2000, a total of 61 wells had been drilled with only two dry holes. As part of the

27  investment package PARSONS provided, at page 23, a "Monthly Cash-Flow" showing a $3,310

28  monthly return on investment with the payout in 7.6 months based upon ten wells, and a 5.6

1  month payout with 15 wells.  He also showed a return of investment at the sale of the properties

2  showing a high return.

3      51.     GIL LAWRENCE invested $45,104 for 0.5% working interest to drill and

4  complete up to ten development wells.  KYRO agreed to waive the KYRO 10 percent net revenue

5  interest and KYRO'S  10 percent net sale proceeds.  GIL LAWRENCE signed the Participation

6  Agreement on March 16, 2000.  The signed Participation Agreement is part of the Brookshire Salt

7  Dome investment packet attached as Exhibit "4."

8      52.     On March 31, 2000, PARSONS told GIL LAWRENCE that the Brookshire Salt

9  Dome investment was the "hottest oil/gas play in Texas and there would be three-hundred and

10  fifty to four-hundred wells drilled."  PARSONS also represented to GIL LAWRENCE that he

11  would get ten  times his investment when the Williams lease was sold later in year 2000 at an oil

12  price of $25 per barrel.   In addition to the original investment, in March, April, and May 2000

13  GIL LAWRENCE invested a total of $302,000 plus other offsets, which made his total investment

14  in Brookshire $378,888.  These additional investments are set forth in a document titled

15  "Ownership and Additional Acreage" showing a total investment of $ 378,888. A true and correct

16  copy of the  Ownership and Additional Acreage is attached as Exhibit "5" hereto.

17      53. The total return on investment GIL LAWRENCE received was $16,439 with no

18  return of principal. The last payment he received was for production in October 2002.

19      54. At the same time, PARSONS offered an investment in stock of Sovereign Chief

20  Ventures at $2.10 per share equaling 21, 249 shares.  PARSONS represented that GIL

21  LAWRENCE would get back at least $4.50 per share.

22      55. On March 20, 2000, GIL LAWRENCE purchased 21,429 shares of Sovereign

23  Chief Ventures for $45,001 representing a cost of $2.10 per share. A true and correct copy of the

24  Letter Agreement is attached as Exhibit "6."

25      56.     PARSONS states, "It is the intention of KYRO to liquidate all shares and deliver

26  the proceeds to Participant when the shares have doubled in value."  On or about May 12, 2002,

27  PARSONS told GIL LAWRENCE this stock would double in two to three years and, depending

28  on the Brookshire development, could rise to $300 per share.  This increase in share price did not

1   occur. To the contrary, the price of the shares substantially declined.

2         57.    PARSONS also offered another investment in Sovereign Chief involving

3   convertible debentures.

4         58.    On March 13, 2000, PARSONS informed GIL LAWRENCE that Sovereign Chief

5   Ventures, a leading participant in the Brookshire Salt Dome Oil/Gas Development, and its

6   subsidiary, Sovereign Resources, Inc., was to acquire additional fields nearby and near Houston

7   called Blue Ridge and Boling for $5 million and would use $1million to develop the fields.

8   Parsons further stated they would issue $6 million in convertible debentures. On March 31, 2000,

9   PARSONS further represented to GIL LAWRENCE that, as part of the acquisition, Sovereign

10   Chief Ventures would receive $50 million in assets, two rigs, and 3-4 million barrels of petroleum

11   reserves worth $8-10 million. In addition, they would received 100 drilling sites, offices, and a

12   staff of 15. PARSONS represented that KYRO had committed to taking $2 million of the $6

13   million debentures. PARSONS told GIL LAWRENCE that there would be "zero risk" if GIL

14   LAWRENCE invested. Accordingly GIL LAWRENCE invested $64,750 to be held in escrow. A

15   true and correct copy of the Sovereign Chief Ventures letter dated August 14, 2000, is attached as

16   Exhibit 7. The April 3, 2000, news release stated that if approval from the Canadian Ventures

17   Exchange was not received by September 1, 2000, the $6 million in assets would revert to

18   debenture holders. The approval was never received, and the property was not acquired. But GIL

19   LAWRENCE still has not received his $64,750 investment from KYRO/PARSONS.

20         59. In addition to the above investments, GIL LAWRENCE also invested $19,200

21   with KYRO/PARSONS in the Nesbett Oil/Gas Drilling prospect and $26,344 in the Ewing

22   Oil/Gas Drilling prospect. He also invested $21,113 for the LaReata #1 and #2 Oil/Gas Drilling

23   prospect and $3,400 in 2004 for LaReata #3 prospect. In 2000 GIL LAWRENCE invested

24   $34,664 in the Jack Starr Oil/Gas Drilling prospect. In 2001 he invested $2,106 in the Wright

25   Twomey #2 Oil/Gas Drilling prospect. He also invested $6,020 in the Wyoming Anaconda Hall

26   #1 Oil/Gas Drilling prospect and $16,788 in the Wyoming Grove #1/Finley #4 prospect. These

27   two Wyoming drillings, which totaled $22,808, plus the Nesbett $9,200 (above) were investments

28   in the PARSONS KYRO payback.

60. GIL LAWRENCE'S son, J. LAWRENCE, invested through PARSONS/KYRO in the Brookshire Dome in the amount of $20,640; in Casablanca Coffee in the amount of $15,000; and in the Sovereign Chief debentures in the amount of $6,475.  J. LAWRENCE relied on the same information that was provided to GIL LAWRENCE by PARSONS.  J. LAWRENCE is not an accredited investor.

61.     MARLEE STEELE, GIL LAWRENCE'S daughter, invested through PARSONS/KYRO $20,640 in the Brookshire Dome project and $37,500 in Fuel FX.  STEELE relied on the same information provided by PARSONS to GIL LAWRENCE.  STEELE is not an accredited investor.

62.     On or about November 12, 2002, PARSONS called GIL LAWRENCE and stated he wanted to pay back GIL LAWRENCE, as well as J. LAWRENCE and MARLEE STEELE, for certain investments with KYRO where matters "had not been right."  PARSONS told GIL LAWRENCE that the KYRO payback would include the Brookshire Dome oil/gas investments, the Casablanca Coffee investments, and the Wyoming oil/gas investments.  GIL LAWRENCE'S KYRO payback total is $365,008.  J. LAWRENCE'S KYRO payback total is $35,640.  MARLEE STEELE'S KYRO payback total is $20,640.

63.     PARSONS first approached GIL LAWRENCE about investing in Soil Savers and Fuel FX in late 2000.  On or about November 12, 2002, PARSONS telephoned GIL LAWRENCE and informed him that he could recoup losses resulting from certain investments he had made with KYRO if investors would purchase $1.2 million worth of stock and royalty in Fuel FX, which was a subsidiary of Soil Savers.  Under the proposed plan, up to 24 investors would be required to invest $50,000 minimum each.  In return Soil Savers would provide royalty payments to KYRO that would pay back the $1.2 million owed to KYRO investors on specific investments that had been nonperforming.  During this telephone call and subsequent calls, representations were made to GIL LAWRENCE as set forth in paragraphs 20-43 of this Complaint.

64. PARSONS assured LAWRENCE that KYRO investors would be compensated for their losses within two to three years, and there were no risks to the plan.  PARSONS represented that Fuel FX would be selling 500 units a month by January 15, 2002, and 100,000 units in the

1  year 2003. PARSONS told GIL LAWRENCE that the investment was a guaranteed payback for
2  all losses sustained by GIL LAWRENCE, J. LAWRENCE and MARLEE STEELE. Relying on
3  these representations, GIL LAWRENCE purchased $100,000 of Fuel FX stock and royalty in an
4  IRA, followed by a $150,000 cash investment. In reality, no royalties were paid to GIL
5  LAWRENCE, J. LAWRENCE, or MARLEE STEELE as part of the KYRO payback promised by
6  PARSONS.

7  　　　65. In reliance on the above-described representations made by PARSONS, GIL
8  LAWRENCE entered into various Investment Agreements and Subscription Agreements to
9  acquire Fuel FX stock and royalties. On or about December 4, 2002, GIL LAWRENCE and Fuel
10  FX entered into an Investment Agreement. A true and correct copy of the December 4, 2002
11  Investment Agreement is attached as Exhibit 8 and incorporated herein by reference. For the sum
12  of $100,000, GIL LAWRENCE was to receive $8.33 per unit royalty on Fuel FX Reactors
13  manufactured by Fuel FX. The $8.33 royalty was to continue in effect for the life of the patent.

14  　　　66. On or about February 1, 2003, GIL LAWRENCE and Fuel FX entered into another
15  Investment Agreement. A true and correct copy of the February 1, 2003, Investment Agreement is
16  attached as Exhibit 9 and incorporated herein by reference. Again, for the sum of $100,000 GIL
17  LAWRENCE was to a receive $8.33 per unit royalty on Fuel FX Reactors manufactured by Fuel
18  FX, Inc. Again, the royalty was to continue in effect for the life of the patent (which was never
19  obtained) at $8.33 per unit.

20  　　　67. On or about April 11, 2003, GIL LAWRENCE AND Fuel FX entered into a
21  Subscription Agreement whereby GIL LAWRENCE received 104,165 shares of Fuel FX stock for
22  an investment of $50,000. A true and correct copy of the April 11, 2003, Subscription Agreement
23  is attached as Exhibit 10 and incorporated herein by reference.

24  　　　68. On or about early April 2003, during a conversation between Larry Johnson and
25  GIL LAWRENCE, Johnson represented to LAWRENCE that Soil Savers held all patents for the
26  Soil Savers technology, and that if GIL LAWRENCE invested $400,000, he would receive a
27  $0.25 royalty for the life of Soil Savers' patents, which was 15 years, on every ton processed
28  worldwide. Johnson further represented to LAWRENCE that in 10 to 12 years, LAWRENCE

FIRST AMENDED COMPLAINT
FOR SECURITIES FRAUD                 17             Case No. 05 CV 1259 IEG

1    would make 100 times his investment, and that Soil Savers had, on a summary sheet, jobs

2    involving millions of tons, and Soil Savers would get 1/3 of these jobs.

3          69. On or about early April 2003, GIL LAWRENCE was contacted via telephone by

4    PARSONS who represented to GIL LAWRENCE that J.S.M. Company would fund soil

5    remediation fixed sites in the United States, and would have 50 sites in the next few years and that

6    J.S.M. wanted Soil Savers' parent stock. This stock was allegedly worth $4.00 per share.

7    PARSONS also represented that J.S.M. wanted to take Soil Savers public. During this same time

8    period Larry Johnson told GIL LAWRENCE that over the next 18-24 months Soil Savers would

9    process 2 million tons in the domestic market alone. He further informed LAWRENCE that Soil

10   Savers would process an additional 55 million tons in Kuwait and a million tons in Oslo.

11   Johnson further represented that, in the next five years Soil Savers would treat 2 to 4 million tons

12   each year in the U.S.  Johnson represented to LAWRENCE that Soil Savers would treat a million

13   tons in Florida. As a result of these conversations, GIL LAWRENCE purchased 500,000 shares

14   and a $0.40 overall royalty for a $700,000 IRA rollover, and purchased 125,000 shares and an

15   additional $0.10 overall royalty for a $100,000 Roth IRA rollover.

16         70. As part of the scheme to induce investment in Soil Savers, Johnson drafted a

17   memo dated April 8, 2003, to "Parties of Interest" re: Limited Stock of Soil Savers, Inc. A true

18   and correct copy of the April 8, 2003, memo is attached hereto as Exhibit 1 and incorporated by

19   reference. On or about April 8, 2003, Johnson mailed the April 8, 2003, memo to GIL

20   LAWRENCE for the purpose of providing information to induce GIL LAWRENCE to invest in

21   Soil Savers. PARSONS discussed this memo with GIL LAWRENCE, confirming the

22   representations contained therein.

23         71. In the April 8, 2003, memo, L. Johnson made the following representations:

24   •      Soil Savers held approximately 15 provisional patents that were currently being

25          used by Soil Savers and its affiliated companies

26   •      Soil Savers owned the majority of Fuel FX, Inc. (domestic); Fuel FX International,

27          Inc.; Soil Savers of Florida, Inc.; Soil Savers of New York, Inc.; and FX

28          Technologies, Inc. (water division).

---

1  •   Soil Savers had licensed various technologies to these companies for use.

2  •   Soil Savers licensed Soil Savers technologies to a "substantial" company in

3      Norway for a $400,000 up-front fee and a technology transfer fee of $5 per ton, and

4      the projects included the Oslo Airport.

5  •   Soil Savers entered into an alliance consisting of a large Kuwaiti company and a

6      large engineering company in the U.S. to pursue the cleanup of Kuwait after the

7      current war.  Estimates of cleanup were in the 30 to 36 <u>billion</u> dollar range.

8  •   Soil Savers was chosen by the United Nations to complete a feasibility study prior

9      to the start of the war, and that the current route with the alliance was much more

10     beneficial than working with the U.N.

11 •   Soil Savers of Florida, Inc., was beginning the process of establishing a fixed base

12     operational facility expected to be completed by fiscal year 2003.

13 •   Soil Savers of New York had $12 million in projects arranged for the next 12-18

14     months, and a fixed base targeted for the market in 2003-2004.

15 •   FX Technologies, Inc., had been awarded a contract to clean up Lake Reseda

16     outside Los Angeles, and that this was of particular significance because FX

17     Technologies had been sole-sourced on the project, which would utilize the "FX

18     Tri-Cyclonic Separator."

19 •   Fuel FX, Inc. (North America market) was making slow but steady progress in the

20     domestic market and had engaged a marketing firm to enhance its domestic sales.

21 •   Fuel FX International, Inc., was making rapid  progress in foreign countries; that

22     Tunisia had placed an order of 1,250 units which had been sold out within two

23     weeks; that the Tunisians were now developing efforts in Morocco, Malta, Algeria,

24     Egypt, and Jordan, and expected increased sales from this region; and that Spain

25     and Brazil were currently testing the technology, as was China in preparing for its

26     first purchase order.

27 •   Soil Savers was negotiating with some large New York institutional funding

28     sources who had expressed a deep desire to facilitate the capitalization of fixed soil

remediation bases nationwide and that these individuals had strong government contacts that would be accessed for additional market share.

• These investors had access to extremely large capital sources which would enable Soil Savers to gain substantial market share and national recognition, and that it was the desire of these firms to capitalize and grow Soil Savers and its affiliates over the next few years in order to build value for a consolidation and potential public offering.

• There was a window of opportunity to purchase up to 10 percent, or 2,500,000 shares, of Soil Savers, for $1.10 per share; that any purchases over $250,000 would be exercised for a $1 per share; and that the stock at this price would be available for a very short time.

72. Larry Johnson concluded the memo by stating that he believed investors would want the stock because it was tied to everything Soil Savers was involved in, and any interested investors should contact him for the appropriate investment and subscription agreements to be forwarded to them.

73. GIL LAWRENCE, relying upon the above-referenced representations that Soil Savers was an established soil remediation company with ongoing projects and future projects ensuring future growth, entered into Investment Agreements and Subscription Agreements with Fuel FX, Soil Savers, Inc., and Larry Johnson for the purchase of stock and royalties.

74.    On or about April 11, 2003, GIL LAWRENCE and Fuel FX entered into an Investment Agreement whereby GIL LAWRENCE paid Fuel FX $50,000 for a $4.17 per unit royalty on Fuel FX Reactors manufactured by Fuel FX. A true and correct copy of the April 11, 2003, Investment Agreements is attached hereto as Exhibit 11 and incorporated herein by this reference. The royalty was to continue in effect for the life of the patent at $4.17.

75. On or about April 16, 2003, GIL LAWRENCE and Soil Savers entered into another investment agreement. A true and correct copy of the investment agreement is attached hereto as Exhibit "12" and incorporated herein by reference. Pursuant to the terms of the investment agreement, GIL LAWRENCE was to receive $0.10 U.S. per ton royalty on soil treated

1    by Soil Savers worldwide, with payment received quarterly for the tonnage treated and payments

2    received by Soil Savers.  The royalty was to continue in effect for the life of Soil Savers and the

3    patents.  In conjunction with the Investment Agreement, GIL LAWRENCE and Soil Savers

4    entered into a Subscription Agreement signed April 11, 2003.  A true and correct copy of the

5    Subscription Agreement is attached hereto as Exhibit "13" and incorporated herein by reference.

6           76. On or about April 10, 2003  GIL LAWRENCE and Soil Savers entered into

7    another investment agreement.  A true and correct copy of the May 15, 2003, Investment

8    Agreement is attached hereto as Exhibit 14 and incorporated herein by reference.   Under the

9    terms of the investment agreement GIL LAWRENCE was to receive $0.40 U.S. per ton royalty on

10   soil treated by Soil Savers worldwide, paid quarterly for the tonnage treated and payments

11   received by Soil Savers.   The royalty was to continue in effect for the life of Soil Savers and the

12   patents.  In conjunction with the Investment Agreement, GIL LAWRENCE and Soil Savers

13   entered into a Subscription Agreement signed April 10, 2003, whereby LAWRENCE received

14   500,000 shares of Soil Savers common stock for an investment of $700,000.  A true and correct

15   copy of the April 10, 2003, Subscription Agreement is attached hereto as Exhibit 15 and

16   incorporated herein by reference.

17          77. Soil Savers and Larry Johnson continued to make false representations to GIL

18   LAWRENCE in furtherance of their scheme to defraud investors by making them believe that

19   Soil Savers was utilizing the investment capital to increase market share, secure remediation

20   contracts, and thereby generate royalties for investors.  On or about June 2003, in a telephone

21   conversation, Johnson again represented to GIL LAWRENCE that Soil Savers would treat

22   2,000,000 tons domestically in next 14-18 months, that Kuwait would require treatment of

23   50,000,000 tons, and future plans included using remediation for gold mining and water

24   treatment.  He further reiterated that Soil Savers expected stock market entry, IPO, and acquisition

25   by others.

26          78. On or about July 18, 2003, via telephone Johnson represented to GIL LAWRENCE

27   that Soil Savers was a minimal risk; that it had sent billing out for $300,000; and would be billing

28   $200,000 a week for nine weeks.  He also represented that Great Lakes Dredge Company wanted

1   to work with Soil Savers, and Mitsubishi would be participating in joint ventures with Soil

2   Savers.  Johnson further represented that Gordon Pump wanted to perform decontamination work

3   for Fortune 500 companies using Soil Savers technology, making Soil Savers a "few billion"

4   dollars.

5       79. Relying upon the continuing flow of information from Johnson and Soil Savers

6   regarding Soil Savers' past, current, and future projects and income, GIL LAWRENCE and Soil

7   Savers entered into another Investment Agreement on or about July 18, 2003.  A true and correct

8   copy of the July 18, 2003, Investment Agreement is attached hereto as Exhibit 16 and

9   incorporated herein by reference.   Under the terms of the Investment Agreement GIL

10  LAWRENCE was to receive $0.25 U.S. per-ton royalty on soil treated by Soil Savers worldwide,

11  paid quarterly for the tonnage treated and payments received by Soil Savers.  The royalty was to

12  continue in effect for the life of the company and the patents.  In conjunction with the Investment

13  Agreement, GIL LAWRENCE and Soil Savers entered into a Subscription Agreement signed July

14  18, 2003, whereby GIL LAWRENCE received 375,000 shares of Soil Savers, Inc., common stock

15  for an investment of $150,000.  A true and correct copy of the July 18, 2003, Subscription

16  Agreement is attached hereto as Exhibit 17 and incorporated herein by reference.

17      80. On or about August 26, 2003, GIL LAWRENCE entered into another Investment

18  Agreement with Johnson by which, for a total of $100,000, Johnson would provide 11 cents of

19  royalty and 150,000 shares of stock.  GIL LAWRENCE paid $75,000 and MARLEE STEELE

20  paid $25,000 to Johnson.  By e-mail letter of August 28, 2003, GIL LAWRENCE directed

21  Johnson to issue 40,000 shares (of the 150,000) to STEELE and provide her 3 cents royalty (of the

22  11 cents royalty).  A true and correct copy of the August 28, 2003, e-mail letter is attached hereto

23  as Exhibit 18 and is incorporated herein by this reference.

24      81. On or about September 18, 2003, GIL LAWRENCE and Soil Savers entered into

25  another Investment Agreement whereby GIL LAWRENCE was to receive $0.80 U.S. per ton

26  royalty on soil treated by Soil Savers worldwide, to be paid quarterly.  A true and correct copy of

27  the September 18, 2003, Investment Agreement is attached hereto as Exhibit 19 and incorporated

28  herein by reference.   The royalty was to continue in effect for the life of Soil Savers and the

FIRST AMENDED COMPLAINT
FOR SECURITIES FRAUD                    22          Case No. 05 CV 1259 IEG

patents.  In conjunction with the Investment Agreement, GIL LAWRENCE and Soil Savers entered into another Subscription Agreement dated September 22, 2003, whereby GIL LAWRENCE received 150,000 shares for an investment of $150,000 at 0.80 per share.  A true and correct copy of the September 22, 2003, Subscription Agreement is attached hereto as Exhibit 20 and incorporated herein by reference.

82. On or about July 22, 2004, via telephone, Larry Johnson disclosed for the first time the Zoom transaction.  Johnson represented to GIL LAWRENCE that Zoom could provide $100 million in capital to Soil Savers; that the Kuwait Project would involve processing 50,000,000 tons; and that this would give investors a royalty for the third quarter of 2004.

83. On or about August 7, 2004, via telephone, Johnson represented to GIL LAWRENCE, "Zoom is scheduled – ready to go gung ho and provide capital to Soil Savers." Johnson reiterated, "Soil Savers stockholders are in fine shape.  If work is only performed in the U.S. then we have $57,000,000 projected income in next year.  Worst case is we will do 25,000,000 tons over next 6 months."

84. On or about September 7, 2004, Johnson represented to GIL LAWRENCE via telephone that Zoom had project listings of $60 million for next 24-30 months; Soil Savers would receive license fees in excess of what Soil Savers needed from the technology pass-through to Soil Savers Holdings; Soil Savers' royalty owners would continue to be paid per-ton royalties; and that Soil Savers could then sell the new technology it owned for $25 million.  Johnson further represented that two improvements were going on currently, and ZOOM would need to pay $10 - 15 million for these because  Zoom was effectively held hostage.  Johnson assured GIL LAWRENCE that he would rapidly get his money back, and investors would receive five to six times their investment during next 18-24 months.  Johnson also said the stock GIL LAWRENCE owned was in a company that controlled 20 different patents in Soil Savers.  He assured GIL LAWRENCE that, because the deal was a transfer of technology/sales, GIL LAWRENCE would be paid a dividend.

85. At no time did Soil Savers or Johnson represent to GIL LAWRENCE that Soil Savers would or did transfer its intellectual property assets, if any, to ZOOM, and that as a result,

1   the investors in Soil Savers would receive nothing for their investment.

2       86.    GIL LAWRENCE invested $21,000 in Casablanca Coffee, $551,386 in the KYRO

3   oil and gas investments, and $1,500,000 in Fuel FX and Soil Savers.  MARLEE STEELE invested

4   $20,640 in the KYRO oil and gas investments and $75,000 in Fuel FX and Soil Savers.  J.

5   LAWRENCE invested $15,000 in Casablanca Coffee and $27,115 in the KYRO oil and gas

6   investments.  Plaintiffs are informed and believe that PARSONS received large commissions and

7   other remuneration for inducing them to purchase the KYRO oil and gas investments, and that

8   PARSONS also received large commissions and or other remuneration for inducing them to

9   purchase the Fuel FX and Soil Savers investments

10                        **KEN MARINAI TRANSACTIONS**

11      87. MARINAI was another target of the PARSONS' fraudulent securities schemes.

12  Like the other Plaintiffs,  MARINAI invested in KYRO.

13      88. MARINAI invested in the Brookshire Dome and Sovereign Chief projects as a

14  direct result of PARSON's representations described in Paragraphs 20-43.  Based upon

15  PARSON'S representations,  MARINAI invested $82,000 in the Brookshire Dome project and

16  $35,000 in the Sovereign Chief Project.

17      89.    PARSONS approached MARINAI with the Fuel FX/Soil Savers deal as a

18  proposed way for MARINAI to recoup his losses from his KYRO investments.  PARSONS

19  persuaded MARINAI to invest in Fuel FX and Soil Savers by blatantly misrepresenting the

20  companies' assets, Income and "revolutionary patented technology."  PARSONS first began to

21  draw MARINAI into the Fuel FX/Soil Savers fraud in late 2002.   He told MARINAI that only

22  those investors who invested in Fuel FX would be given the opportunity to invest in Soil Savers,

23  Fuel FX's parent company and the owner of revolutionary soil remediation technology.

24      90. On November 18, 2002, PARSONS sent a letter to  MARINAI via U.S. mail

25  intended to entice him to invest in Fuel FX.  The correspondence is on Fuel FX letterhead entitled,

26  "Re: Fuel FX Reactor Information."  A true and correct copy of the November 18, 2002,

27  correspondence is attached hereto as Exhibit 21 and incorporated herein by reference.  The letter

28  makes knowingly false and exaggerated claims about Fuel FX.  These claims Include:

1      •     MARINAI's $50,000 investment would result in a $750,000 return based upon

2              claims that the FX Reactor was expected to penetrate at least 1 percent of the

3              domestic market.

4      •     All [Fuel FX] Coca-Cola orders alone would return $204,168.00 based on

5              domestic fleet wide implementation of 49,000 units and this implementation had

6              already begun.

7      •     Several New York firms wanted to do an IPO of Fuel FX.

8      •     Patent royalty was a much more secure investment vehicle because they were paid

9              on the 10th of each month after date of manufacture, not after receipt of payment

10              from a particular client.

11     91. On November 20, 2002, MARINAI received follow-up correspondence.  This

12 letter is entitled, "Fuel FX Opportunity Kyro New York Soil Savers Per Ton Remedy Structure."

13 A true and correct copy of the November 20, 2202, correspondence is attached hereto as Exhibit

14 22 and incorporated herein by reference.  In the letter, PARSONS represented that he had traveled

15 to Fuel FX's corporate offices in Dallas, Texas, and had seen with his own eyes that the

16 technology worked and that he had talked to people who installed the reactor device on their

17 trucks who were thrilled with the fuel savings encountered, and that Fuel FX expected to place

18 50,000 to 100,000 units in 2003.

19     92. PARSONS' proposal stated that if the entire $1.2 million of the Fuel FX offering

20 was placed, then Soil Savers, the parent company of Fuel FX, would provide a dollar per ton

21 royalty on the soil remediation of their New York joint-venture.  This royalty would be available

22 to the clients who invested in the Fuel FX offering.  MARINAI was told by PARSONS, "This

23 tonnage royalty would allow you to recoup 100% of your investment in Kyro's Brookshire

24 properties and Wyoming properties.  It is expected that this payout would take 2-3 years to

25 accomplish."

26     93. Based upon the letters and telephone conferences with PARSONS, MARINAI

27 entered into a Subscription Agreement and Investment Agreement to purchase Fuel FX stock and

28 receive a $4.167 royalty per unit on Fuel FX Reactors sold and installed by Fuel FX for the life of

the patent .   A true and correct copy of the Fuel FX, Inc., Subscription Agreement and Investment Agreement dated December 11, 2002, are attached hereto as Exhibits 23 and 24, respectively, and Incorporated herein by reference.  MARINAI invested $50,000 for 104,167 shares plus the royalty.

94. On December 31, 2002, Larry Johnson acknowledged receipt of MARINAI's check in the amount of $50,000 and IRA instructions and forwarded to MARINAI a stock certificate for 104,167 shares of Fuel FX.  On January 31, 2003, MARINAI received, via U.S. mail, a royalty payment from Fuel FX of $204.33 representing 49 units billed at $4.17.

95. MARINAI received a Fuel FX monthly royalty statement of $145.95 representing 35 units billed at 4.17 per unit on February 28, 2003.  MARINAI, relying upon his receipt of royalty checks and Defendants' false information about Fuel FX's growth and Income, signed a second Subscription Agreement and Investment Agreement for Fuel FX on March 15, 2003.  True and correct copies of the February 2003 Subscription Agreement and Investment Agreement are attached at Exhibits 25 and 26, respectively, and incorporated herein by reference.  Under these Agreements, MARINAI paid $100,000 for an 8.33 U.S. per unit royalty on Fuel FX Reactors manufactured by Fuel FX and 208,333 shares of Fuel FX stock.  The terms for the royalty were identical to the previous Investment Agreement, except for the additional amount invested and the royalty per unit.

96. PARSONS then began promoting Soil Savers to lure MARINAI to invest in this corporation.  As part of the scheme to defraud MARINAI, Johnson and Rippetoe prepared a memo to be distributed by Soil Savers, Inc., to potential investors.  This memo was given to PARSONS and sent to MARINAI.  Dated April 8, 2003, the memo states that it is from "L. Johnson" to "Parties of Interest" regarding limited stock of Soil Savers, Inc.  The memo is designated "CONFIDENTIAL."  This was the same memorandum sent to GIL LAWRENCE described in Paragraphs 20-43 of this Complaint.  (See Exhibit 1.)

97. In reliance on the continuing stream of glowing business forecasts, on April 30, 2003, MARINAI entered a third Subscription Agreement and Investment Agreement, this time for Soil Savers.  True and correct copies of the Subscription Agreement and Investment Agreement

1    dated April 30, 2003, are attached hereto as Exhibits 27 and 28, respectively.  Under the terms of

2    the Subscription Agreement, MARINAI received 500,000 shares of Soil Savers Common Stock

3    for an investment of $800,000.  Pursuant to the terms of the Investment Agreement MARINAI

4    was to receive $0.40 per ton royalty on soil treated by Soil Savers Worldwide.

5         98. To further bolster false claims of income and assets, MARINAI received false

6    financial information for Soil Savers.  A true and correct copy of a May 14, 2003, e-mail and

7    attached Soil Savers, Inc., balance sheets for May 14, 2003, are attached hereto as Exhibit 29 and

8    incorporated herein by reference.  The e-mail states that the financial information did not include

9    as assets the majority of stock Soil Savers owned in companies such as Fuel FX and Soil Savers

10   of New York and the value of the water technology and soil technology patents, and that Soil

11   Savers' liquidity was approximately $2,000,000 in cash and securities and there was $4.5 million

12   in stockholder equity.

13        99. The May 14, 2003, Soil Savers balance sheets showed current assets of

14   $1,723,659.12; property and equipment of $170,859.83; other assets $2,851,736.47, including

15   securities of $1,043,500 and license fees of $1,500,000; adding up to total assets of

16   $4,746,255.42.  Total liabilities were listed as $230,070.87 and stockholder equity of $1,176,500

17   paid in capital.

18        100.    The Income Statement dated May 14, 2003 showed current royalty fees of

19   $25,200.00 and year-to-date royalty fees $42,600.00.  The license fee income was given as $0 for

20   the current month and $2,150,000 for year to date.  Gross profit year-to-date was listed as

21   $2,190,637.46.  After total expenses year-to-date were stated as $517,932.24, net income was

22   stated as $1,672,704.22.

23        101.    Fuel FX sent a monthly royalty statement dated May 31, 2003, to MARINAI,

24   identifying $646.35 in royalties, and a 2nd Quarterly Fuel FX Investor Update dated May 2003.

25        102.    In reliance on the continuing positive news from Soil Savers, and relying upon

26   PARSONS' recommendations,  MARINAI, on August 26, 2003, entered into a fourth

27   Subscription Agreement and Investment Agreement for the purchase of stock in Soil Savers for

28   the price of $1.60 per share.  True and correct copies of the Subscription Agreement and

Investment Agreement are attached as Exhibits 30 and 31, respectively, and are incorporated herein by reference.  Under these agreements, MARINAI received 125,000 shares of Soil Savers common stock for an investment of $200,000 and a $0.10 royalty on soil treated by Soil Savers worldwide for the life of the company and patents.

103.   On October 10, 2003, Johnson sent a letter to MARINAI forwarding royalty checks for Soil Savers stock for the projects at Hertz and Osmose.  Thereafter, MARINAI did not receive royalty checks for his investments in Fuel FX and Soil Savers.  When MARINAI raised concerns with Johnson regarding his investments, Soil Savers agreed to give MARINAI additional stock and royalties in Soil Savers at no cost to MARINAI.

104.   On April 5, 2004, MARINAI received 75,000 shares of Soil Savers for $30,000.00 investment and a per ton royalty on successfully treated soil by Soil Savers worldwide based on certain classifications.  The royalty was to continue in effect for the life of the company and the proprietary technology, including patents pending and patents issued by Soil Savers.  The soil classifications were hydrocarbon contaminated soil ($0.03 royalty per ton) and hazardous waste ($0.10 royalty per ton).  True and correct copies of the Subscription Agreement and Investment Agreement are attached hereto as Exhibits 32 and 33, respectively, and incorporated herein by reference.

105.   At no time did PARSONS or anyone at Soil Savers disclose that Soil Savers was losing money.  MARINAI was never notified that Soil Savers was going to, and eventually did, sell its "revolutionary, patented technology" to ZOOM; nor did MARINAI ever approve this transaction as a shareholder of Soil Savers.

106.   MARINAI is informed and believes that PARSONS received significant consideration from Johnson for "introducing" him to Soil Savers and Fuel FX.  MARINAI invested a total of $117,000 in the KYRO oil and gas investments and $1,150,000 in Fuel FX and Soil Savers.

### TRANSACTIONS INVOLVING JOHN FLAXEL

107.   FLAXEL was another target of the PARSONS' fraudulent securities schemes. Like the other Plaintiffs, FLAXEL invested in KYRO.

108.    FLAXEL incorporates by reference Paragraphs 1-45 above as though set forth in full herein.

109.    At all times herein mentioned, PARSONS occupied a fiduciary relationship with FLAXEL because (a) PARSONS was acting as FLAXEL's securities broker-dealer; and (b) because a confidential relationship had developed through business dealings over a period of time such as to induce FLAXEL to place confidence in PARSONS' integrity.

110.    At all times herein mentioned, PARSONS held himself out to FLAXEL as possessing a superior knowledge of oil and gas exploration, fuel technology, soil remediation, and investment, subjects that FLAXEL knew almost nothing about.  Because of the extreme disparity in the parties' knowledge of these matters, PARSONS at all times encouraged FLAXEL to rely on his expertise in matters of oil and gas exploration, fuel technology, soil remediation, and investment.

111.    By means of several telephone conversations during the first four months of 2000, PARSONS solicited FLAXEL to invest in the Brookshire Salt Dome prospect.  Specifically, PARSONS promoted three oil and gas drilling prospects: (1) a ten-well oil and gas drilling prospect in Waller County, Texas, on 24.506 acres, referred to as the Williams lease;  (2) a five-well oil and gas drilling prospect in Waller County, Texas, on ten acres, referred to as the Southwell (Nursery) lease; and (3) a 20-well oil and gas drilling prospect in Waller County, Texas, on 36 acres, referred to as the Weido lease.

112.    On or about May 15, 2000, PARSONS informed FLAXEL in a letter that the Brookshire Salt Dome was "the hottest oil and gas play presently being developed in the domestic market."  PARSONS claimed KYRO had been approached by several companies who wished to purchase KYRO's interest.  He represented to FLAXEL that KYRO's section of the Brookshire Salt Dome would be the "sweet spot" because his development group, which included petroleum geologists, believed it to be feeding other productive zones.  He informed FLAXEL that his development group anticipated drilling "300-400 wells on this acreage over the next 2-3 years" and finding "150-200 feet of pay in the wells drilled on these tracts."  He represented that, in the opinion of his development group, which included petroleum geologists, the leases were

"expected to produce 3000 to 4500 BOPD," and that investing in the project "truly is a once in a
lifetime opportunity." PARSONS made the same representations in the course of several
telephone conversations with FLAXEL at approximately the same time. These representations
were untrue and PARSONS had no reason for believing them to be true. Rather, he knew they
were untrue and that the geological evidence for making these assertions did not exist. From his
experience of the oil and gas industry, PARSONS knew the prospects were highly speculative and
that it was virtually impossible that he would drill "300-400 wells on this acreage over the next 2-
3 years" and extremely unlikely that he would find "150-200 feet of pay in the wells drilled on
these tracts." PARSONS failed to disclose the true facts to FLAXEL because he wished to induce
FLAXEL to purchase the investment. For his part, FLAXEL had no knowledge of the true facts
and no reasonable way of obtaining that knowledge. Therefore FLAXEL relied on PARSONS'
statements about the condition of the property which, according to PARSONS, were based on the
findings of petroleum geologists. Had PARSONS disclosed the true facts, FLAXEL would not
have purchased the investment.

113. On or about May 15, 2000, PARSONS provided FLAXEL with an investment
prospectus for each lease. The prospectuses represented that a consortium of six oil companies
would develop the oil reserves on the three leases.

114. In the investment prospectus for the Williams lease PARSONS represented that
KYRO owned a 6.3% working interest in the Williams lease and would invest $158,240.00
toward the development of the property.

115. The Williams lease prospectus included a "history" of the leases in the area, stating
that, as of March 2000, a total of 61 wells had been drilled, with only two dry holes occurring. In
the prospectus, PARSONS assured FLAXEL that the Williams lease was considered a "low risk
development play." He further assured FLAXEL, "It appears that all of the acreage controlled
will be productive as the studies show strong hydrocarbon indications." He also informed
FLAXEL, "The consortium on our first lease, the 24.506 acre Williams lease, plans to drill 10-15
wells, then sell the production with PUD offset locations. They believe the market value would
be a 72 month payout valued with $25 per barrel of oil. Then we would proceed to develop the

Case 3:05-cv-01259-JLS-WMC   Document 200   Filed 10/24/06   Page 31 of 75


1  additional acreage.  They expect to have the lease ready for sale by August 2000."   These

2  representations were untrue and PARSONS had no reason for believing them to be true.  Rather,

3  he knew they were untrue in that the geological evidence for  making these assertions did not

4  exist.  On the basis of his experience investing in the oil and gas industry, and his knowledge of

5  the geologists' findings, PARSONS knew the prospects were highly speculative and that they

6  could not truthfully be described as "low risk."  For his part, FLAXEL had no knowledge of the

7  true facts and no reasonable way of obtaining that knowledge.   Rather, he trusted PARSONS,

8  whose statements about the condition of the property were, according to PARSONS, based on the

9  findings of petroleum geologists.  Had PARSONS disclosed the true facts, FLAXEL would not

10 have purchased the investment.

11      116.   With respect to investment income, PARSONS projected only two possible

12 outcomes for the Williams lease, set forth in a section of the prospectus entitled "Monthly Cash

13 Flow."  The first outcome projected ten wells, producing 3,000 BOPD and providing FLAXEL

14 with a monthly income of $3,310.00.  According to PARSONS, this would result in a "payout"

15 (100 percent return on FLAXEL's investment) within 7.6 months.  The second outcome projected

16 fifteen wells producing 4,500 BOPD and providing a $4,965.00 monthly income to FLAXEL.

17 According to PARSONS, this would result in a payout  (100 percent return on FLAXEL's

18 investment) within 5.6 months.  He also made similar oral representations to FLAXEL by

19 telephone on or about May 15-20, 2000.  He advised FLAXEL of no other possible investment

20 income results from the Williams lease.  These representations were untrue and PARSONS had

21 no reason for believing them to be true.  Rather, he knew they were untrue in that the geological

22 evidence for making these assertions did not exist.  Yet PARSONS did not disclose the true facts

23 because he wished to induce FLAXEL to purchase the investment.  On the basis of his experience

24 of the oil and gas industry, and his access to the findings of geologists, PARSONS knew the

25 prospects were highly speculative and that they could not truthfully be described as "low risk."

26 For his part, FLAXEL had no knowledge of the true facts and no reasonable way of obtaining that

27 knowledge.  Rather, he trusted PARSONS, whose statements about the condition of the property

28

FOR SECURITIES FRAUD                    31                    Case No. 05 CV 1259 IEG

1  were, according to PARSONS, based on the findings of petroleum geologists.  Therefore
2  FLAXEL relied on PARSONS' statements.  Had PARSONS disclosed the true facts, FLAXEL
3  would not have purchased the investment.

4      117.    Also, PARSONS was intending to take, and took, a much larger percentage of
5  FLAXEL's investment than 10 percent. PARSONS failed to disclose the true facts to FLAXEL
6  because he wished to induce FLAXEL to purchase the investment. Had PARSONS disclosed the
7  true facts, FLAXEL would not have purchased the investment.

8      118.    Similarly, PARSONS advised FLAXEL of only two possible sale outcomes for the
9  Williams lease, in a section of the Prospectus entitled "Return at Sale of Properties."  The first
10  sale outcome, with ten projected wells producing 3,000 BOPD, assured FLAXEL he would
11  receive a 9.5 to1 rate of return on his investment.  The second, alternative, sale outcome, with
12  fifteen projected wells producing 4,500 BOPD, assured FLAXEL he would receive a 12.7 to1 rate
13  of return on his investment.  PARSONS also made similar oral representations to FLAXEL by
14  telephone on or about May 15-20, 2000.  He advised FLAXEL of no other possible sale outcome
15  from the Williams lease.  These representations were untrue and PARSONS had no reason for
16  believing them to be true.  Rather, he knew they were untrue in that the geological evidence for
17  making these assertions did not exist.  PARSONS knew the prospects were highly speculative and
18  that both projected outcomes were extremely unlikely.   Yet PARSONS did not disclose the true
19  facts because he wished to induce FLAXEL to purchase the investment.  For his part, FLAXEL
20  had no knowledge of the true facts and no reasonable way of obtaining that knowledge.  Rather,
21  he trusted PARSONS whose statements about the condition of the property were, according to
22  PARSONS, based on the findings of petroleum geologists.  Therefore FLAXEL relied on
23  PARSONS' statements.  Had PARSONS disclosed the true facts, FLAXEL would not have
24  purchased the investment.

25      119.    In the investment prospectus for the Southwell (Nursery) lease PARSONS
26  represented that KYRO owned a 6.3% working interest in the Southwell (Nursery) lease and
27  would invest $207,657 toward the development of the property.

28      120.    The Southwell (Nursery) lease included a "history" of the leases in the area, stating

1  that, as of May 1, 2000, a total of 74 wells had been drilled, with only three dry holes occurring.

2  In the prospectus, PARSONS assured FLAXEL that the Southwell lease was considered a "low

3  risk development play." He stated, "It appears that all of the acreage controlled will be productive

4  as the studies show strong hydrocarbon indications." He further assured FLAXEL, "On our first

5  lease, the Williams lease, we have drilled two wells out of a projected 15 wells to be drilled. Our

6  1st well potentialed at 1150 BPD and our second well potentialed at 1200 BOPD. They have been

7  choked back to produce a daily rate of 300 BOPD, which is the maximum allowed by the Texas

8  Railroad Commission. The consortium on our second lease, the 24.506 acre Southwell lease,

9  plans to drill 5 wells, then sell the production with PUD offset locations. They believe the market

10 value would be a 72 month payout valued with $25 per barrel of oil. Then we would proceed to

11 develop the additional acreage. They expect to have the lease ready for sale by September 2000."

12 These representations were untrue and PARSONS had no reason for believing them to be true.

13 Rather, he knew they were untrue in that the geological evidence for making these assertions did

14 not exist. On the basis of his experience of the oil and gas industry, and his access to the findings

15 of geologists, PARSONS knew the prospects were highly speculative and that they could not

16 truthfully be described as "low risk."

17      121.    The only remuneration disclosed by PARSONS as being received by himself or

18 KYRO was a 10-90 percent split on net revenue or sale, with KYRO receiving 10 percent and

19 participants receiving 90 percent. He assured FLAXEL,"Kyro will not participate in sale until

20 Participants have received back 100% of their original investment." But PARSONS was

21 intending to take, and took, a much larger percentage of FLAXEL's investment than 10 percent.

22 PARSONS failed to disclose the true facts to FLAXEL because he wished to induce FLAXEL to

23 purchase the investment. For his part, FLAXEL had no knowledge of the true facts and no

24 reasonable way of obtaining that knowledge. Rather, he trusted PARSONS. Therefore FLAXEL

25 relied on PARSONS' statements. Had PARSONS disclosed the true facts, FLAXEL would not

26 have purchased the investment.

27      120.    With respect to investment income, PARSONS advised FLAXEL of only two

28 possible outcomes for the Southwell (Nursery) lease in a section of the prospectus entitled

"Monthly Cash Flow." The first outcome projected five wells, producing 1500 BOPD and providing FLAXEL with a monthly income of $1,241. According to PARSONS, this would result in a "payout" (100 percent return on FLAXEL's investment) within 7.4 months. The second, alternative outcome projected seven wells, producing 2,100 BOPD and providing a $1,738 monthly income to FLAXEL. According to PARSONS, this would result in a payout (100 percent return on FLAXEL's investment) within six months. PARSONS also made similar representations to FLAXEL by telephone on or about May 15-20, 2000. He advised FLAXEL of no other possible investment outcome from the Southwell (Nursery) lease. These representations were untrue and PARSONS had no reason for believing them to be true. Rather, he knew they were untrue in that the geological evidence for making these assertions did not exist. On the basis of his experience of the oil and gas industry, and his access to the findings of geologists, PARSONS knew the prospects were highly speculative and that both projected outcomes were extremely unlikely. Yet PARSONS did not disclose the true facts because he wished to induce FLAXEL to purchase the investment. For his part, FLAXEL had no knowledge of the true facts and no reasonable way of obtaining that knowledge. Rather, he trusted PARSONS whose statements about the condition of the property were, according to PARSONS, based on the findings of petroleum geologists. Therefore FLAXEL relied on PARSONS' statements. Had PARSONS disclosed the true facts, FLAXEL would not have purchased the investment.

121. Similarly, PARSONS provided only two possible sale outcomes for the Southwell (Nursery) lease, in a section entitled "Return at Sale of Properties." The first sale outcome, with five projected wells producing 1500 BOPD, informed FLAXEL he would receive an 8 to 1 rate of return on his investment. The second, alternative, sale outcome, with seven projected wells, producing 2,100 BOPD, informed FLAXEL he would receive a 9.9 to1 rate of return on his investment. PARSONS also made similar representations to FLAXEL by telephone on or about May 15-20, 2000. He advised FLAXEL of no other possible sale outcomes from the Southwell (Nursery) lease. These representations were untrue and PARSONS had no reason for believing them to be true. Rather, he knew they were untrue in that the geological evidence for making these assertions did not exist. PARSONS knew the prospects were highly speculative and that

1   both projected outcomes were extremely unlikely.   Yet PARSONS did not disclose the true facts

2   because he wished to induce FLAXEL to purchase the investment.  For his part, FLAXEL had no

3   knowledge of the true facts and no reasonable way of obtaining that knowledge. Rather, he trusted

4   PARSONS whose statements about the condition of the property were, according to PARSONS,

5   based on the findings of petroleum geologists. Therefore FLAXEL relied on PARSONS'

6   statements.  Had PARSONS disclosed the true facts, FLAXEL would not have purchased the

7   investment.

8        122.     In the investment prospectus for the Weido lease, PARSONS represented that

9   KYRO owned a 6.3% working interest in the Weido lease and would invest $207,657 toward the

10   development of the property.

11        123.     In the Weido lease prospectus, PARSONS provided FLAXEL with a "history" of

12   the leases in the area, stating that, as of May 1, 2000, a total of 74 wells had been drilled, with

13   only three dry holes occurring.  As with the other leases, PARSONS assured FLAXEL that the

14   prospect lease was considered a "low risk development play" and "It appears that all of the

15   acreage controlled will be productive as the studies show strong hydrocarbon indications."  As

16   with the Southwell lease, PARSONS informed FLAXEL, "On our first lease, the Williams lease,

17   we have drilled two wells out of a projected 15 wells to be drilled.  Our 1st well potentialed at

18   1150 BPD and our second well potentialed at 1200 BOPD.  They have been choked back to

19   produce a daily rate of 300 BOPD, which is the maximum allowed by the Texas Railroad

20   Commission.  The consortium on our third lease, the 36 acre Weido lease, plans to drill 20 wells,

21   then sell the production with PUD offset locations.  They believe the market value would be a 72

22   month payout valued with $25 per barrel of oil.  Then we would proceed to develop the additional

23   acreage.  They expect to have the lease ready for sale by end of the year, 2000."  These

24   representations were untrue and PARSONS had no reason for believing them to be true.  Rather,

25   he knew they were untrue in that the geological evidence for  making these assertions did not

26   exist.  On the basis of his experience of the oil and gas industry, and his access to the findings of

27   geologists, PARSONS knew the prospects were highly speculative and that they could not

28   truthfully be described as "low risk."   For his part, FLAXEL had no knowledge of the true facts

and no reasonable way of obtaining that knowledge.  Rather, he trusted PARSONS, whose statements about the condition of the property were, according to PARSONS, based on the findings of petroleum geologists.  Therefore FLAXEL relied on PARSONS' statements.

124.    The only remuneration disclosed by PARSONS as being received by himself or KYRO was a 10-90 percent split on net revenue or sale, with KYRO receiving 10 percent and participants receiving 90 percent.  He assured FLAXEL,"Kyro will not participate in sale until Participants have received back 100% of their original investment."  But PARSONS was intending to take, and took, a much larger percentage of FLAXEL's investment than 10 percent.  PARSONS failed to disclose the true facts to FLAXEL because he wished to induce FLAXEL to purchase the investment.  Had PARSONS disclosed the true facts, FLAXEL would not have purchased the investment.

125.    With respect to investment income, PARSONS provided to FLAXEL only two possible outcomes from the Weido lease, in a section of the prospectus entitled "Monthly Cash Flow."  The first outcome projected twenty wells, producing 6000 BOPD and providing FLAXEL with a monthly income of $3,310.  According to PARSONS, this would result in a "payout" (100 percent return on FLAXEL's investment) within seven months.  The second outcome projected twenty-five wells producing 7,500 BOPD and providing a $4,138 monthly payment to FLAXEL.  According to PARSONS, this would result in a payout  (100 percent return on FLAXEL's investment)  within 6.3 months.  PARSONS also made similar representations to FLAXEL by telephone on or about May 15-20, 2000.  He advised FLAXEL of no other possible income results from the Weido lease.  These representations were untrue and PARSONS had no reason for believing them to be true.  Rather, he knew they were untrue in that the geological evidence for making these assertions did not exist.  On the basis of his experience of the oil and gas industry, and his access to the findings of geologists, PARSONS knew the prospects were highly speculative and that both projected outcomes were extremely unlikely.   Yet PARSONS did not disclose the true facts because he wished to induce FLAXEL to purchase the investment.  For his part, FLAXEL had no knowledge of the true facts and no reasonable way of obtaining that knowledge.  Rather, he trusted PARSONS whose statements about the condition of the property

1    were, according to PARSONS, based on the findings of petroleum geologists. Therefore FLAXEL

2    relied on PARSONS' statements. Had PARSONS disclosed the true facts, FLAXEL would not

3    have purchased the investment.

4         126.    Similarly, PARSONS provided only two possible sale outcomes for the Weido

5    lease, in a section of the prospectus entitled "Return at Sale of Properties." The first sale

6    outcome, with 20 projected wells producing 6000 BOPD, assured FLAXEL he would receive an

7    8.5 to 1 rate of return on his investment. The second, alternative, sale outcome, with twenty-five

8    projected wells, producing 7,500 BOPD, assured FLAXEL he would receive a 109 to1 rate of

9    return on his investment. He also made similar representations to FLAXEL by telephone on or

10   about May 15-20, 2000. He advised FLAXEL of no other possible sale outcome from the Weido

11   lease. These representations were untrue and PARSONS had no reason for believing them to be

12   true. Rather, he knew they were untrue in that the geological evidence for making these assertions

13   did not exist. On the basis of his experience of the oil and gas industry, and his access to the

14   findings of geologists, PARSONS knew the prospects were highly speculative and that both

15   projected outcomes were extremely unlikely.   Yet PARSONS did not disclose the true facts

16   because he wished to induce FLAXEL to purchase the investment. For his part, FLAXEL had no

17   knowledge of the true facts and no reasonable way of obtaining that knowledge. Rather, he trusted

18   PARSONS whose statements about the condition of the property were, according to PARSONS,

19   based on the findings of petroleum geologists. Therefore FLAXEL relied on PARSONS'

20   statements. Had PARSONS disclosed the true facts, FLAXEL would not have purchased the

21   investment.

22        127.    In reliance on these representations by PARSONS, FLAXEL purchased

23   investments as follows: He paid $25,058 for a 0.25% working interest in the Williams lease. He

24   paid $9,229 for 0.25% working interest in the Southwell (Nursery) lease. He paid $23,214 for a

25   0.25% working interest in the Weido lease. He signed the Participation Agreements for all three

26   leases on March 22, 2000.

27        128.    After FLAXEL had invested in the Brookshire Dome investment, PARSONS

28   informed him by letter on or about July 24, 2000, that the lease developments were making rapid

---

FIRST AMENDED COMPLAINT
FOR SECURITIES FRAUD                    37                    Case No. 05 CV 1259 IEG

1  progress and offered FLAXEL further investment opportunities.  Specifically, he informed

2  FLAXEL, "All of the wells drilled so far are showing multiple oil and gas zones in each wellbore.

3  Our first well on the Nursery has 4 oil zones and 2 gas zones.  It appears, as Bill Wood believes,

4  that production will get better as we move farther south on our acreage. The Nursery well drilled

5  just as Bill had it mapped." He further informed FLAXEL, "With what we have seen to date, Bill

6  believes he can have the Williams producing 3000 BOPD equivalent and the Nursery producing

7  1500 BOPD equivalent.   It is then the intent to sell these two leases for cash reserves to help pay

8  for the development of the additional leases.  We expect to drill 250-300 wells on our lease

9  positions over the next 3 years."  These representations were untrue and PARSONS had no reason

10  for believing them to be true.  Rather, he knew they were untrue in that the geological evidence

11  for making these assertions did not exist.  For his part, FLAXEL had no knowledge of the true

12  facts and no reasonable way of obtaining that knowledge. Rather, he trusted PARSONS whose

13  statements about the condition of the property were, according to PARSONS, based on the

14  findings of petroleum geologists. Therefore FLAXEL relied on PARSONS' statements.  Had

15  PARSONS disclosed the true facts, FLAXEL would not have purchased the investment.

16      129.    PARSONS followed up with further solicitations of additional oil and gas drilling

17  investments.   On or about July 27, 2001, PARSONS solicited FLAXEL to invest in a "20-plus"

18  well oil and gas drilling prospect in Niobara  County, Wyoming, on 6,200 acres, referred to as the

19  Rusty Creek Prospect.

20      130.    In the investment prospectus for the Rusty Creek lease, PARSONS represented that

21  the Rusty Creek would be developed by Energas; that KYRO would own a 14.25% working

22  interest in the lease, costing $476,352; and that KYRO would pay additional monies toward the

23  development of the property.

24      131.    In the prospectus, PARSONS announced that KYRO had used a "revolutionary

25  new exploration tool, a sophisticated form of geo-chem, where samples were taken from the earth

26  at a depth of 36-42 inches below the surface...." and that "[a]s a result of the positive readings

27  from the coring, the group has gone out twice and increased our acreage position as the coring

28  identified the channel sands running beyond our original acreage position.  The acreage now under

FIRST AMENDED COMPLAINT
FOR SECURITIES FRAUD                 38                  Case No. 05 CV 1259 IEG

1   control is 6200 acres...The Energas development group believes we are about to make a major

2   discovery."   PARSONS knew these facts were untrue in that the Energas development group had

3   not indicated its belief that PARSONS or KYRO were about to make a major discovery. For his

4   part, FLAXEL had no knowledge of the true facts and no reasonable way of obtaining that

5   knowledge. Therefore FLAXEL relied on PARSONS' statements. Had PARSONS disclosed the

6   true facts, FLAXEL would not have purchased the investment.

7        132.      PARSONS made several claims regarding a well on the Rusty Creek lease:

8   "Estimated daily potential: 150 barrels per day (although the well will be capable of more)";

9   "Estimated total potential 150,000 barrels of oil from the Dakota only (some will be considerably

10  greater)"; and "The proposed field should have the same potential as the East Lance Creek Field

11  that has produced 10 million barrels from the Dakota sands. The number of projected Dakota

12  wells as mapped should range between 12 to 15." PARSONS assured FLAXEL that "After

13  consistent Dakota production has been established, several wells should be drilled deeper to

14  evaluate the potential in the Canyon Springs and Leo sands. These sands are prolific producers in

15  the Lance Creek Field and can be tested with an additional 2,000 feet of drilling."   Of another

16  well on the Rusty Creek lease, known as Hall#1, PARSONS stated "The proposed Hall#1 is updip

17  from two wells that have produced 900,00 barrels of oil which initially flowed at the rate of 1,751

18  BOPD and downdip of Muddy/Dakota producers.  Anticipated flow rates for a completed well is

19  100-350 BOPD."   These representations were untrue and, on the basis of his experience in the oil

20  and gas industry and his access to the findings of geologists, PARSONS had no reason for

21  believing them to be true.  Rather, he knew they were untrue in that the geological evidence for

22  making these assertions did not exist.  PARSONS failed to disclose the true facts to FLAXEL

23  because he wished to induce FLAXEL to purchase the investment.  For his part, FLAXEL had no

24  knowledge of the true facts and no reasonable way of obtaining that knowledge. Rather, he trusted

25  PARSONS whose statements about the condition of the property were, according to PARSONS,

26  based on the findings of petroleum geologists. Therefore FLAXEL relied on PARSONS'

27  statements. Had PARSONS disclosed the true facts, FLAXEL would not have purchased the

28  investment.

---

133. The only remuneration to PARSONS or KYRO resulting from the sale of the investment disclosed by PARSONS was a 10-90 percent split on net revenue or sale, with KYRO receiving 10 percent and participants receiving 90 percent. PARSONS assured FLAXEL, "Kyro will not participate in sale until Participants have received back 100% of their original investment." These representations were untrue and PARSONS had no reason for believing them to be true. PARSONS was intending to take, and took, a much larger percentage of FLAXEL's investment than 10 percent. PARSONS failed to disclose the true facts to FLAXEL because he wished to induce FLAXEL to purchase the investment. For his part, FLAXEL had no knowledge of the true facts and no reasonable way of obtaining that knowledge. Rather, he trusted PARSONS. Therefore FLAXEL relied on PARSONS' statements. Had PARSONS disclosed the true facts, FLAXEL would not have purchased the investment.

134. In the investment prospectus for the Rusty Creek lease, PARSONS provided to FLAXEL only three possible investment outcomes, in a section entitled "Proforma." The first investment outcome projected a production of 600 BOPD, providing FLAXEL with yearly income of $32,642 and paying a 100 percent return on investment within 12 months. The second investment outcome projected production of 1,200 BOPD, providing FLAXEL with a yearly income of $65,580 per year and paying 100 percent return on investment within 6.1 months. The third investment outcome projected production of 2,000 BOPD, providing FLAXEL with income of $109,608 per year and paying 100 percent return on investment within 3.7 months. PARSONS advised FLAXEL of no other possible investment income outcome from the Rusty Creek investment. He also made similar representations to FLAXEL during the course of telephone conversations on or about the end of July 2001. He advised FLAXEL of no other possible income outcome from the Rusty Creek investment. These representations were untrue and PARSONS had no reason for believing them to be true. Rather, he knew they were untrue in that the geological evidence for making these assertions did not exist. From his experience in the oil and gas industry and his access to the findings of geologists, PARSONS knew the prospects were highly speculative and that the projected outcomes were extremely unlikely. Yet PARSONS did not disclose the true facts because he wished to induce FLAXEL to purchase the investment. For his

1   part, FLAXEL had no knowledge of the true facts and no reasonable way of obtaining that

2   knowledge.  Rather, he trusted PARSONS whose statements about the condition of the property

3   were, according to PARSONS, based on the findings of petroleum geologists. Therefore FLAXEL

4   relied on PARSONS' statements.  Had PARSONS disclosed the true facts, FLAXEL would not

5   have purchased the investment.

6         135.    At approximately the same time, PARSONS sent FLAXEL a sales videotape

7   soliciting investments in Rusty Creek.  The videotape informed FLAXEL that the geo-chem

8   method of detecting the presence of hydrocarbons had a "track record of one hundred percent";

9   that in its fourteen-year history, it had a "hundred percent success ratio"; and that in the previous

10  year alone, the geo-chem method had led to "twenty highly commercial discoveries."  The video

11  informed viewers, "This reservoir is a monster"; and "From the analysis, it looks like we have

12  found an isolated bar of five to ten million barrels of oil that will produce three hundred to one

13  thousand barrels per day."  These representations were untrue and PARSONS had no reason for

14  believing them to be true.  Rather, he knew they were untrue in that the geological evidence for

15  making these assertions did not exist.  Yet PARSONS did not disclose the true facts because he

16  wished to induce FLAXEL to purchase the investment.  For his part, FLAXEL had no knowledge

17  of the true facts and no reasonable way of obtaining that knowledge.  Rather, he trusted

18  PARSONS whose statements about the condition of the property were, according to PARSONS,

19  based on the findings of petroleum geologists. Therefore FLAXEL relied on PARSONS'

20  statements.  Had PARSONS disclosed the true facts, FLAXEL would not have purchased the

21  investment.

22        136.    In reliance on these representations by PARSONS, FLAXEL paid $27,744.00 for a

23  1 percent working interest in the Rusty Creek lease, with a $5,831 follow-up "completion"

24  payment.

25        137.    Also at the end of July 2001, PARSONS solicited FLAXEL to invest in an oil and

26  gas drilling prospect in Converse County, Wyoming, on 80 acres, referred to as the Anaconda

27  Prospect.

28        138.    In the investment prospectus for the Anaconda lease PARSONS represented that

1   the Anaconda lease would be developed by Energas, and that KYRO would own a 28.15%

2   working interest costing $209,875, and that KYRO would pay additional monies toward the

3   development of the property.

4        139.   PARSONS assured FLAXEL that KYRO had used a "revolutionary new

5   exploration tool, a sophisticated form of geo-chem, where samples were taken from the earth at a

6   depth of 36-42 inches below the surface...." and "...As a result of the positive readings from the

7   coring, the group believes that this well location has been isolated from the Glenrock Field by way

8   of a faulting trap running across the acreage and the production should be virgin reservoir

9   quality." PARSONS further assured FLAXEL, "Anticipated flow rates for the completed wells

10   are 200-1000 BOPD," and "Estimated reserves 250,000 BO." These representations were untrue

11   and PARSONS had no reason for believing them to be true. Rather, from his knowledge of the

12   oil and gas industry and his access to the findings of geologists, he knew they were untrue in that

13   the geological evidence for making these assertions did not exist. For his part, FLAXEL had no

14   knowledge of the true facts and no reasonable way of obtaining that knowledge. Rather, he

15   trusted PARSONS whose statements about the condition of the property were, according to

16   PARSONS, based on the findings of petroleum geologists. Therefore FLAXEL relied on

17   PARSONS' statements. Had PARSONS disclosed the true facts, FLAXEL would not have

18   purchased the investment.

19        140.   The only remuneration disclosed by PARSONS as being received by himself or

20   KYRO as a result of a sale was a 10-90 percent split on net revenue or sale, with KYRO receiving

21   10 percent and participants receiving 90 percent. PARSONS assured FLAXEL, "Kyro will not

22   participate in sale until Participants have received back 100% of their original investment." These

23   representations were untrue and PARSONS had no reason for believing them to be true.

24   PARSONS was intending to take, and took, a much larger percentage of FLAXEL's investment

25   than 10 percent. PARSONS failed to disclose the true facts to FLAXEL because he wished to

26   induce FLAXEL to purchase the investment. For his part, FLAXEL had no knowledge of the true

27   facts and no reasonable way of obtaining that knowledge. Therefore FLAXEL relied on

28   PARSONS' statements. Had PARSONS disclosed the true facts, FLAXEL would not have

---

FIRST AMENDED COMPLAINT
FOR SECURITIES FRAUD              42              Case No. 05 CV 1259 IEG

1    purchased the investment.

2        141.    In the investment prospectus for the Anaconda lease, PARSONS projected only

3    three possible investment income outcomes for the lease, in a section entitled "Proforma." The

4    first investment outcome projected a production of 150 BOPD, providing FLAXEL with a yearly

5    income of $8,016 and paying a 100-percent return on investment within 11 months. The second

6    investment outcome projected a production of 250 BOPD, providing FLAXEL with a yearly

7    income of $13,404 and paying a 100-percent return on investment within 6.7 months. The third

8    investment outcome projected a production of 350 BOPD, providing FLAXEL with a yearly

9    income of $18,792 and paying 100-percent return on investment within 4.8 months. PARSONS

10   also made similar representations to FLAXEL during the course of telephone conversation a the

11   end of July 2001. He advised FLAXEL of no other possible investment outcome from the

12   Anaconda investment. These representations were untrue and PARSONS had no reason for

13   believing them to be true. Rather, he knew they were untrue in that the geological evidence for

14   making these assertions did not exist. From his knowledge of the oil and gas industry and his

15   access to the findings of geologists, PARSONS knew the prospects were highly speculative and

16   that the projected outcomes were extremely unlikely.  Yet PARSONS did not disclose the true

17   facts because he wished to induce FLAXEL to purchase the investment. For his part, FLAXEL

18   had no knowledge of the true facts and no reasonable way of obtaining that knowledge. Rather,

19   he relied on PARSONS' statements about the condition of the property, which according to

20   PARSONS, were based on the findings of petroleum geologists. Therefore FLAXEL relied on

21   PARSONS' statements. Had PARSONS disclosed the true facts, FLAXEL would not have

22   purchased the investment.

23       142.    At approximately the same time, PARSONS sent FLAXEL a sales videotape

24   soliciting investments in the Anaconda lease.  The videotape informed FLAXEL that Anaconda

25   was a "one hundred and twenty-five to two hundred thousand barrel reservoir" and a "well that

26   should produce one hundred and fifty to three hundred barrels per day." These representations

27   were untrue and PARSONS had no reason for believing them to be true. Rather, he knew they

28   were untrue in that the geological evidence for making these assertions did not exist. PARSONS

1    failed to disclose the true facts to FLAXEL because he wished to induce FLAXEL to purchase the

2    investment. For his part, FLAXEL had no knowledge of the true facts and no reasonable way of

3    obtaining that knowledge.  Rather, he trusted PARSONS whose statements about the condition of

4    the property were, according to PARSONS, based on the findings of petroleum geologists.

5    Therefore FLAXEL relied on PARSONS' statements.  Had PARSONS disclosed the true facts,

6    FLAXEL would not have purchased the investment.

7           143.    In reliance on these representations provided by PARSONS, FLAXEL paid

8    $5,009.00 for 1% working interest in the Anaconda lease, with a $1,011 follow-up "completion"

9    payment.

10         144.    On or about October 4, 2001, PARSONS informed FLAXEL in a letter that a well

11    in the Rusty Creek lease known as Finley State #4-36 was found to have "70-90 feet of productive

12    sands."  He added, "Everyone in the Wyoming plays is excited about our results so far and are all

13    eagerly looking forward to the drilling of the Hall and Groves wells."  These facts were untrue and

14    PARSONS had no reason for believing them to be true in that the geological evidence for

15    PARSONS' statements did not exist.  PARSONS failed to disclose the true facts to FLAXEL

16    because he wished to induce FLAXEL to purchase the investment. For his part, FLAXEL had no

17    knowledge of the true facts and no reasonable way of obtaining that knowledge.  Rather, he

18    trusted PARSONS whose statements about the condition of the property were, according to

19    PARSONS, based on the findings of petroleum geologists. Therefore FLAXEL relied on

20    PARSONS' statements.  Had PARSONS disclosed the true facts, FLAXEL would not have

21    purchased the investment.

22         145.    At approximately the same time, PARSONS sent FLAXEL a second sales

23    videotape soliciting investments in the Rusty Creek and Anaconda leases.  It purported to

24    summarize the achievements at Rusty Creek and Anaconda so far and informed FLAXEL "It all

25    paid off" and "We're looking at five to ten million barrels finished development" and "We have

26    the potential of five to ten million barrels in the Finley Field."  These representations were untrue

27    and PARSONS had no reason for believing them to be true.  Rather, from his access to the

28    findings of geologists, he knew they were untrue in that the geological evidence for making these

1    assertions did not exist. PARSONS failed to disclose the true facts to FLAXEL because he

2    wished to induce FLAXEL to purchase the investment. For his part, FLAXEL had no knowledge

3    of the true facts and no reasonable way of obtaining that knowledge. Rather, he trusted

4    PARSONS whose statements about the condition of the property were, according to PARSONS,

5    based on the findings of petroleum geologists. Therefore FLAXEL relied on PARSONS'

6    statements. Had PARSONS disclosed the true facts, FLAXEL would not have purchased the

7    investment.

8         146.   On October 10, 2001, in reliance on PARSONS' statements, FLAXEL paid KYRO

9    an additional $5,831.00 for an increased working interest in the Rusty Creek lease, and paid

10   KYRO an additional $1,011.00 for an increased working interest in the Anaconda lease.

11        147.   In persuading FLAXEL to purchase the highly speculative oil and gas investments

12   in Brookshire Salt Dome, Rusty Creek, and Anaconda, PARSONS did not advise FLAXEL of the

13   degree of risk that they entailed. Rather, he knowingly made false statements that they were low

14   risk investments. PARSONS grossly exaggerated their rate of return and their financial prospects

15   in order to induce FLAXEL to purchase them. In reliance on PARSONS' representations,

16   FLAXEL did purchase them and suffered serious financial damage as a result. At no time did

17   PARSONS disclose to FLAXEL that he was not a licensed broker-dealer.

18        148.   In 2001 PARSONS also induced FLAXEL to invest in a project known as

19   Casablanca Coffee/Casablanca Express that entailed the construction of drive-through coffee

20   outlets. On or about 2001, PARSONS represented to FLAXEL that the project was well planned;

21   that the coffee drive-through locations had been selected; and the project was ready to proceed. In

22   reliance on PARSONS' representations, FLAXEL invested $35,000.00 for two units in

23   Casablanca Coffee/Casablanca Express. PARSONS' representations were untrue, and PARSONS

24   knew the representations were untrue in that the coffee drive-through locations had not been

25   selected, and the project was not ready to proceed. When locations were finally selected, they

26   were unsuitable and the project failed. FLAXEL received no return on his investment. For his

27   part, FLAXEL had no knowledge of the true facts and no reasonable way of obtaining that

28   knowledge. Therefore FLAXEL relied on PARSONS' statements. Had PARSONS disclosed the

1   true facts, FLAXEL would not have purchased the investment.

2        149.   In the fall of 2002, FLAXEL communicated to PARSONS his disappointment with

3   the investments that PARSONS had induced him to purchase.  To placate FLAXEL and to

4   prevent what PARSONS perceived as the threat of litigation, PARSONS informed FLAXEL in a

5   telephone conversation, followed by a letter containing the same statements on or about

6   November 12, 2002, that he would perform on his promises and provide a "cure" and a "remedy"

7   that would settle any claim or dissatisfaction FLAXEL might have.  According to PARSONS, the

8   proposed settlement and promise to perform would consist of a new investment opportunity.

9   Specifically, PARSONS told FLAXEL he had specially negotiated a very favorable investment

10   opportunity with Soil Savers that would allow FLAXEL to recoup 100 percent of his investment

11   in Kyro's Brookshire properties and Wyoming properties, as well as the Casablanca Coffee

12   investment, within two to three years.  PARSONS called this investment opportunity, the "Kyro

13   Payback Program" and the "Kyro New York Soil Savers Per Ton Remedy Structure."

14        150.   On or about November 15, 2002, PARSONS mailed FLAXEL an offering

15   document for the proposed remedial investment, entitled "SSNY/FFX/Kyro New York per Ton

16   Remedy Structure. "  PARSONS enclosed a cover letter entitled "Kyro New York Soil Savers Per

17   Ton Remedy Structure."  It explained that the opportunity required KYRO investors to

18   collectively purchase $1.2 million in shares in Fuel FX.  If they did so, they would be rewarded

19   with a $1.00 per-ton royalty from soil treated by Fuel FX's parent company, Soil Savers.  The per-

20   ton royalty would provide a total payout of $4.2 million, at which point it would cease.

21   PARSONS explained that this investment would allow FLAXEL to "recoup 100% of your

22   investment in Kyro's Brookshire and Wyoming properties.  It is expected that the pay-out would

23   take 2-3 years to accomplish."  In the same letter, PARSONS informed FLAXEL that he had

24   traveled to Fuel FX's corporate offices and manufacturing facility and had seen with his own eyes

25   that the technology worked as stated.  He informed FLAXEL that he had spoken with satisfied

26   users of the reactor device and assured FLAXEL that Fuel FX expected to "place 50,000 to

27   100,000 units in 2003."  In subsequent telephone calls at around the same time, PARSONS told

28   FLAXEL that there were no risks to the plan.  PARSONS again represented that Fuel FX would

1   be selling 500 units a month by January 15, 2002, and a 100,000 units for the year 2003.

2   PARSONS told FLAXEL that the money he had lost in the KYRO oil and gas investments and

3   Casablanca Coffee and was "a guaranteed payback." These representations were untrue, and

4   PARSONS had no reason for believing them to be true. Rather, he knew they were untrue.

5   PARSONS was working in concert with the principals of Fuel FX and Soil Savers and knew that

6   they were not operating at a profit and could not, under any foreseeable circumstances,

7   compensate FLAXEL for his previous investment losses. Rather, PARSONS made these

8   representations to prevent FLAXEL from commencing litigation against him and to gain

9   additional remuneration by taking an undisclosed percentage of FLAXEL's investment with Fuel

10  FX and Soil Savers. For his part, FLAXEL had no knowledge of the true facts and no reasonable

11  way of obtaining that knowledge. Therefore FLAXEL relied on PARSONS' statements. Had

12  PARSONS disclosed the true facts, FLAXEL would not have purchased the investment.

13          151.    On or about November 18, 2002, FLAXEL received correspondence from

14  PARSONS on Fuel FX letterhead entitled, "Re: Fuel FX Reactor Information." In the letter

15  PARSONS provided additional information about Fuel FX, assuring FLAXEL that a $50,000

16  investment would result in a $750,000 return based upon PARSON's claim that the FX Reactor

17  was expected to penetrate at least 1 percent of the domestic market. PARSONS represented that,

18  "All [Fuel FX] Coca-Cola orders alone will return $204,168.00 based on domestic fleetwide

19  implementation of 49,000 units and this implementation has already begun. The 104,167 shares

20  of stock that accompany this $50,000 investment represent 0.4167% of the company. While at

21  this time the stock is not traded, PARSONS represents that Fuel FX has several New York firms

22  that want to do an IPO." These representations were untrue and PARSONS had no reason for

23  believing them to be true. Rather, he knew they were untrue. PARSONS had assured FLAXEL

24  he had personally investigated Fuel FX and Soil Savers. Moreover, PARSONS was working in

25  concert with the principals of Fuel FX and Soil Savers; had knowledge of their business

26  operations; and knew that they did not have the business activity he described. For his part,

27  FLAXEL had no knowledge of the true facts and no reasonable way of obtaining that knowledge.

28  Therefore FLAXEL relied on PARSONS' statements. Had PARSONS disclosed the true facts,

1    FLAXEL would not have purchased the investment.

2    152.    PARSONS informed FLAXEL that Fuel FX's pending patents provided "a broad

3    scope of protection that will hamper the market entry of others," and that he "anticipated a 3-4

4    year minimum jump on any competition while our patents are in pending status." PARSONS

5    asserted that the Fuel FX patent royalty was a very secure investment vehicle because it would be

6    paid on the 10th of each month after date of manufacture, not after receipt of payment from a

7    particular client. These representations were untrue and PARSONS had no reason for believing

8    them to be true. Rather, he knew they were untrue. PARSONS had assured FLAXEL he had

9    personally investigated Fuel FX and Soil Savers. PARSONS was working in concert with the

10   principals of Fuel FX and Soil Savers; had knowledge of their business operations; and knew that

11   they neither had the patents he described and were not paying any substantial royalties. For his

12   part, FLAXEL had no knowledge of the true facts and no reasonable way of obtaining that

13   knowledge. Therefore FLAXEL relied on PARSONS' statements. Had PARSONS disclosed the

14   true facts, FLAXEL would not have purchased the investment.

15   153.    PARSONS sent FLAXEL a list of Soil Savers' projected sales, prepared on

16   10/15/02. It listed contracts that would generate revenue of $12,887,700, a number "adjusted for

17   probability" to $4,516,525. The package was entitled "Soil Savers of New York 4.2mm Kyro

18   Payback Program." The list was false, and PARSONS had no reason for believing it to be true.

19   Rather, he knew it was untrue. PARSONS had assured FLAXEL he had personally investigated

20   Fuel FX and Soil Savers. PARSONS was working in concert with the principals of Fuel FX and

21   Soil Savers; had knowledge of their business operations; and knew that they did not have the

22   listed business activity and could not be expected to acquire it under foreseeable circumstance.

23   PARSONS knew Soil Savers could not reasonably expect revenue of $4,516,525 in 2003. For his

24   part, FLAXEL had no knowledge of the true facts and no reasonable way of obtaining that

25   knowledge. Therefore FLAXEL relied on PARSONS' statements. Had PARSONS disclosed the

26   true facts, FLAXEL would not have purchased the investment.

27   154.    In reliance on PARSON's representations, on December 27, 2002, FLAXEL

28   purchased 104,167 shares of Fuel FX, Inc., stock at a price of $0.48 per share for a total purchase

1  price of $50,000. On February 27, 2003, FLAXEL made a second purchase of 104,167 shares of

2  Fuel FX, Inc., stock at a price of $0.48 per share for a total purchase price of $50,000.

3      155.    Shortly before April 11, 2003, PARSONS solicited FLAXEL to invest in Soil

4  Savers, Inc.  On or about April 11, 2003, PARSONS informed FLAXEL in written

5  correspondence, "Please find Subscription and Investment Agreements enabling you to invest in

6  Soil Savers, Inc. (SSI), the parent company of Fuel FX and Fuel FX International, along with all

7  of the Soil Remediation entities.  SSI owns all of the rights to the 18 patents utilized by these

8  subsidiary companies. Tied into this stock purchase is a $1.50 per tonnage royalty from all soil

9  remediation work done worldwide by SSI, until you have received a 200% return on your

10 investment.  SSI would have to treat 2,675,000 tons to return your initial investment and

11 5,350,000 tons to treat 200%.  Currently, SSI has under contract approximately 3,500,000 tons,

12 which is to be treated over the next 14-18 months." These representations were untrue and

13 PARSONS had no reason for believing them to be true.  Rather, he knew they were untrue.

14 PARSONS had assured FLAXEL he had personally investigated Fuel FX and Soil Savers.

15 PARSONS was working in concert with the principals of Fuel FX and Soil Savers; had

16 knowledge of their business operations; and knew that they did not have the business he

17 described.  For his part, FLAXEL had no knowledge of the true facts and no reasonable way of

18 obtaining that knowledge.  Therefore FLAXEL relied on PARSONS' statements.  Had PARSONS

19 disclosed the true facts, FLAXEL would not have purchased the investment.

20     156.    On or about April 30, 2003, in reliance on these representations, FLAXEL signed

21 an Investment Agreement with Soil Savers, Inc.  Under the agreement, FLAXEL would receive

22 $0.25 U.S. per-ton royalty on soil treated by SSI worldwide, and each quarter would receive an

23 accounting and payment for the tonnage treated and payments received by SSI.  This royalty

24 would continue in effect for the life of the company and the patents.

25     157.    In response to FLAXEL's requests, Soil Savers' president, Larry Johnson, provided

26 documents represented as Soil Savers, Inc.'s, financial balance sheet dated May 2, 2003.  This

27 document showed current assets of $1,737,768.75; total property and equipment of $153,862.35;

28 total other assets, including securities, of $1,351,736.47; and license fees of $1,500,000;

1  amounting to total assets of $4,743,367.57.  The Income Statement dated May 2, 2003, showed
2  year-to-date royalty fees of $42,600.00.  It showed license fees of $2,150,000 for year to date.
3  Gross profit year-to-date was listed as $2,189,989.40.  After total expenses year-to-date of
4  $541,094.42, net income was listed as $1,648,894.98.  These representations were untrue and
5  PARSONS had no reason for believing them to be true.  Rather, he knew they were untrue.
6  PARSONS had assured FLAXEL he had personally investigated Fuel FX and Soil Savers.
7  PARSONS was working in closely with the principals of Fuel FX and Soil Savers; had knowledge
8  of their business operations; and knew that they did not have the assets Johnson described.
9      158.    On May 7, 2003, FLAXEL met PARSONS and Johnson at a breakfast meeting.
10  FLAXEL specifically asked about Soil Savers' patents and was assured that the technology was
11  protected; 14 additional patents had been applied for, and an estimated 12 more were to be
12  submitted within the next two years.  PARSONS stated that Pan American, Canadian, and
13  European patents had been in preparation since 60 days prior to the meeting, and were all to be
14  completed by mid-October 2003.  These representations were untrue, and PARSONS had no
15  reasonable grounds for believing them to be true.  Rather, he knew they were untrue.  PARSONS
16  had assured FLAXEL he had personally investigated Fuel FX and Soil Savers.  Moreover,
17  PARSONS was working in concert with the principals of Fuel FX and Soil Savers; had
18  knowledge of their business operations; and knew that they did not have the patents he described.
19  For his part, FLAXEL had no knowledge of the true facts and no reasonable way of obtaining that
20  knowledge.  Therefore FLAXEL relied on PARSONS' statements.  Had PARSONS disclosed the
21  true facts, FLAXEL would not have purchased the investment.
22      159.    Impressed by the straightforward attitude of both PARSONS and Johnson,
23  FLAXEL authorized a Buy Direction Letter authorizing IRA Resources, Inc., to purchase 315,500
24  shares of Soil Savers, Inc., stock at 1.60 per share for a total purchase price of $500,000 on May 8,
25  2003.
26      160.    At no time did PARSONS or anyone at Soil Savers inform FLAXEL that Soil
27  Savers was losing money.  FLAXEL was not notified that Soil Savers had plans to, and eventually
28  did, sell its "revolutionary, patented technology" to ZOOM; nor did FLAXEL ever approve this

1  transaction as a shareholder of Soil Savers.  For his part, FLAXEL had no knowledge of the true

2  facts and no reasonable way of obtaining that knowledge.  Therefore FLAXEL relied on

3  PARSONS' statements.  Had PARSONS disclosed the true facts, FLAXEL would not have

4  purchased the investment.

5        161.  FLAXEL is informed and believes that PARSONS was paid substantial

6  consideration by Johnson for inducing FLAXEL to purchase Soil Savers and Fuel FX shares and

7  royalties.

8        162.  In reliance on PARSONS' representations, FLAXEL invested a total of $103,939

9  in KYRO's oil and gas investments; $35,000 in PARSONS' Casablanca Coffee venture; and

10  $600,000 in Fuel FX and Soil Savers.  In addition, FLAXEL paid substantial amounts of money in

11  cash calls for KYRO's oil and gas investments, to be proven at trial.  Apart from a few hundred

12  dollars that FLAXEL received as income from the Brookshire Salt Dome and Wyoming wells,

13  FLAXEL received nothing from the investments that PARSONS induced him to purchase.

14  **TRANSACTIONS WITH THE BISHOPS**

15        163.  THE BISHOPS were another target of the PARSONS' fraudulent securities

16  schemes.  Like the other Plaintiffs, THE BISHOPS invested in KYRO.

17        164.  Plaintiffs THE BISHOPS incorporate by reference Paragraphs 1- 45 above as

18  though the same were set forth in full herein.

19        165.  At all times herein mentioned, PARSONS occupied a fiduciary relationship with

20  THE BISHOPS because (a) PARSONS was acting as THE BISHOPS' securities broker-dealer;

21  and (b) because a confidential relationship had developed through business dealings over a period

22  of time such as to induce THE BISHOPS to place confidence in PARSONS' integrity.

23        166.  At all times herein mentioned, PARSONS held himself out to THE BISHOPS as

24  possessing a superior knowledge of oil and gas exploration, fuel technology, soil remediation, and

25  investment, subjects that THE BISHOPS knew almost nothing about.  Because of the extreme

26  disparity in the parties' knowledge of these matters, PARSONS at all times encouraged THE

27  BISHOPS to rely on his expertise in matters of oil and gas exploration, fuel technology, soil

28  remediation, and investment.

167.   By means of several telephone conversations during the first few months of 2000,
PARSONS solicited THE BISHOPS to invest in the Brookshire Salt Dome prospect.
Specifically, PARSONS promoted three oil and gas drilling prospects: (1) a ten-well oil and gas
drilling prospect in Waller County, Texas, on 24.506 acres, referred to as the Williams lease;  (2)
a five-well oil and gas drilling prospect in Waller County, Texas, on ten acres, referred to as the
Southwell (Nursery) lease; and (3) a 20-well oil and gas drilling prospect in Waller County,
Texas, on 36 acres, referred to as the Weido lease.

168.   On or about March 15, 2000, PARSONS provided THE BISHOPS with an
investment prospectus for the Williams lease.  In the prospectus PARSONS represented that
KYRO owned a 6.3% working interest in the Williams Lease and would invest $158,240.00
toward the development of the property.

169.   The Williams lease prospectus included a "history" of the leases in the area, stating
that, as of March 2000, a total of 61 wells had been drilled, with only two dry holes occurring.  In
the prospectus, PARSONS assured THE BISHOPS that the Williams lease was considered a "low
risk development play."  He further assured BISHOP, "It appears that all of the acreage controlled
will be productive as the studies show strong hydrocarbon indications."  He also informed THE
BISHOPS, "The consortium on our first lease, the 24.506 acre Williams lease, plans to drill 10-15
wells, then sell the production with PUD offset locations.  They believe the market value would
be a 72 month payout valued with $25 per barrel of oil.  Then we would proceed to develop the
additional acreage.  They expect to have the lease ready for sale by August 2000. These
representations were untrue and PARSONS had no reason for believing them to be true.  Rather,
he knew they were untrue in that the geological evidence for  making these assertions did not
exist.  From his knowledge of the oil and gas industry and his access to the findings of geologists,
PARSONS knew the prospects were highly speculative and that they could not truthfully be
described as "low risk."  For  their part, THE BISHOPS had no knowledge of the true facts and
no reasonable way of obtaining that knowledge.  Rather, they trusted PARSONS, whose
statements about the condition of the property were, according to PARSONS, based on the
findings of petroleum geologists.  Therefore THE BISHOPS relied on PARSONS' statements.

1  Had PARSONS disclosed the true facts, THE BISHOPS would not have purchased the

2  investment.

3        170.    The only remuneration disclosed by PARSONS as being received by himself or

4  KYRO was a 10-90 percent split on net revenue or sale, with KYRO receiving 10 percent and

5  participants receiving 90 percent. He assured THE BISHOPS, "Kyro will not participate in sale

6  until Participants have received back 100% of their original investment." But PARSONS was

7  intending to take, and took, a much larger percentage of THE BISHOPS' investment than 10

8  percent. PARSONS failed to disclose the true facts to THE BISHOPS because he wished to

9  induce THE BISHOPS to purchase the investment. Had PARSONS disclosed the true facts, THE

10  BISHOPS would not have purchased the investment.

11        171.    With respect to investment income, PARSONS projected only two possible

12  outcomes for the Williams lease, set forth in a section of the prospectus entitled "Monthly Cash

13  Flow." The first outcome projected ten wells, producing 3,000 BOPD and providing THE

14  BISHOPS with a monthly income of $3,310.00. According to PARSONS, this would result in a

15  "payout" (100 percent return on THE BISHOPS' investment) within 7.6 months. The second

16  outcome projected fifteen wells producing 4,500 BOPD and providing a $4,965.00 monthly

17  income to THE BISHOPS. According to PARSONS, this would result in a payout (100 percent

18  return on THE BISHOPS' investment) within 5.6 months. He also made similar oral

19  representations to THE BISHOPS by telephone on or about March 15-20, 2000. He advised THE

20  BISHOPS of no other possible investment income results from the Williams lease. These

21  representations were untrue and PARSONS had no reason for believing them to be true. Rather,

22  he knew they were untrue in that the geological evidence for making these assertions did not exist.

23  From his knowledge of the oil and gas industry and his access to the findings of geologists,

24  PARSONS knew the prospects were highly speculative and that both projected outcomes were

25  extremely unlikely. Yet PARSONS did not disclose the true facts because he wished to induce

26  THE BISHOPS to purchase the investment. For their part, THE BISHOPS had no knowledge of

27  the true facts and no reasonable way of obtaining that knowledge. Rather, they trusted PARSONS

28  whose statements about the condition of the property were, according to PARSONS, based on the

1    findings of petroleum geologists. Therefore THE BISHOPS relied on PARSONS' statements.

2    Had PARSONS disclosed the true facts, THE BISHOPS would not have purchased the

3    investment.

4         172.    Similarly, PARSONS advised THE BISHOPS of only two possible sale outcomes

5    for the Williams lease, in a section of the Prospectus entitled "Return at Sale of Properties." The

6    first sale outcome, with ten projected wells producing 3,000 BOPD, assured THE BISHOPS they

7    would receive a 9.5 to1 rate of return on their investment. The second, alternative, sale outcome,

8    with fifteen projected wells producing 4,500 BOPD, assured THE BISHOPS they would receive a

9    12.7 to1 rate of return on their investment. PARSONS also made similar oral representations to

10   THE BISHOPS by telephone on or about March 15-20, 2000. He advised THE BISHOPS of no

11   other possible sale outcome from the Williams lease. These representations were untrue, and

12   PARSONS had no reason for believing them to be true. Rather, he knew they were untrue in that

13   the geological evidence for making these assertions did not exist. PARSONS knew the prospects

14   were highly speculative and that both projected outcomes were extremely unlikely. Yet

15   PARSONS did not disclose the true facts because he wished to induce THE BISHOPS to

16   purchase the investment. For their part, THE BISHOPS had no knowledge of the true facts and

17   no reasonable way of obtaining that knowledge. Rather, they trusted PARSONS whose

18   statements about the condition of the property were, according to PARSONS, based on the

19   findings of petroleum geologists. Therefore THE BISHOPS relied on PARSONS' statements.

20   Had PARSONS disclosed the true facts, THE BISHOPS would not have purchased the

21   investment.

22         173.    In reliance on these representations by PARSONS, THE BISHOPS purchased

23   investments as follows: On March 17, 2000, they paid $50,116.50 for a .5 percent working

24   interest in the Williams lease; on March 21, 2000, they paid a further $12,529.00 for a .125

25   percent interest in Williams lease; on April 2, 2000, they paid $49,583.60 for an additional .5

26   percent interest in the Williams lease.

27         174.    On or about May 15, 2000, PARSONS informed THE BISHOPS in a letter that the

28   Brookshire Salt Dome was "the hottest oil and gas play presently being developed in the domestic

---

FIRST AMENDED COMPLAINT
FOR SECURITIES FRAUD                          54                    Case No. 05 CV 1259 IEG

1    market." PARSONS claimed KYRO had been approached by several companies who wished to

2    purchase KYRO's interest.  He represented to THE BISHOPS that KYRO's section of the

3    Brookshire Salt Dome would be the "sweet spot" because its development group, which included

4    petroleum geologists, believed it to be feeding other productive zones.  He informed THE

5    BISHOPS that his development group anticipated drilling "300-400 wells on this acreage over the

6    next 2-3 years" and finding "150-200 feet of pay in the wells drilled on these tracts."  He

7    represented that, in the opinion of his development group, which included petroleum geologists,

8    the leases were "expected to produce 3000 to 4500 BOPD," and would be ready for sale by

9    September 2000, and that investing in the project "truly is a once in a lifetime opportunity."

10   PARSONS made the same representations in the course of several telephone conversations with

11   THE BISHOPS at approximately the same time.  These representations were untrue and

12   PARSONS had no reason for believing them to be true.  Rather, he knew they were untrue and

13   that the geological evidence for  making these assertions did not exist.  From his knowledge of the

14   oil and gas industry and his access to the findings of geologists, PARSONS knew the prospects

15   were highly speculative and that it was virtually impossible that he would drill "300-400 wells on

16   this acreage over the next 2-3 years" and extremely unlikely that he would find "150-200 feet of

17   pay in the wells drilled on these tracts."  PARSONS failed to disclose the true facts to THE

18   BISHOPS because he wished to induce THE BISHOPS to purchase the investment.  For their

19   part, THE BISHOPS had no knowledge of the true facts and no reasonable way of obtaining that

20   knowledge.  Therefore THE BISHOPS relied on PARSONS' statements about the condition of

21   the property which, according to PARSONS, were based on the findings of petroleum geologists.

22   Had PARSONS disclosed the true facts, THE BISHOPS would not have purchased the

23   investment.

24          175.    Approximately one week later, PARSONS mailed THE BISHOPS investment

25   prospectuses for the Southwell (Nursery) lease and the Weido lease.  In the investment prospectus

26   for the Southwell (Nursery) lease, PARSONS represented that KYRO owned a 6.3% working

27   interest in the Southwell (Nursery) lease and would invest $207,657 toward the development of

28   the property.

176.   The Southwell (Nursery) lease prospectus included a "history" of the leases in the area, stating that, as of March 1, 2000, a total of 74 wells had been drilled, with only three dry holes occurring.   In the prospectus, PARSONS assured THE BISHOPS that the Southwell lease was considered a "low risk development play."  He stated, "It appears that all of the acreage controlled will be productive as the studies show strong hydrocarbon indications."  He further assured THE BISHOPS, "On our first lease, the Williams lease, we have drilled two wells out of a projected 15 wells to be drilled.  Our 1st well potentialed at 1150 BPD and our second well potentialed at 1200 BOPD.  They have been choked back to produce a daily rate of 300 BOPD, which is the maximum allowed by the Texas Railroad Commission. The consortium on our second lease, the 24.506 acre Southwell lease, plans to drill 5 wells, then sell the production with PUD offset locations.  They believe the market value would be a 72 month payout valued with $25 per barrel of oil.  Then we would proceed to develop the additional acreage.  They expect to have the lease ready for sale by September 2000."  These representations were untrue and PARSONS had no reason for believing them to be true.  Rather, he knew they were untrue in that the geological evidence for making these assertions did not exist.  From his knowledge of the oil and gas industry and his access to the findings of geologists, PARSONS knew the prospects were highly speculative and that they could not truthfully be described as "low risk."  PARSONS failed to disclose the true facts to THE BISHOPS because he wished to induce THE BISHOPS to purchase the investment. For  their part, THE BISHOPS had no knowledge of the true facts and no reasonable way of obtaining that knowledge. Rather, they trusted PARSONS, whose statements about the condition of the property were, according to PARSONS, based on the findings of petroleum geologists. Therefore THE BISHOPS relied on PARSONS' statements. Had PARSONS disclosed the true facts, THE BISHOPS would not have purchased the investment.

177.   The only remuneration disclosed by PARSONS as being received by himself or KYRO was a 10-90 percent split on net revenue or sale, with KYRO receiving 10 percent and participants receiving 90 percent.  He assured THE BISHOPS,"Kyro will not participate in sale until Participants have received back 100% of their original investment.  But PARSONS was

1  intending to take, and took, a much larger percentage of THE BISHOPS' investment than 10

2  percent. Had PARSONS disclosed the true facts, THE BISHOPS would not have purchased the

3  investment.

4      178.    With respect to investment income, PARSONS advised THE BISHOPS of only

5  two possible outcomes for the Southwell (Nursery) lease, in a section of the prospectus entitled

6  "Monthly Cash Flow." The first outcome projected five wells, producing 1500 BOPD and

7  providing THE BISHOPS with a monthly income of $1,241. According to PARSONS, this

8  would result in a "payout" (100 percent return on THE BISHOPS' investment) within 7.4 months.

9  The second, alternative outcome projected seven wells, producing 2,100 BOPD and providing a

10  $1,738 monthly income to THE BISHOPS. According to PARSONS, this would result in a

11  payout (100 percent return on THE BISHOPS' investment) within six months. PARSONS also

12  made similar representations to THE BISHOPS by telephone on or about March 15-20, 2000. He

13  advised THE BISHOPS of no other possible investment outcome from the Southwell (Nursery)

14  lease. These representations were untrue and PARSONS had no reason for believing them to be

15  true. Rather, he knew they were untrue in that the geological evidence for making these assertions

16  did not exist. From his knowledge of the oil and gas industry and his access to the findings of

17  geologists,

18  PARSONS knew the prospects were highly speculative and that both projected outcomes were

19  extremely unlikely.  Yet PARSONS did not disclose the true facts because he wished to induce

20  THE BISHOPS to purchase the investment. For their part, THE BISHOPS had no knowledge of

21  the true facts and no reasonable way of obtaining that knowledge. Rather, they trusted PARSONS

22  whose statements about the condition of the property were, according to PARSONS, based on the

23  findings of petroleum geologists. Therefore THE BISHOPS relied on PARSONS' statements.

24  Had PARSONS disclosed the true facts, THE BISHOPS would not have purchased the

25  investment.

26      179.    Similarly, PARSONS provided only two possible sale outcomes for the Southwell

27  (Nursery) lease, in a section entitled "Return at Sale of Properties." The first sale outcome, with

28  five projected wells producing 1500 BOPD, informed THE BISHOPS they would receive an 8 to

1    1 rate of return on their investment. The second, alternative, sale outcome, with seven projected

2    wells, producing 2,100 BOPD, informed THE BISHOPS they would receive a 9.9 to1 rate of

3    return on their investment. PARSONS also made similar representations to THE BISHOPS by

4    telephone on or about March 15-20, 2000. He advised THE BISHOPS of no other possible sale

5    outcomes from the Southwell (Nursery) lease. These representations were untrue, and PARSONS

6    had no reason for believing them to be true. Rather, he knew they were untrue in that the

7    geological evidence for making these assertions did not exist. From his knowledge of the oil and

8    gas industry and his access to the findings of geologists, PARSONS knew the prospects were

9    highly speculative and that both projected outcomes were extremely unlikely.  Yet PARSONS

10   did not disclose the true facts because he wished to induce THE BISHOPS to purchase the

11   investment. For their part, THE BISHOPS had no knowledge of the true facts and no reasonable

12   way of obtaining that knowledge. Rather, they trusted PARSONS whose statements about the

13   condition of the property were, according to PARSONS, based on the findings of petroleum

14   geologists. Therefore THE BISHOPS relied on PARSONS' statements. Had PARSONS

15   disclosed the true facts, THE BISHOPS would not have purchased the investment.

16        180.    In the investment prospectus for the Weido lease, PARSONS represented that

17   KYRO owned a 6.3% working interest in the Weido lease and would invest $207,657 toward the

18   development of the property.

19        181.    In the Weido lease prospectus, PARSONS provided THE BISHOPS with a

20   "history" of the leases in the area, stating that, as of March 1, 2000, a total of 74 wells had been

21   drilled, with only three dry holes occurring. As with the other leases, PARSONS assured THE

22   BISHOPS that the prospect lease was considered a "low risk development play" and "It appears

23   that all of the acreage controlled will be productive as the studies show strong hydrocarbon

24   indications." As with the Southwell lease, PARSONS informed THE BISHOPS, "On our first

25   lease, the Williams lease, we have drilled two wells out of a projected 15 wells to be drilled. Our

26   1st well potentialed at 1150 BPD and our second well potentialed at 1200 BOPD. They have been

27   choked back to produce a daily rate of 300 BOPD, which is the maximum allowed by the Texas

28   Railroad Commission. The consortium on our third lease, the 36 acre Weido lease, plans to drill

---

FIRST AMENDED COMPLAINT
FOR SECURITIES FRAUD                    58            Case No. 05 CV 1259 IEG

20 wells, then sell the production with PUD offset locations.  They believe the market value would be a 72 month payout valued with $25 per barrel of oil.  Then we would proceed to develop the additional acreage.  They expect to have the lease ready for sale by end of the year, 2000."  These representations were untrue and PARSONS had no reason for believing them to be true.  Rather, he knew they were untrue in that the geological evidence for making these assertions did not exist.  From his knowledge of the oil and gas industry and his access to the findings of geologists,

PARSONS knew the prospects were highly speculative and that they could not truthfully be described as "low risk."  PARSONS failed to disclose the true facts to THE BISHOPS because he wished to induce THE BISHOPS to purchase the investment.  For their part, THE BISHOPS had no knowledge of the true facts and no reasonable way of obtaining that knowledge.  Rather, they trusted PARSONS, whose statements about the condition of the property were, according to PARSONS, based on the findings of petroleum geologists.  Therefore THE BISHOPS relied on PARSONS' statements.  Had PARSONS disclosed the true facts, THE BISHOPS would not have purchased the investment.

182.    The only remuneration disclosed by PARSONS as being received by himself or KYRO was a 10-90 percent split on net revenue or sale, with KYRO receiving 10 percent and participants receiving 90 percent.  He assured THE BISHOPS,"Kyro will not participate in sale until Participants have received back 100% of their original investment."  But PARSONS was intending to take, and took, a much larger percentage of THE BISHOPS' investment than 10 percent.  Had PARSONS disclosed the true facts, THE BISHOPS would not have purchased the investment.

183.    With respect to investment income, PARSONS provided to THE BISHOPS only two possible outcomes from the Weido lease, in a section of the prospectus entitled "Monthly Cash Flow."  The first outcome projected twenty wells, producing 6000 BOPD and providing THE BISHOPS with a monthly income of $3,310.  According to PARSONS, this would result in a "payout" (100 percent return on THE BISHOPS' investment) within seven months.  The second outcome projected twenty-five wells producing 7,500 BOPD and providing a $4,138 monthly

1    payment to THE BISHOPS.  According to PARSONS, this would result in a payout  (100 percent

2    return on THE BISHOPS' investment) within 6.3 months.  PARSONS also made similar

3    representations to THE BISHOPS by telephone on or about March 15-20, 2000.  He advised THE

4    BISHOPS of no other possible income results from the Weido lease.  These representations were

5    untrue and PARSONS had no reason for believing them to be true.  Rather, he knew they were

6    untrue in that the geological evidence for making these assertions did not exist.  From his

7    knowledge of the oil and gas industry and his access to the findings of geologists, PARSONS

8    knew the prospects were highly speculative and that both projected outcomes were extremely

9    unlikely.  Yet PARSONS did not disclose the true facts because he wished to induce THE

10   BISHOPS to purchase the investment.  For  their part, THE BISHOPS had no knowledge of the

11   true facts and no reasonable way of obtaining that knowledge. Rather, they trusted PARSONS

12   whose statements about the condition of the property were, according to PARSONS, based on the

13   findings of petroleum geologists.  Therefore THE BISHOPS relied on PARSONS' statements.

14   Had PARSONS disclosed the true facts, THE BISHOPS would not have purchased the

15   investment.

16         184.    Similarly, PARSONS provided only two possible sale outcomes for the Weido

17   lease, in a section of the prospectus entitled "Return at Sale of Properties."  The first sale

18   outcome, with 20 projected wells producing 6000 BOPD, assured THE BISHOPS they would

19   receive an 8.5 to 1 rate of return on their investment.  The second, alternative, sale outcome, with

20   twenty-five projected wells, producing 7,500 BOPD, assured THE BISHOPS they would receive a

21   109 to1 rate of return on their investment.  He also made similar representations to THE

22   BISHOPS by telephone on or about March 15-20, 2000.  He advised THE BISHOPS of no other

23   possible sale outcome from the Weido lease. These representations were untrue and PARSONS

24   had no reason for believing them to be true.  Rather, he knew they were untrue in that the

25   geological evidence for making these assertions did not exist.  From his knowledge of the oil and

26   gas industry and his access to the findings of geologists, PARSONS knew the prospects were

27   highly speculative and that both projected outcomes were extremely unlikely.  Yet PARSONS did

28   not disclose the true facts because he wished to induce THE BISHOPS to purchase the

1    investment.  For their part, THE BISHOPS had no knowledge of the true facts and no reasonable

2    way of obtaining that knowledge.  Rather, they trusted PARSONS whose statements about the

3    condition of the property were, according to PARSONS, based on the findings of petroleum

4    geologists.  Therefore THE BISHOPS relied on PARSONS' statements.  Had PARSONS

5    disclosed the true facts, THE BISHOPS would not have purchased the investment.

6             185In reliance on PARSONS' misrepresentations, THE BISHOPS paid $9,229 for

7    0.25% working interest in the Southwell (Nursery) lease and paid $23,214 for a 0.25 percent

8    working interest in the Weido lease.

9             186.    On or about May 15, 2000, PARSONS, in his letter of that date, also offered THE

10   BISHOPS an investment in stock of Sovereign Chief Ventures.  He informed THE BISHOPS that

11   Sovereign was purchasing two other nearby Salt Dome fields which would "dramatically increase

12   the value of the company."  He informed THE BISHOPS that he had "two groups who wish to

13   purchase the entire amount but want to give all of our existing clients an opportunity to

14   participate."   In oral conversations at approximately the same date, PARSONS represented that

15   THE BISHOPS would recover at least $4.50 per share.   In reliance on PARSONS'

16   representations, THE BISHOPS purchased 22,191 shares in Sovereign Chief Ventures for

17   $47,000.

18            187.    After THE BISHOPS had invested in the Brookshire Dome investment,

19   PARSONS informed them by letter on or about July 24, 2000, that the lease developments were

20   making rapid progress and offered THE BISHOPS further investment opportunities.  Specifically,

21   he informed THE BISHOPS, "All of the wells drilled so far are showing multiple oil and gas

22   zones in each wellbore.  Our first well on the Nursery has 4 oil zones and 2 gas zones.  It appears,

23   as Bill Wood believes, that production will get better as we move farther south on our acreage.

24   The Nursery well drilled just as Bill had it mapped."  He further informed THE BISHOPS, "With

25   what we have seen to date, Bill believes he can have the Williams producing 3000 BOPD

26   equivalent and the Nursery producing 1500 BOPD equivalent.  It is then the intent to sell these

27   two leases for cash reserves to help pay for the development of the additional leases.  We expect

28   to drill 250-300 wells on our lease positions over the next 3 years."  These representations were

---

FIRST AMENDED COMPLAINT
FOR SECURITIES FRAUD                              61                    Case No. 05 CV 1259 IEG

1  untrue and PARSONS had no reason for believing them to be true.  Rather, he knew they were
2  untrue in that the geological evidence for making these assertions did not exist.  Yet PARSONS
3  did not disclose the true facts because he wished to induce THE BISHOPS to purchase additional
4  investments.  For their part, THE BISHOPS had no knowledge of the true facts and no reasonable
5  way of obtaining that knowledge. Rather, they trusted PARSONS whose statements about the
6  condition of the property were, according to PARSONS, based on the findings of petroleum
7  geologists.  Therefore THE BISHOPS relied on PARSONS' statements.  Had PARSONS
8  disclosed the true facts, THE BISHOPS would not have purchased the investment.

9       188.    Generally, in persuading THE BISHOPS to purchase the highly speculative oil and
10  gas investments in Brookshire Salt Dome, PARSONS did not advise THE BISHOPS of the
11  degree of risk that they entailed.  He grossly exaggerated their rate of return and their financial
12  prospects in order to induce THE BISHOPS to purchase them.  In reliance on PARSONS'
13  representations, THE BISHOPS did purchase them and suffered serious financial damage as a
14  result.  At no time did PARSONS disclose to THE BISHOPS that he was not a licensed broker-
15  dealer.

16       189.    Throughout 2001, PARSONS sent THE BISHOPS encouraging news about their
17  investments.  On or about March 12, 2001, in a letter of that date, PARSONS informed THE
18  BISHOPS that their interest in the Brookshire Dome leases would be expanded in area at no cost
19  to them.  PARSONS informed THE BISHOPS that the "current drilling activity" was "heating
20  up," and that 50 wells would be drilled on the Brookshire Dome leases in 2001.  On or about May
21  23, 2001, PARSONS sent THE BISHOPS another videotape, showing wells in operation. On or
22  about June 28, 2001, PARSONS sent THE BISHOPS a letter explaining that the delay in income
23  was caused by the "shortage of completion rigs, which has delayed everyone getting their wells
24  into production."  To reassure THE BISHOPS, PARSONS informed them that one of the
25  Williams lease wells "looks to be the best well drilled so far, as it has over 80 feet of pay."

26       190.    On or about September 1, 2001, in reliance on PARSONS' representations, THE
27  BISHOPS purchased an additional interest in the Peggy Lynne well in the Brookshire Salt Dome
28  for $10,872.15.

191.    On or about February 2, 2002, in a letter of that date, PARSONS informed THE BISHOPS that the delay in income from the wells had been caused by heavy rain, but they would soon be at full capacity.  Throughout 2002, PARSONS orally represented to THE BISHOPS that the delay in completing the Brookshire Salt Dome wells was caused by various disputes between individuals in Sovereign Chief, the operating company for Brookshire Salt Dome.

192.    In reliance on PARSONS' representations, THE BISHOPS invested in excess of $202,544 in the above-described oil and gas investments.  In addition, THE BISHOPS paid substantial amounts of money in cash calls for KYRO's oil and gas investments, to be proven at trial.  Apart from a few hundred dollars that THE BISHOPS received as income from the Brookshire Salt Dome and Wyoming wells, which were greatly exceeded by the cash calls for continued drilling, they received nothing from the investments described above that PARSONS induced them to purchase.

193.    Throughout 2003, in telephone conversations with THE BISHOPS, PARSONS provided various additional technical explanations as to why their investments in the Brookshire Salt Dome had not produced the income he had earlier represented.  He continually assured THE BISHOPS that their investments would soon pay off.  THE BISHOPS, both of whom were older than 65 and within the protections of W & I Code §§ 15600 *et seq*, believed PARSONS and continued to invest in him.  In fact, as late as October 4, 2004, THE BISHOPS invested a further $4,853 with PARSONS in an oil and gas prospect known as "E.O. Cox."  For their part, THE BISHOPS had no knowledge of the true facts and no reasonable way of obtaining that knowledge.  Therefore THE BISHOPS relied on PARSONS' statements about the condition of their investments.

194.    On or about March 8, 2005, THE BISHOPS joined as a plaintiff in Case No.  05 CV 1259 IEG (WMc) against Larry Johnson; his corporation, Soil Savers, Inc.; and related entities for losses resulting from the Fuel FX/Soil Savers fraudulent securities scheme.  In July 2005, some of the same plaintiffs filed a second action, Case No. 05 CV-1404-BEN (RBB), against PARSONS for related fraudulent practices.   On or about October 2005, the two actions were consolidated.  On or about February 2006, PARSONS learned that THE BISHOPS were

1  considering joining the other the other plaintiffs in the consolidated action against him.

2  PARSONS attorney thereupon informed THE BISHOPS' attorney that PARSONS intended to

3  resolve the matter with them.  Approximately six months passed with exchanges between counsel,

4  but without a resolution of the matter.   Finally, the BISHOPS realized that they could no longer

5  rely on the assurances of PARSONS' counsel regarding settlement and commenced the instant

6  proceedings.

## CAUSES OF ACTION

### FIRST CLAIM – FEDERAL SECURITIES VIOLATIONS

*(By All Plaintiffs Against All Defendants)*

10  195.    Plaintiffs incorporate by reference Paragraphs 1- 203 above as though the same

11  were set forth in full herein.

12  196.    Plaintiffs' First Claim against defendants PARSONS, KYRO, Inc., a Texas

13  Corporation; KYRO, Inc., a California Corporation; and DOES 1-100 (referred to collectively as

14  "Defendants") alleges that:

15  197.    By knowingly or recklessly misrepresenting the fraudulent nature of their

16  investment program, and by otherwise making material misrepresentations, directly and indirectly,

17  to Plaintiffs, Defendants directly and indirectly, by the use of the means and instrumentalities of

18  interstate commerce, or of the mail, in connection with the purchase or sales of securities: (a)

19  Have employed devices, schemes, or artifices to defraud; (b) Have made untrue statements of

20  material fact, or have omitted to state material facts necessary in order to make the statements

21  made, in light of the circumstances with which they were made, not misleading; and ©)  Have

22  engaged in transactions, acts, practices and courses of business which operated as a fraud upon

23  purchasers of securities.

24  198.    By reason of the foregoing, Defendants have violated Section 10(b) of the

25  Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

26  199.    As a result of Defendants' violation of Section 10(b) of the Exchange Act and rule

27  10b-5, Plaintiffs have been damaged in the sum in excess of $4,418,624

28

## SECOND CLAIM – RESCISSION

*(By All Plaintiffs Against All Defendants)*

200.    Plaintiffs Incorporate by reference paragraphs 1- 203 above as though the same were set forth in full herein.

201.    Plaintiffs for a Second Claim against defendants PARSONS, KYRO, a Texas Corporation; KYRO, Inc., a California Corporation; and DOES 1-100 (referred to collectively as "Defendants") alleges as follows:

202.    Section 15(a)(1) of the Securities and Exchange Act of 1933 requires all brokers and dealers that use any means of interstate commerce to effect transactions in securities to register on Form BD with the Securities and Exchange Commission.

203.    PARSONS promoted and sold various investment securities, using the means of interstate commerce to effect the transactions with Plaintiffs as set forth in paragraphs 1-187.

204.    Plaintiffs are informed and believe and thereon allege that at all relevant times, PARSONS was not a registered broker dealer nor was he associated with a registered broker dealer.  Therefore, PARSONS, at all relevant times, was not authorized to effect transactions securities utilizing any means of interstate commerce.

205.    Because PARSONS was not a registered broker dealer when he utilized means of interstate commerce to sell securities to Plaintiffs, the transactions are void as illegal contracts under Section 215(b) of the Investment Advisor Action (15 U.S.C. Section 80b-15(b) and Section 29(b) of the Securities Exchange Act of 1934.

206.    Plaintiffs request a determination by the Court that the transactions described herein are illegal and void and that these transactions be voided by the Court.  Plaintiffs further seek return of their investments, plus interest and costs incurred including Individual Retirement Account transfer fees and other fees associated with the transfer of funds minus any payments made to Plaintiffs as return on their investments in an amount in excess of $4,418,624.

207.    In performing the acts herein alleged, Defendants intentionally misrepresented and concealed from Plaintiffs material facts, known to Defendants, as set forth in paragraphs 1-187 of this Complaint, with the intention on the part of Defendants of depriving Plaintiffs of their money,

1  thereby justifying an award of punitive damages against Defendants.

2  ### THIRD CLAIM – RESCISSION

3  *(By All Plaintiffs Against All Defendants)*

4  208.    Plaintiffs incorporate by reference paragraphs 1-203 above as though the same

5  were set forth in full herein.

6  209.    Plaintiffs for a Third Claim against Defendants PARSONS; KYRO, a Texas

7  corporation; KYRO, a California Corporation; and DOES 1-100 (referred to collectively as

8  "Defendants") allege that:

9  210.    Plaintiffs entered into Subscription Agreements and Investment Agreements with

10  Defendants, whereby Defendants represented that Plaintiffs would be purchasing shares of oil and

11  gas leases as well as shares of stock in companies that had ownership rights to certain patented

12  technology.  Defendants also represented that these companies had completed certain soil

13  remediation projects and were contracted to perform extensive additional soil remediation projects

14  currently and in the future.  Defendants also provided Plaintiffs with copies of financial reports

15  evidencing positive cash flow and cash in reserves substantiating Defendants' representations that

16  Soil Savers and its subsidiaries were growing business concerns.  Defendants also represented the

17  value of the various corporations and stock ownership of those corporations as the stock of the

18  various Defendants.

19  211.    The representations made by Defendants were in fact false.  With regard to the

20  KYRO oil and gas leases, the true facts were as follows: (a) The necessary geological evidence to

21  support Defendants' representations as to the oil and gas reserves contained in the properties and

22  their expected oil and gas production did not exist; (b) The investments were not "low risk" but

23  highly speculative; and ©) Defendants were receiving as remuneration undisclosed percentages of

24  Plaintiffs' investment payment. With regard to Fuel FX and Soil Savers, the true facts were as

25  follows: (a) Soil Savers did not own the patented technology claimed by Defendants; (b) There

26  were no valid patent applications for new technology; ©) The financial statements provided to

27  Plaintiffs were false; (d) The valuations of the various Fuel FX and Soil Saver companies claimed

28  by Defendants were false, seriously overvaluing the companies; and ©) the past, present, and

1  future jobs that Defendants claimed to be handled by Soil Savers were not in fact performed by

2  Soil Savers but by other entities; and (d) The past, future, and current contracts that Defendants

3  claimed to have belonged to Fuel FX and SOIL SAVERS were grossly exaggerated.  The facts

4  supporting this Claim are more specifically set forth in hereinabove.

5         212.   At the time the representations were made, and at the time Plaintiffs entered into

6  the Subscription Agreements and Investment Agreements, Plaintiffs did not know the

7  representations were false, but believed them to be true and reasonably relied upon them as set

8  forth in this Complaint.

9         213.   Plaintiffs will suffer substantial harm and injury under the Subscription

10 Agreements and Investment Agreements if they are not rescinded because the investment

11 contracts were procured by fraud; the consideration upon which the Subscription Agreements and

12 Investment Agreements are based is illusory; and there has been a failure of consideration.

13        214.   Plaintiffs intend service of the summons and complaint in this Action to serve as

14 notice  of rescission of the Subscription Agreements and Investment Agreements listed

15 hereinabove and hereby demand that Defendants restore to them the consideration furnished by

16 Plaintiffs to purchase oil and gas leases and Fuel FX and Soil Savers stock, specifically

17 $2,072,386 for GIL LAWRENCE, $95,640 for MARLEE STEELE, $1,267,000 for KEN

18 MARINAI, $42,115 for J. LAWRENCE, $738,939 for FLAXEL, and $202,544 for THE

19 BISHOPS, for a total amount of $4,418,624.

20        215.   As a result of entering into the various Subscription Agreements and Investment

21 Agreements with Defendants, Plaintiffs have incurred expenses in addition to those alleged above.

22 Additional expenses include oil and gas lease cash calls; Individual Retirement Account transfer

23 fees and other fees associated with the transfer of funds from Plaintiffs to Defendants that

24 Plaintiffs have paid as well as lost opportunity for true investment returns.

25        216.   In performing the acts herein alleged, Defendants intentionally misrepresented and

26 concealed from Plaintiffs material facts, known to Defendants, as set forth hereinabove, with the

27 intention on the part of Defendants of depriving Plaintiffs of their money, thereby justifying an

28 award of punitive damages against Defendants.

# FOURTH CLAIM – FRAUD

## *(By All Plaintiffs Against All Defendants)*

217.    Plaintiffs incorporate by reference paragraphs 1-203 above as though the same were set forth in full herein.

218.    Plaintiffs for a Fourth Claim against defendants PARSONS; KYRO, a Texas Corporation; and KYRO, Inc., a California Corporation; and DOES 1-100 (referred to collectively as "Defendants") allege as follows:

219.    Defendants knowingly made false representations to Plaintiffs with the intent to defraud Plaintiffs.  The representations made by Defendants, as set forth hereinabove and identified as misrepresentations, were representations regarding material facts, which were relied upon by Plaintiffs in making their decision to invest in oil and gas leases and Fuel FX and Soil Savers stock and royalties, and the amount of money that would be invested therein.  Plaintiffs relied on these actual representations as set forth hereinabove and identified as misrepresentations.

220.    As a proximate result of Defendants' fraud and deceit, and the facts herein alleged, Plaintiffs were collectively damaged in the sum in excess of $4,418,624.

221.    In performing the acts herein alleged, Defendants intentionally misrepresented and concealed from Plaintiffs material facts known to Defendants, as set forth hereinabove and identified as misrepresentations, with the intention of depriving Plaintiffs of their money, thereby justifying an award of punitive damages against Defendants.

# FIFTH CLAIM – NEGLIGENT MISREPRESENTATION

## *(By All Plaintiffs Against All Defendants)*

222.    Plaintiffs incorporate by reference paragraphs 1-203 above as though the same were set forth in full herein.

223.    Plaintiffs, for a Fifth Claim against Defendants PARSONS; KYRO, a Texas Corporation; KYRO, a California Corporation; and DOES 1-100 (referred to collectively as "Defendants") allege as follows:

224.    Defendants made false representations to Plaintiffs without a reasonable belief or investigation into the accuracy of representations, knowing that Plaintiffs would rely on these

representations.  The representations made by Defendants, as set forth hereinabove and identified

as misrepresentations, were representations regarding material facts, which were relied upon by

Plaintiffs in making their decision to invest in oil and gas leases; Fuel FX; and Soil Savers and its

subsidiaries and the amount of money that would be therein invested.  Plaintiffs relied on these

actual representations as set forth hereinabove.

225.    Defendants, in making the representations set forth in hereinabove and identified as

misrepresentations did so without a reasonable belief in the accuracy and truthfulness of those

statements.  Plaintiffs reasonably relied upon those statements and as a result have been damaged

in the sum in excess of $4,418,624.

## SIXTH CLAIM – CONVERSION

*(By All Plaintiffs Against All Defendants)*

226.    Plaintiffs Incorporate by reference paragraphs 1-203 above as though the same

were set forth in full herein.

227.    Plaintiffs' Sixth Claim against Defendants, PARSONS, KYRO, a Texas

corporation; KYRO, a California Corporation; and DOES 1- 100 (referred to collectively as

"Defendants") alleges as follows:

228.    Under the terms of the oil and gas investments, Subscription Agreements, and

Investment Agreements, Plaintiffs were entitled to royalties based upon work performed by the

various oil and gas ventures, Fuel FX, and Soil Savers, as more specifically set forth in each

Subscription Agreement and each Investment Agreement and the Complaint hereinabove.

Payment of royalties was due either on a monthly or quarterly basis.

229.    Defendant PARSONS, an unlicensed broker-dealer, was paid a commission for

money invested by Plaintiffs in the oil and gas ventures and Fuel FX and Soil Savers and retained

interests in oil and gas leases in his own name and that of KYRO.  The Investment Agreements

and Subscription Agreements entered into by the parties did not disclose that PARSONS would

receive a commission from the money they invested in Fuel FX and Soil Savers.  Plaintiffs have

demanded return of their money and payment of royalties.

230.    As a result of Defendants' conversion, Plaintiffs have been deprived of their

1   property to Plaintiffs' damage in a sum to be proven at trial.

2       231.   The aforementioned acts of Defendants were willful, wanton, malicious and

3   oppressive and were taken with the intent to defraud Plaintiffs, justifying the award of exemplary

4   and punitive damages.

5   **SEVENTH CLAIM – VIOLATION OF CALIFORNIA**

6   **CORPORATIONS CODE § 25401 *ET SEQ.***

7   *(By Plaintiffs MARINAI and THE BISHOPS against All Defendants)*

8       232.   Plaintiffs Incorporate by reference paragraphs 1-203 above as though the same

9   were set forth in full herein.

10       233.   Plaintiffs MARINAI and BISHOP, for an Seventh Claim against Defendants

11   PARSONS; KYRO, a Texas Corporation; KYRO, a California Corporation; and DOES 1-100

12   (referred to collectively as "Defendants") allege as follows:

13       234.   By knowingly or recklessly misrepresenting the fraudulent nature of their

14   investment program, and by otherwise making material misrepresentations, directly and indirectly,

15   to Plaintiff, Defendants by the use of the means and instrumentalities of state commerce in

16   connection with the purchase or sales of securities: (a) Have employed devices, schemes, or

17   artifices to defraud; (b) Have made untrue statements of material fact and have omitted to state

18   material facts necessary in order to make the statements made, in light of the circumstances under

19   which they were made, not misleading; and (c) Have engaged in transactions, acts, practices and

20   courses of business which operated as a fraud upon purchasers of securities.

21       235.   By reason of the foregoing, Defendants have violated California Corporations

22   Code § 25401 *et seq.*

23       236.   As a result of Defendants' violation of California Corporations Code § 25401,

24   Plaintiffs have been damaged as follows: in a sum exceeding $1,267,000 for KEN MARINAI, and

25   in a sum exceeding $202,544 for THE BISHOPS.

26

27

28

---

FIRST AMENDED COMPLAINT
FOR SECURITIES FRAUD           70           Case No. 05 CV 1259 IEG

**EIGHTH CLAIM – VIOLATION OF WASHINGTON REV.**

**CODE §§ 21.20.010; 21.20.140 & 21.20.005**

*(By Plaintiffs GIL LAWRENCE and J. LAWRENCE against All Defendants)*

237.    Plaintiffs GIL LAWRENCE and J. LAWRENCE incorporate by reference paragraphs 1-203 above as though the same were set forth in full herein.

238.    Plaintiffs GIL LAWRENCE and J. LAWRENCE for an Eighth Claim against Defendants PARSONS; KYRO, a Texas Corporation; KYRO, a California Corporation; and DOES 1-100 (referred to collectively as "Defendants") allege as follows:

239.    By knowingly and recklessly misrepresenting the fraudulent nature of their investment program, and by otherwise making material misrepresentations, directly and indirectly, to Plaintiffs, Defendants, by the use of the means and instrumentalities of state commerce in connection with the purchase or sales of securities: (a) Have employed devices, schemes, or artifices to defraud; (b) Have made untrue statements of material fact, and have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) Have engaged in transactions, acts, practices and courses of business which operated as a fraud upon purchasers of securities.

240.    By reason of the foregoing, Defendants have violated Washington Rev. Code §§ 21.20.010; 21.20.140 and 21.20.005.

241.    As a result of Defendants' violation of Washington Rev. Code §§ 21.20.010; 21.20.140 and 21.20.005, Plaintiffs have been damaged in the sum in excess of $2,072,386 as to GIL LAWRENCE and $42,115 as to J. LAWRENCE and have incurred attorneys' fees and costs.

**NINTH CLAIM – VIOLATION OF VIRGINIA CODE § 13.1-522**

*(By Plaintiff STEELE Against All Defendants)*

242.    Plaintiff STEELE incorporates by reference paragraphs 1- 203 above as though the same were set forth in full herein.

243.    Plaintiff STEELE, for an Ninth Claim against Defendants PARSONS; KYRO, a Texas Corporation; KYRO, a California Corporation; and DOES 1-100 (referred to collectively as "Defendants") alleges as follows:

244.    By knowingly or recklessly misrepresenting the fraudulent nature of their investment program, and by otherwise making material misrepresentations, directly and indirectly, to Plaintiff, Defendants directly and indirectly, by the use of the means and instrumentalities of state commerce, or of the mail, in connection with the purchase or sales of securities: (a) Have employed devices, schemes, or artifices to defraud; (b) Have made untrue statements of material fact, and have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and ©) Have engaged in transactions, acts, practices and courses of business which operated as a fraud upon purchasers of securities.

245.    By reason of the foregoing, Defendants have violated Virginia Code § 13.1-522.

246.    As a result of Defendants' violation of Virginia Code § 13.1-522, Plaintiff has been damaged in a sum in excess of $95,640 and has incurred attorneys' fees and costs.

### TENTH CLAIM – VIOLATION OF OREGON REV. STAT. § 59.135, *ET SEQ.*

*(By Plaintiff FLAXEL Against All Defendants)*

247.    Plaintiff FLAXEL incorporates by reference paragraphs 1-203 above as though the same were set forth in full herein.

248.    Plaintiff FLAXEL for an Tenth Claim against Defendants PARSONS; KYRO, a Texas Corporation; KYRO, a California Corporation; and DOES 1-100 (referred to collectively as "Defendants") alleges as follows:

248.    By knowingly and recklessly misrepresenting the fraudulent nature of their investment programs, and by otherwise making material misrepresentations to Plaintiff directly and indirectly by the use of the means and instrumentalities of state commerce in connection with the purchase or sales of securities: (a) Have employed devices, schemes, or artifices to defraud; (b) Have made untrue statements of material fact, and have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and ©) Have engaged in transactions, acts, practices and courses of business which operated as a fraud upon purchasers of securities.

249.    By reason of the foregoing, Defendants have violated Oregon Revised Code §

1    59.135, *et seq.*

2         250.    As a result of Defendants' violation of Oregon Revised Code § 59.135, *et seq.*,

3    Plaintiff has been damaged in a sum in excess of $738,939 for FLAXEL and has incurred

4    attorneys' fees and costs.

5    **ELEVENTH CLAIM – VIOLATION OF THE ELDER**

6    **ABUSE ACT, CALIFORNIA W & I CODE §§ 15600 *ET SEQ.***

7    *(By THE BISHOPS, Against All Defendants)*

8         251.    Plaintiffs THE BISHOPS incorporate by reference paragraphs 1-203 above as

9    though the same were set forth in full herein.

10        252.    Plaintiffs THE BISHOPS are and at all times herein mentioned were over 65 years

11   of age.  They were "elders" within the purview and definition of Welfare and Institutions Code

12   §15610.23.

13        253.    Defendants and each of them, were and are fiduciaries to THE BISHOPS at all

14   relevant times herein and stood in a position of trust and confidence toward THE BISHOPS,

15   pursuant to Welfare and Institutions Code §15610.30.  Despite their positions as fiduciaries,

16   Defendants, and each of them, took, secreted, and appropriated THE BISHOPS' money for their

17   use and purposes which were not in the due and lawful execution of Respondents' fiduciary duties

18   and or relationship of trust to THE BISHOPS.  By committing the acts and making the statements

19   and omissions set forth herein, Defendants committed financial elder abuse pursuant to W & I

20   Code §15610.30 and abandonment pursuant to and within the meaning of W & I Code 15610.05.

21        254.    As a legal and factual consequence of Defendants' violation of W& I Code §15600

22   *et seq.*, THE BISHOPS have suffered damages in the amount of $202,544 and also attorneys fees

23   and costs, and are further entitled to recover their attorneys' fees, costs and damages as allowed by

24   law, including those set forth in §15657.

25   **PRAYER FOR RELIEF**

26   **WHEREFORE,** Plaintiffs pray for judgement against Defendants, and each of them as follows:

27        255.    A preliminary injunction against defendants PARSONS and KYRO from further

28   violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §

---

1   240.10b-5] thereunder.

2         256.    A permanent injunction against defendants PARSONS and KYRO and their

3   agents, servants, employees, attorneys, and all persons in active contact or participation with them

4   who receive actual notice of the injunction by personal service or otherwise, and each of them,

5   from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

6   [17 C.F.R. § 240.10b-5] thereunder.

7         257.    An order that each Defendant be restrained and enjoined from destroying,

8   removing, mutilating, altering, concealing or disposing of, in any manner, any of their books,

9   records and documents relating to the matters set forth in the Complaint, or the books and records

10  and such documents of any entities under their control, until further order of the Court; an order

11  allowing that parties may commence discovery immediately, and that notice periods be shortened

12  to permit the parties to require production of documents within ten (10) calendar days written

13  notice by facsimile or personal service.

14        258.    An order requiring defendants PARSONS and KYRO to repatriate and to return to

15  identified accounts in the United States of America all monies and liquid assets held outside this

16  Court's jurisdiction.

17        259.    Disgorgement of all illicit profits and benefits, plus pre-judgment interest, realized

18  by each Defendant, and all investor monies obtained by each Defendant, plus pre-judgment

19  interest as a result of participation in, or attributable to, the fraudulent schemes alleged in this

20  Complaint.

21        260.    A civil monetary penalty against each Defendant as provided by statute and

22  determined  by the Court to be just and proper.

23        261.    For monetary damages in excess of $3,477,141, according to proof at trial;

24        263.    As to the Second, Fourth and Sixth Claims, for punitive damages to be determined

25  at trial.

26        264.    As to the Ninth, Tenth, and Eleventh Claims, for attorneys' fees and costs as

27             allowed by statute; and

28

1    265.    Such other and further relief as Plaintiffs are entitled as determined by this Court.

2  DATED: September 18, 2006                McCULLOGH & ASSOCIATES, APC.

5   By: _____
6        R. Patrick McCullogh
         Giles Townsend
7        Attorneys for Plaintiffs