1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                    **SOUTHERN DISTRICT OF CALIFORNIA**
10

11   JOHN FLAXEL, et al.,                    (LEAD) CASE NO. 05CV1259 JLS
                                             (WMC); (CONSOLIDATED) CASE
12                          Plaintiffs,      NO. 05CV1404 JLS (WMC)

13                                           **ORDER (1) GRANTING IN PART,
                                             DENYING IN PART GEORGE**
14                                           **ART BISHOP'S MOTION FOR
                                             PARTIAL SUMMARY**
15        vs.                                **JUDGMENT, (2) GRANTING IN
                                             PART, DENYING IN PART JOHN**
16                                           **FLAXEL'S MOTION FOR
                                             PARTIAL SUMMARY**
17                                           **JUDGMENT, (3) GRANTING IN
                                             PART, DENYING IN PART KEN**
18                                           **MARINAI'S MOTION FOR
                                             PARTIAL SUMMARY**
19                                           **JUDGMENT, and (4) GRANTING
                                             DEFENDANT LARRY**
20   LARRY JOHNSON, et al.,                  **JOHNSON'S MOTION FOR
                                             EXTENSION OF TIME TO FILE**
21                          Defendants.      **EXHIBITS**

22                                           (Doc. Nos. 219, 220, 221, & 260)

23

24

25              **BACKGROUND OF THE PRESENT MOTIONS**

26        On March 31, 2007, plaintiffs George Art Bishop, John Flaxel, and Ken Marinai (together,

27   "moving plaintiffs") each filed a motion for partial summary judgment.  (Doc. Nos. 219, 220, &

28   221.)  Each plaintiff's motion included a thirty-four page memorandum of points and authorities,

1  and the moving plaintiffs jointly lodged 163 exhibits.  (Doc. Nos. 223-31.)  Those motions were

2  initially set for hearing on May 29, 2007.  This hearing date was thrice continued[1]—first when

3  attorney John Dratz, Jr. withdrew as counsel for defendants Larry Johnson; Soil Savers, Inc.; Soil

4  Savers of New York, Inc.; Soil Savers of Florida, Inc.; Soil Savers of Florida, LLC; Soil Savers

5  Technologies, Inc.; SSI Holdings, Inc.; and RTJ Enterprises Inc. ("Johnson defendants"[2]) (Doc.

6  No. 239), the second time upon the ex parte motion of plaintiffs' counsel (Doc. No. 241), and then

7  a third time upon the ex parte motion of Larry Johnson for an extension of time to file his

8  opposition memorandum (Doc. No. 250).  On July 26, 2007, because, inter alia, Mr. Johnson did

9  not timely submit evidence in support of his opposition, the motions for partial summary judgment

10  were taken under submission, without appearances or oral argument.[3]  (Doc. No. 258.)

11       After reassignment, this Court set a hearing on the motions for partial summary judgment

12  for November 16, 2007.  Mr. Johnson appeared telephonically.  The Court invited Mr. Johnson to

13  supplement his filings in opposition to summary judgment, but he declined.[4]  The Court also

14  provided Mr. Johnson a month to retain counsel, but no licensed attorney entered an appearance

15  for Johnson or the entity defendants.  By written Order, the Court again submitted the matter on

16  December 17, 2007 and indicated that it would rule on the motions on or before January 25, 2008.

17

18       [1] This action was originally assigned to Chief Judge Irma E. Gonzalez.  On September 25,
     2007, the case was reassigned to the Hon. Janis L. Sammartino.

19

20       [2] After Mr. Dratz withdrew from the case, Mr. Johnson began to represent himself pro se.  For
     the reasons stated in this Court's Order of November 20, 2007 (Doc. No. 274), Mr. Johnson, a

21   nonlawyer, cannot represent the entity defendants, and the Court has stricken their answers.  Because
     the entity defendants did not retain counsel by the Court-imposed deadline of December 17, 2007,

22   plaintiffs may move for the Clerk to enter default against the entity defendants.  As of the date of this
     Order, plaintiffs have not filed such a motion.

23       [3] On July 27, 2007, Mr. Johnson filed a motion for an extension of time to amend his
     opposition to file exhibits.  (Doc. No. 260.)  On August 8, 2007, Chief Judge Gonzalez accepted

24   Johnson's exhibits.  (See Doc. Nos. 262 (Discrepancy Order) & 263 (filing of exhibits).)  The
     Discrepancy Order indicated that the Court would grant the motion to amend the opposition; however,

25   no such Order issued prior to the reassignment of this action.  The Court grants Mr. Johnson's motion
     for an extension of time to file the exhibits, which the Court accepted on discrepancy in August 2007.  This

26   Order shall not be construed as allowing any party to file additional exhibits beyond those which were
     already filed.

27

28       [4] Because Mr. Johnson declined the opportunity to supplement his papers further, the Court
     decides these motions on the basis of what Mr. Johnson did file: a six-page opposition/declaration,
     and more than eight hundred pages of unauthenticated exhibits.

(Doc. No. 274.)

## FACTUAL BACKGROUND[5]

Generally, this action arises from alleged misrepresentations in the personal communications of Larry Johnson and literature concerning the assets and business prospects of three business entities: Soil Savers, Fuel FX, Soil Savers of New York

**A.    Soil Savers**

Soil Savers, Inc. ("Soil Savers") was formed as a Texas corporation on March 30, 2001. (SSUF No. 1.)  Mr. Johnson is the chairman, president, and CEO of Soil Savers.  (SSUF No. 2; see Lodgment Exhibit 2.)  In a promotional booklet received by plaintiffs Marinai and Bishop[6], Soil Savers represented that it had patented technologies for soil and water remediation.  (SSUF No. 154.)  The booklet represented that the estimated value of its patents exceeded $200 million dollars.  (SSUF No. 155.)  Johnson did not, in fact, know the value of the patents and said that it was "like appraising water."  (SSUF No. 158 (quoting Lodgment Exhibit 7, at 169:6-8).)  The booklet further represented that Johnson's business partner, Mr. William Rippetoe, had filed eight patent applications in the past year[7].  (SSUF No. 159.)  Since Soil Savers's incorporation, Rippetoe did not file actual patent applications, but instead filed provisional patent applications[8] and disclosure documents[9].  (SSUF No. 160.)

---

[5] In this section, the Court discusses the relevant undisputed facts.  The Court treats a fact as "undisputed" if it appears in the moving plaintiffs' joint separate statement of undisputed material facts ("SSUF"), is adequately supported by the exhibits that moving plaintiffs lodged, and is not contested in Larry Johnson's joint opposition/declaration.   The Court's citation to the SSUF incorporates by reference the admissible evidence in the record

[6] Although plaintiff Flaxel claims to have relied on the representations in this promotional booklet (Flaxel Decla. ¶ 27), the Court cannot find any other indication in Flaxel's declaration (or in the remainder of the record) that he actually received the booklet.

[7] Although plaintiffs do not direct the Court to any indication in the promotional booklet of which precise year is in question, the booklet contains financial projections for fiscal year 2004 and beyond.  Furthermore, it was distributed in time for plaintiffs Bishop and Marinai to review it and make purchases in late 2002 and early 2003.

[8] Provisional patent applications entitle the holder to use the term "patent pending" for a 1-year term, which is nonrenewable.

[9] According to the Patent and Trademark Office, disclosure documents do not count as patent applications.

The promotional booklet projected that Soil Savers would net millions of dollars of profit in 2004-06.  (SSUF No. 161.)  However, Soil Savers never operated at an annual profit and, in fact, lost $2 million in 2002-03.  (SSUF Nos. 162, 274.)

In addition to the promotional booklet, plaintiffs Marinai and Flaxel received memoranda that Johnson signed.  (SSUF No. 165; see Marinai Decla. ¶ 10; Flaxel Decla. ¶¶ 14-15.)  The April 8, 2003 memorandum represented that Soil Savers held provisional patents worth $50 million, in addition to $118 million of value not recorded on its books.  (Lodgment Exhibit 76.)   The memorandum further represented that Soil Savers of New York had $12 million in projects scheduled for the next twelve to eighteen months.  (SSUF No. 174.)  As discussed infra, Soil Savers of New York went out of business after three months, having never completed a project.  The second memorandum, dated April 17, 2003, represented that Soil Savers would process three million tons of soil in fiscal year 2004.  (Lodgment Exhibit 99.)  The memo concluded, "Once this is achieved an investor could reasonably expect $750,000 on an annual basis."  (Id.)

In May 2003, Johnson emailed Marinai twice.  A May 14, 2003 email represented that, although not reflected on the balance sheets, the value of the patents was at least $50 million.  (Lodgment Exhibit 115.)  Johnson attached financial statements, including an income statement that showed net income of approximately $1.67 million dollars as of May 14, 2003.  (Id.)  The second email, dated May 19, 2003, represented that Soil Savers would have a project in Kuwait by year's end.  (Lodgment Exhibit 116.)  The record provides no indication that the project in Kuwait actually materialized.

In conjunction with his purchase of Soil Savers stock, Flaxel requested financial statements.  (SSUF No. 222.)  The income statement that Johnson faxed to Flaxel reported a net income of approximately $1.65 million as of May 2, 2003.  (Lodgment Exhibit 103.)  Flaxel attended a Soil Savers board meeting on May 8, 2003.  (Doc. No. 225.)  While there, Johnson represented, inter alia, that Soil Savers had total ownership of its patented technologies.  (Doc. No. 226; see Flaxel Decla. ¶¶ 14-15.)

In 2004, Soil Savers began negotiating with Zoom Developers USA, LLC ("Zoom")[10] for a worldwide license of Soil Savers technology.  (SSUF No. 256.)  This transaction involved the creation of various wholly owned subsidiaries to transfer Soil Savers technologies.  (SSUF Nos. 259-63.)  Soil Savers announced the transaction in a September 25, 2004 press release and October 7, 2004 investment report.  (SSUF Nos. 270, 274.)  The moving plaintiffs knew nothing about the Zoom deal before Soil Savers issued these documents.  (SSUF Nos. 271-73.)  The investor report was also the first time that the moving plaintiffs learned of the extent of Soil Savers's losses in the 2002-03 fiscal years.  (SSUF Nos. 275-77.)

From 2003-05, Soil Savers transferred approximately $3.2 million[11] to Johnson or entities wholly owned by Johnson, which he used for conducting personal business.  (Chelsea Decla. ¶ 38.)  This includes amounts from both Soil Savers bank accounts and a Zoom account opened in the name of Soil Savers, LLC (a holding company).  (SSUF Nos. 278-80, 283-309.)

In April/May 2003,[12] Marinai purchased $800 thousand of Soil Savers stock.  (SSUF No. 242.)  Marinai purchased an additional $200 thousand of Soil Savers stock on August 26, 2003.  (SSUF No. 247.)  Marinai subsequently received royalty checks of $2,265 and $2,966.35 (SSUF No. 255.)

On April 30, 2003, Flaxel signed subscription and investment agreements to purchase $500 thousand of Soil Savers stock.  (SSUF No. 233.)  However, payment for Flaxel's shares was not wired until June 3, 2003, after he had attended the May 2003 board meeting.  (SSUF No. 235.)  Flaxel never received any royalties from Soil Savers.  (SSUF No. 254.)

On August 8, 2002, Bishops purchased $70 thousand of Soil Savers stock.  (SSUF No. 205.)  Bishop never received any royalties from Soil Savers.  (SSUF No. 211.)  Bishop received two additional stock certificates, each for 100,000 shares of Soil Savers stock, because the Board

---

[10] Zoom was itself a subsidiary of an Indian company.

[11] In computing this amount, the Court deducts the $271 thousand transferred to Burst Advanced Technologies, a corporation wholly owned by Mr. Rippetoe.

[12] The Court does not specify a precise date because the SSUF provides different dates for this transaction.  The Subscription Agreement was signed, and Marinai's check was written, on April 30, 2003.  (Lodgment Exhibits 111 & 113.)  However, the Investment Agreement is dated May 13, 2003.  (Lodgment Exhibit 112.)

1   of Directors voted for a forward split of the stock.  (SSUF No. 212.)

2   **B.      Fuel FX**

3         Fuel FX, Inc. ("Fuel FX") was formed as a Texas corporation on June 18, 2001.  (SSUF

4   No. 3.)  Mr. Johnson is the chairman, president, and CFO of Fuel FX.  (SSUF No. 4; see also

5   Lodgment Exhibit No. 3.)  In a marketing booklet received by the moving plaintiffs, Fuel FX

6   represented that it had patented technologies for fuel treatment to improve gas mileage and lower

7   emissions in diesel- and gas-powered engines.  (SSUF No. 53.)  The booklet further represented

8   that Johnson's business partner, Mr. William Rippetoe, had filed a patent application for the Fuel

9   FX technology, in addition to the more than fifty patents that he already held.  (SSUF No. 54.)  In

10  fact, Rippetoe held only six patents, and none of those were granted during the existence of Soil

11  Savers and Fuel FX.  (SSUF No. 18.)  Since Fuel FX's incorporation, Rippetoe did not file actual

12  patent applications, but instead filed provisional patent applications and disclosure documents.

13  (SSUF Nos. 18-19; see also Pls. Joint Surreply at 3, 5, & Exhibit 2.)

14        The marketing booklet also discussed Fuel FX's business purposes.  It stated that Fuel FX,

15  having completed research and field trials on its primary product, "has now aggressively moved to

16  marketing and production."  (SSUF No. 54 (quoting Lodgment Exhibit 5, at 018763).)  The

17  booklet indicated that Fuel FX would purchase a demonstration trailer costing more than

18  $180,000, but that purchase was never made.  (SSUF Nos. 72-73.)  The booklet offered specific

19  prognostications concerning the number of units that Fuel FX expected to sell and revenues that it

20  expected to obtain, while offering investors a royalty for each unit sold.  (Doc. Nos. 65, 70, & 76.)

21  However, Johnson never expected Fuel FX to be profitable because it was intended to be a

22  research and development enterprise.  (SSUF Nos. 61, 71.)

23        In addition to the Fuel FX booklet, plaintiffs Flaxel and Marinai received a letter on

24  company letterhead entitled "Re: Fuel FX Reactor Information."  (SSUF Nos. 98, 113.)  Mike

25  Parsons[13] wrote in each letter that an investor could expect a fifteen-fold return on an investment

26  of $50,000.  (SSUF Nos. 99, 114.)

27

28        [13] Originally a co-defendant in this action, Parsons was dismissed with prejudice by stipulation
    and Order dated January 24, 2007.  (Doc. Nos. 209, 212.)

1    From September 2002 to April 2004, Fuel FX issued more than $2 million of checks to

2  Soil Savers, in addition to other checks written to Johnson and corporate entities controlled by

3  Johnson.  (SSUF Nos. 144-149.)  Rather than the $8.3 million in gross sales predicted by the

4  advertising booklet, Fuel FX's actual sales in 2003 amounted to slightly over $80 thousand.

5  (SSUF No. 150.)  In February 16, 2004, Johnson sold Soil Savers's shares in Fuel FX to Mr. Erik

6  Ulsteen for less than $500,000.[14]  (SSUF Nos. 134-35.)  Ulsteen then wrote to the other

7  shareholders and demanded that they give up their shares.  (SSUF No. 138.)

8    On December 11, 2002, plaintiff Marinai purchased $50 thousand of Fuel FX stock.

9  (SSUF No. 119.)  Marinai received royalty payments of $108 and $204.33 (SSUF Nos. 123-24)

10  and also reviewed the February 2003 activity report concerning the installation of one unit and the

11  scheduling of numerous demonstrations (SSUF Nos. 125-26).  Marinai then purchased an

12  additional $100 thousand of Fuel FX stock on March 15, 2003.  (SSUF No. 128.)  Marinai

13  received one additional royalty check for $638.01.  (SSUF No. 129.)

14    On December 10, 2002, plaintiff Flaxel purchased $50 thousand of Fuel FX stock.  (SSUF

15  No. 104.)  Flaxel received royalty payments of $100.08 and $408.66.  (SSUF No. 105.)  Flaxel

16  then purchased an additional $50 thousand of Fuel FX stock on February 27, 2003.  (SSUF No.

17  107.)  Flaxel received one additional royalty check for $212.67.  (SSUF No. 109.)

18    In connection with the purchase of Soil Savers of New York stock, discussed infra,[15]

19  Bishop purchased $112.5 thousand of Fuel FX stock in June 2002.  (SSUF Nos. 92, 94.)  Bishop

20  subsequently obtained royalty checks in the amounts of $1,715, $472.50, and $857.50.  (SSUF No.

21  95.)

22

23    [14] The record contains conflicting evidence regarding the precise amount that Ulsteen paid for
    Soil Savers's shares in Fuel FX.  Johnson testified in his deposition that Ulsteen paid $460,000.
24  (Lodgment Exhibit 7, at 104:18-19.)  However, the stock purchase agreement signed by Johnson and
    Ulsteen set a purchase price of $250,000.  (Id. Exhibit 69, at 1.)  Discerning the actual price of the
25  Fuel FX stock is further complicated by the creation during the interim of Fuel FX International, Inc.,
    a Wyoming corporation ostensibly established to market Fuel FX technologies overseas.  The sale to
26  Ulsteen included Soil Savers's shares in Fuel FX and Fuel FX International.  In any event, Ulsteen
    purchased a majority interest in Fuel FX for less than 10% of the more than $5 million that Fuel FX
27  investors (including the moving plaintiffs) originally paid for those shares.  (See SSUF No. 133.)

28    [15] Bishop claims, without evidentiary support in the record, that his purchase of Fuel FX stock
    was a "condition" of purchasing stock in Soil Savers of New York.  (Bishop Decla. ¶ 13.)

1  **C.      Soil Savers of New York**

2         With respect to Soil Savers of New York ("SSNY"), Johnson emailed plaintiff Bishop to

3  offer purchase of its "outstanding stock" a week before the company was incorporated in New

4  York in May 2002.  (SSUF Nos. 27, 29.) Johnson promised Bishop a $1.00 per ton royalty on soil

5  processed in specific states in the Northeastern and mid-Atlantic regions, as well as an annual

6  return that would more than double, perhaps even quintuple, Bishop's original proposed

7  investment of $200,000.  (SSUF No. 27.)  Bishop made the solicited investment through his IRA

8  account on June 19, 2002.[16]  (SSUF No. 41.)  Soil Savers was the only other owner of SSNY.

9  (SSUF No. 38.)  SSNY went out of business after three months when its first and only project at

10  John F. Kennedy Airport failed in the demonstration phase.  (SSUF No. 42.)  Bishop never

11  received any royalties or other form of return from his ownership of SSNY stock.  (SSUF No. 49.)

12                          **SUMMARY JUDGMENT STANDARD**

13         Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates

14  the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  See

15  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when,

16  under the governing substantive law, it could affect the outcome of the case.  Anderson v. Liberty

17  Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  A

18  dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return

19  a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

20         A party seeking summary judgment always bears the initial burden of establishing the

21  absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party can

22  satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the

23  nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a

24  showing sufficient to establish an element essential to that party's case on which that party will

25  bear the burden of proof at trial.  Id. at 322-23.

26         If the moving party meets this initial burden, the nonmoving party cannot defeat summary

27  ───────────────

28         [16] The SSUF contains an apparent scrivener's error, stating that Bishop purchased SSNY stock on June 23, 2004.  The underlying evidence establishes, however, that the purchase was made on June 19, 2002.  (Lodgment Exhibit 29; Bishop Decla. ¶ 11.)

1    judgment merely by demonstrating "that there is some metaphysical doubt as to the material

2    facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>Triton</u>

3    <u>Energy Corp. v. Square D Co.</u>, 68 F.3d 1216, 1221 (9th Cir. 1995) (citing <u>Anderson</u>, 477 U.S. at

4    252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position

5    is not sufficient.").  Rather, the nonmoving party must "go beyond the pleadings and by her own

6    affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate

7    'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324 (quoting

8    Fed. R. Civ. P. 56(e)).  In reviewing the record, the Court is not obligated "to scour the record in

9    search of a genuine issue of triable fact." <u>Keenan v. Allen</u>, 91 F.3d 1275, 1279 (9th Cir. 1996)

10    (internal citation omitted).

11                                  **DISCUSSION**

12    **A.      Federal Securities Fraud**

13            1.      <u>Legal Standard</u>

14            Section 10(b) of the Securities Exchange Act prohibits the "use or employ, in connection

15    with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or

16    contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."

17    15 U.S.C. § 78j(b).  In accordance with this statutory authority, the Securities Exchange

18    Commission promulgated Rule 10b-5, which creates a private cause of action for investors harmed

19    by materially false or misleading statements.  17 C.F.R. § 240.10b-5.  Rule 10b-5 makes it

20    unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a

21    material fact necessary to make the statements made[,] in light of the circumstances under which

22    they were made, not misleading . . . in connection with the purchase or sale of any security." <u>Id.</u>

23    The elements of a § 10(b) claim are (1) a material misrepresentation or omission, (2) scienter, <u>i.e.</u>,

24    a wrongful state of mind, (3) a connection to the purchase or sale of a security, (4) reliance, (5)

25    economic loss, and (6) loss causation, <u>i.e.</u>, a causal connection between the material

26

27

28

misrepresentation and the loss.[17]  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

Section 20 of the Securities Exchange Act also provides for "controlling person" liability:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable[.]

15 U.S.C. § 78t(a). The statute excludes controlling persons who acted in good faith and did not participate in the violation.  Id.  To make the prima facie case for controlling person liability, "a plaintiff must prove: (1) 'a primary violation of federal securities law' and (2) 'that the defendant exercised actual power or control over the primary violator.'"  No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003) (quoting Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000)).  The regulations define "control" as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.

2.    Discussion

Based on the undisputed facts, the Court finds the following.  The shares of Soil Savers, Fuel FX, and Soil Savers of New York purchased by the moving plaintiffs are "securities" within the meaning of the Securities and Exchange Act.  See 15 U.S.C. § 78c(a)(10) (defining "security" to include, inter alia, "any investment contract").

With respect to Soil Savers, the Court finds that Soil Savers and Johnson misrepresented that (1) Soil Savers possessed patented technology, when nothing more than provisional patent applications and disclosure statements had been filed; (2) those patents could be estimated as having a specific value of millions of dollars, when Johnson did not know the value; (3) Soil

_____

[17] The moving plaintiffs also seek summary judgment on the basis of "scheme liability."  This concept arises from another section of Rule 10b-5, which makes it unlawful "[t]o employ any device, scheme, or artifice to defraud[.]"  17 C.F.R. § 240.10b-5(b).  In a very recent opinion, the Supreme Court reiterated, "[t]he § 10(b) implied right of action does not extend to aiders and abettors.  The conduct of a secondary actor must satisfy each of the elements or preconditions for liability[.]"  Stoneridge Inv. Partners, LLC. v. Scientific-Atlanta, Inc., — U.S. —, 2008 WL 123801, at *6 (Jan. 15, 2008); accord Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 191 (1994).  The Court interprets Stoneridge to mean that, in the present motions for summary judgment, the moving plaintiffs must prove each element of the § 10(b) cause of action to prevail against any particular defendant, as a matter of law.

Savers was operating at a profit during 2002-03 and would operate in a profit in future fiscal years (including the provisions of financial statements showing more than $1 million in profit when the company was, in fact, losing more than $1 million per year during the same period); and (4) Soil Savers had projects going forward through its subsidiary, Soil Savers of New York, and in Kuwait, when neither materialized.

With respect to Fuel FX, the Court finds that Fuel FX misrepresented the following: (1) Fuel FX possessed patented technology, when nothing more than provisional patent applications and disclosure statements had been filed; (2) Fuel FX was committed to marketing and production, when, in fact, Johnson intended for it to be a research and development corporation; (3) Fuel FX would purchase a demonstration trailer to assist in its marketing efforts, when such purchase never happened; and (4) Fuel FX investors could expect a fifteen-fold return on their investment, when the company was not, in fact, intended to cut a profit.

With respect to Soil Savers of New York, the Court finds that Soil Savers of New York and Johnson misrepresented the following: (1) investors would obtain a royalty on soil processed in certain states, when, in fact, SSNY never executed a project in those states, and (2) the annual return would be several multiples of the initial investment, when, in fact, SSNY folded after a few months in business.  Although Johnson conclusorily alleges that his statements were mere opinions, the Court finds that Johnson's statements were misrepresentations, in light of SSNY's swift demise only a few months after Johnson promised an annual return more than double the initial investment.[18]

A misrepresentation is material "if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed."  Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005).  Materiality can be resolved on summary judgment "'[o]nly if the established omissions are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality[.]'"  Sec. & Exch. Comm'n v. Phan, 500 F.3d 895, 908 (9th Cir. 2007) (quoting TSC

---

[18] Johnson's argument that Bishop received stock in other entities as compensation for the failure of SSNY is an argument concerning damages, not liability.

1   Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976)) (other internal citation omitted).  The

2   Court finds that the misrepresentations identified supra satisfy the legal standard for materiality.  A

3   reasonable investor would have acted differently if Soil Savers, Fuel FX, Soil Savers of New

4   York, and Johnson had not made these misrepresentations.  The Court further finds that reasonable

5   minds cannot differ on the question of the materiality of these misrepresentations.

6        Scienter is "the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs, Inc. v.

7   Makor Issues & Rights, Ltd., — U.S. —, 127 S. Ct. 2499, 2504 (2007) (quoting Ernst & Ernst v.

8   Hochfelder, 425 U.S. 194 & n.12 (1976)).  Scienter may also be established by showing deliberate

9   recklessness.  Livid Holdings Ltd., 416 F.3d at 948.  Recklessness is "'an extreme departure from

10  the standards of ordinary care, and which presents a danger of misleading buyers . . . that is either

11  known to the defendant or is so obvious that the actor must have been aware of it.'" Howard, 228

12  F.3d at 1063 (quoting Hollinger v. Titan Cap. Corp., 914 F.2d 1564, 1569 (9th Cir. 1990)).  The

13  Court finds that the material misrepresentations identified supra were made with scienter.  I.e., Soil

14  Savers, Fuel FX, Soil Savers of New York, and Johnson made an extreme departure from ordinary

15  care by, inter alia, claiming to have nonexistent patents, misstating the companies' current goals

16  and financial positions, and making unsupported financial projections.  These statements presented

17  a danger of misleading the moving plaintiffs that defendants either knew or should have been

18  aware of.  With respect to Mr. Johnson, the Court's finding of scienter is supported by statements

19  in his deposition that, e.g., valuing patents was akin to appraising water, Fuel FX was never

20  intended to make a profit, and Soil Savers of New York went out of business after its first and only

21  demonstration project failed.

22       The Court finds that all the material misrepresentations discussed supra were made in

23  connection with the purchase and sale of a security.  The misrepresentations occurred in the

24  context of publications, emails, and conversations intended to solicit investments in the subject

25  companies.

26       With respect to the remaining elements of the securities fraud claim, the Court makes

27  individual findings infra concerning each plaintiff.

28       Johnson is primarily liable for the securities fraud violations of Soil Savers and Soil Savers

1  of New York.  With respect to Soil Savers, the Court finds that Johnson authored the memoranda

2  dated April 8 and 17, 2003.  With respect to Soil Savers of New York, the Court finds that Johnson

3  personally emailed Bishop with the material misrepresentations.  The Court further finds that

4  Johnson is subject to controlling person liability for the securities fraud violations of Fuel FX

5  because Johnson exercised actual power and control over Fuel FX.  Given Johnson's pervasive

6  involvement as chairman, president, and CFO, he was the person "controlling [Fuel FX] in every

7  material respect[.]" Arthur Children's Trust v. Keim, 994 F.2d 1390, 1397 (9th Cir. 1993).

8               a.    *Marinai*

9                     I.    SOIL SAVERS

10  The undisputed facts establish that Marinai relied on the representations in the Soil Savers

11  promotional booklet and the April 8 and 17, 2003 memoranda when he invested $800 thousand in

12  his April 30, 2003 purchase of Soil Savers stock.  (SSUF No. 240.)  He again relied on these

13  misrepresentations, as well as those in the May 14 and 19, 2003 emails, when he invested an

14  additional $200 thousand.  (SSUF No. 247.)  Therefore, Marinai has established reliance with

15  respect to both purchases.

16  Economic loss (a/k/a "transaction causation") is established by proof as a matter of law

17  "'that the violations in question caused the plaintiff to engage in the transaction[.]'" Livid

18  Holdings, Ltd., 416 F.3d at 949 (quoting Binder v. Gillespie, 184 F.3d 1059, 1063 (9th Cir. 1999)).

19  This proof requires each plaintiff to show that he "would not have purchased the [corporation's]

20  stock but for the misrepresentation[.]" Id.  Because Marinai relied exclusively on documents and

21  emails containing misrepresentations, the Court finds that transaction causation is satisfied with

22  respect to both purchases.

23  Loss causation is established by proof as a matter of law "'that the misrepresentations or

24  omissions caused the harm.'" Livid Holdings, Ltd., 416 F.3d at 949 (quoting Binder, 184 F.3d at

25  1063).  This proof requires each plaintiff to show that "the misrepresentation was directly related

26  to the actual economic loss [he] suffered." Id.  Here, as a result of misrepresentations concerning

27  the status of Soil Savers's technologies, its soil remediation projects, and its financial situation,

28  Marinai did not obtain the expected royalties nor the promised return on his investment.  Instead,

1   unbeknownst to Marinai, Soil Savers assigned its rights in the technologies to a third-party

2   corporation that never paid royalties to Soil Savers investors.

3       The Court finds that Soil Savers and Johnson are liable to Marinai for violations of § 10(b)

4   and Rule 10b-5 with respect to both of Marinai's investments in Soil Savers.

5                           II.    FUEL FX

6       The undisputed facts establish that Marinai relied on the representations in the Fuel FX

7   marketing booklet and the November 18, 2002 memoranda when he invested $50 thousand in his

8   December 11, 2002 purchase of Fuel FX stock.  (SSUF No. 119.)  He again relied on these

9   misrepresentations, as well as the February 2003 activity report and the receipt of royalty

10  payments, when he invested an additional $100 thousand on March 15, 2003.  (SSUF No. 127.)

11  Therefore, Marinai has established reliance with respect to both purchases.

12      With respect to the first purchase only, the Court finds that Marinai has established

13  transaction causation.  He would not have invested $50 thousand, but for those misrepresentations.

14  However, with respect to the second purchase, the Court finds that Marinai has not established

15  transaction causation, as a matter of law.  Marinai relied not only on misrepresentations, but also

16  on the activity report and the royalty payments.  There is no evidence of any misrepresentations in

17  that activity report or the payments themselves.  A reasonable jury could find that Marinai would

18  not have invested the additional $100 thousand if he had not reviewed the activity report and

19  received the royalty checks.  Therefore, Marinai cannot prevail on summary judgment with respect

20  to the second purchase.

21      Marinai has established loss causation for the first transaction.  Because Fuel FX did not

22  have the patented technologies that it claimed and did not follow up on its purported commitment

23  to marketing and production, a majority of its shares were sold at a sharply reduced price to a

24  third-party investor who demanded that other shareholders (including Marinai) give up their

25  shares.

26      The Court finds that Fuel FX is liable to Marinai for violations of § 10(b) and Rule 10b-5

27  with respect to Marinai's $50 thousand purchase of Fuel FX stock in December 11, 2002.  Johnson

28  is liable to Marinai as a controlling person.  Summary judgment on the $100 thousand purchase of

1    March 15, 2003 is denied.

2                 *b.*    *Flaxel*

3                     I.    SOIL SAVERS

4       The analysis for plaintiff Flaxel is basically the same as for plaintiff Marinai, and the Court

5 incorporates by reference that reasoning here. The undisputed facts establish that Flaxel relied on

6 the representations in the April 8 and 17, 2003 memoranda and Johnson's oral representations at

7 the May 2003 board meeting when he invested $500 thousand in his April/May 2003 purchase of

8 Soil Savers stock.  (SSUF No. 233.)  Therefore, Flaxel has established reliance with respect to his

9 Soil Savers purchase.

10       Because Flaxel relied exclusively on documents and statements containing

11 misrepresentations, the Court finds that transaction causation is satisfied with respect to his

12 purchase. Loss causation is also satisfied.  As a result of misrepresentations concerning the status

13 of Soil Savers's technologies, its soil remediation projects, and its financial situation, Flaxel did

14 not obtain the expected royalties nor the promised return on his investment.  Instead, unbeknownst

15 to Flaxel, Soil Savers assigned its rights in the technologies to a third-party corporation that never

16 paid royalties to Soil Savers investors.

17       The Court finds that Soil Savers and Johnson are liable to Flaxel for violations of § 10(b)

18 and Rule 10b-5 with respect to Flaxel's investment in Soil Savers.

19                   II.    FUEL FX

20       The analysis for plaintiff Flaxel is basically the same as for plaintiff Marinai, and the Court

21 incorporates by reference that reasoning here.

22       The undisputed facts establish that Flaxel relied on the representations in the Fuel FX

23 marketing booklet and the November 18, 2002 memoranda when he invested $50 thousand in his

24 December 10, 2002 purchase of Fuel FX stock.  (SSUF No. 101.)  He again relied on these

25 misrepresentations, as well as the receipt of royalty payments, when he invested an additional $50

26 thousand on February 27, 2003.  (SSUF No. 107.)  Therefore, Flaxel has established reliance with

27 respect to both purchases.

28       With respect to the first purchase only, the Court finds that Flaxel has established

1  transaction causation.  He would not have invested the first $50 thousand, but for those

2  misrepresentations.  However, with respect to the second purchase, the Court finds that Flaxel has

3  not established transaction causation, as a matter of law.  Flaxel relied not only on

4  misrepresentations, but also on the royalty payments.  There is no evidence of any

5  misrepresentations in the payments themselves.  A reasonable jury could find that Flaxel would

6  not have invested the additional $50 thousand if he had not received the royalty checks.

7  Therefore, Flaxel cannot prevail on summary judgment with respect to the second purchase.

8         Flaxel has established loss causation for the first transaction.  Because Fuel FX did not

9  have the patented technologies that it claimed and did not follow up on its purported commitment

10 to marketing and production, a majority of its shares were sold at a sharply reduced price to a

11 third-party investor who demanded that other shareholders (including Flaxel) give up their shares.

12        The Court finds that Fuel FX is liable to Flaxel for violations of § 10(b) and Rule 10b-5

13 with respect to Flaxel's first $50 thousand purchase of Fuel FX stock of December 10, 2002.

14 Johnson is liable to Flaxel as a controlling person.  Summary judgment on the second $50

15 thousand purchase of February 27, 2003 is denied.

16        *c.*     ***Bishop***

17                I.     SOIL SAVERS OF NEW YORK

18        The undisputed facts establish that Bishop relied on the representations in Johnson's May

19 13, 2002 email when he invested $200 thousand in his June 2002 purchase of SSNY stock.  (SSUF

20 Nos. 37, 40.)  Therefore, Bishop has established reliance with respect to his purchase.

21        Because Marinai relied exclusively on the email containing the misrepresentations, the

22 Court finds that transaction causation is satisfied with respect to his purchase.  But for the

23 misrepresentations in the email, Bishop would not have purchased SSNY stock.

24        Here, as a result of misrepresentations and omissions concerning the status of SSNY's

25 business, including the baseless projections about its financial and business prospects, Bishop did

26 not obtain the expected royalties nor the promised return on his investment.  Instead, SSNY folded

27 within a couple of months after the failure of a single demonstration project.

28        The Court finds that SSNY and Johnson are liable to Bishop for violations of § 10(b) and

1    Rule 10b-5 with respect to Bishop's investment in SSNY.

2                              II.    FUEL FX

3          The Court finds that, with respect to Bishop's federal securities fraud claim for his

4    purchase of Fuel FX stock, summary judgment is inappropriate for two reasons.  First, Bishop

5    makes a conclusory allegation that he was required to purchase Fuel FX stock as a condition of his

6    purchase of SSNY stock.  (SSUF No. 50 & Bishop Decla. ¶ 13.)  Despite being represented by

7    counsel, Bishop does not elaborate on this assertion in his moving papers nor provide evidence in

8    the record to support it.

9          Second, Bishop claims that he relied on oral misrepresentations concerning Fuel FX that

10   Johnson made in a personal visit to Bishop's San Diego home.  (Bishop Decla. ¶¶ 14, 20.)

11   However, Johnson asserts that he did not make these representations to Bishop, other than saying

12   that "all looked good."  (Doc. No. 253 (Opposition), at 2, 5.)  Johnson's declaration, made under

13   penalty of perjury, creates a dispute of material fact as to what Johnson represented to Bishop

14   concerning Fuel FX prior to Bishop's purchase of Fuel FX's stock.

15         For these reasons, the Court finds that Bishop cannot establish reliance or transaction

16   causation, as a matter of law.  A dispute of fact exists concerning reliance.  Furthermore, although

17   Bishop indisputably received the Fuel FX marketing booklet before making his investment

18   (Bishop Decla. ¶ 13), a reasonable jury could find that Bishop would not have invested in Fuel FX

19   on the basis of the booklet alone, without the oral representations that Johnson allegedly made at

20   Bishop's home.  The Court denies the motion for summary judgment on Bishop's purchase of Fuel

21   FX stock.

22                              III.    SOIL SAVERS

23         The Court finds that, with respect to Bishop's federal securities fraud claim for his

24   purchase of Soil Savers stock, summary judgment is inappropriate because of a dispute of material

25   fact.  Bishop's declaration states that Johnson came to his San Diego home and made oral

26   representations concerning Soil Savers.  (Bishop Decla. ¶ 14.)  Bishop further represents that he

27   bought Soil Savers stock on the basis of those representations.  (Id. ¶ 20.)  However, Johnson

28   disputes making those representations.  His joint opposition/declaration is particularly specific:

1  Johnson "never met Mr. Bishop in California to discuss Soil Savers stock."  (Doc. No. 253

2  (Opposition), at 5 (emphasis in the original).)  In light of the dispute whether the representations

3  were even made, Bishop cannot establish reliance or transaction causation, as a matter of law.

4  **B.      Securities Registration**

5          Moving plaintiffs seek summary judgment on their second cause of action for rescission.

6  Specifically, they argue that, as a matter of law, defendants Soil Savers, Fuel FX, and Johnson

7  violated federal and state securities registration requirements.  To analyze this part of plaintiffs'

8  motions, the Court considers a prior ruling in this case relevant to the present motions.

9          1.      Prior Summary Judgment Order

10         On July 10, 2006, Chief Judge Gonzalez issued a written Order denying the motions for

11 partial summary judgment by other plaintiffs in this action for violations of state securities

12 registration laws.  (Doc. No. 172.)  There, the Court held that Congress prohibited states from

13 regulating various state securities offerings, including those that are exempt from registration

14 pursuant to Securities and Exchange Commission Regulation D[19].  The Court specifically

15 considered, inter alia, the Rule 505 exemption, which imposes two limitations: (1) a $5 million

16 ceiling on the amount that the company can raise in a twelve-month period, and (2) no more than

17 thirty-five "unaccredited investors" (i.e., those investors who do not meet certain standards for

18 wealth and investor sophistication).  Evidence in the record indicated that defendants attempted to

19 comply with Rule 505 (or another exemption) because defendants did not exceed the limits on

20 unaccredited investing and specifically asked investors to identify themselves as accredited

21 investors or one of the thirty-five allowable non-accredited investors.  The Court further rejected

22 plaintiffs' argument that defendants failed to file a Form D, the required notice to the SEC for any

23 company seeking to claim a registration exemption.  The only evidence submitted by plaintiffs was

24 counsel's declaration that counsel had called the SEC's public reference room and spoken with an

25 attendant, who could not find any forms for "Fuel FX" or "Soil Savers".

26         The Court declines to apply the "law of the case" doctrine here because "other changed

27 circumstances exist".  See United States v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997).

28

[19] Regulation D consists of eight separate regulations codified at 17 C.F.R. §§ 230.501-08.

1   Specifically, more than eighteen months have passed since the prior Order, and the parties have

2   had time to conduct additional discovery.  Nonetheless, to the extent that the reasoning is

3   persuasive in disposing of the present motions, the Court takes judicial notice of Chief Judge

4   Gonzalez's prior Order.

5          2.      Analysis

6                  a.      Federal

7          Section 5 of the Securities Act of 1933 prohibits the sale of unregistered securities.  15

8   U.S.C. § 77e.  To prove a federal securities registration violation, plaintiff must show that "the

9   offer was made in a manner prohibited by section 5."  Sec. & Exch. Comm'n v. Thomas D.

10  Kienlen Corp., 755 F. Supp. 936, 939 (D. Or. 1991).  However, the SEC has discretion to exempt

11  particular classes of securities from registration.  15 U.S.C. § 77c(b).

12         As compared to the prior motion decided by Chief Judge Gonzalez, plaintiffs have

13  presented stronger evidence here that defendants did not file the Form D—a prerequisite for

14  claiming an exemption from securities registration requirements.  17 C.F.R. § 230.503(a).

15  Specifically, plaintiffs have submitted attestations from an SEC Records Officer that, after "[a]

16  diligent search" of its files, the SEC cannot locate "any registration statement" under the names

17  "Fuel FX" or "Soil Savers".  (SSUF Nos. 82 (Fuel FX) and 199 (Soil Savers).)  Even so, the Court

18  is not persuaded that plaintiffs have established a federal securities registration violation.  The

19  Form D is not a "registration statement," but, instead, a form that exempts a company from

20  registering its securities.  Although moving plaintiffs' counsel represents that she also inquired

21  whether Fuel FX or Soil Savers had filed "exemption paperwork" (Chelsea Decla. ¶ 40), that

22  language does not appear in the attestation from the SEC's records department.

23         Furthermore, the record still contains evidence that defendants did comply with the legal

24  requirements to obtain an exemption from SEC registration.  Johnson's joint

25  declaration/opposition plainly states, under penalty of perjury, that the companies complied with

26  the requirements: "To my knowledge no individuals that were NON Accredited Investor Status

27  was (sic) allowed to invest in any of the companies.  We only filed a REG D was (sic) to be

28  cautious as we did not raise or sell securities to non accredited investors and we were under the

5,000,000 per year." (Opp., at 2.) And, as with the previous motion, the Subscription Agreements in the record here plainly require potential investors to identify themselves as accredited or non-accredited investors. (See, e.g., Lodgment Exhibit 49.) Although defendants could have given the Court stronger evidence of their compliance with the requirements to claim a registration exemption (e.g., by submitting a copy of the actual Form D that they allegedly mailed to the SEC), defendants' evidence is strong enough to create a dispute of material fact as to whether they complied with the formalities of registration exemption and, in fact, sold exempt securities. Plaintiffs' motion for summary judgment on their claim for violation of the federal securities registration laws is denied.

> b.    State

Because a dispute of fact remains as to whether defendants properly complied with federal registration requirements, the Court does not reach plaintiffs' claim for state securities registration violations. As explained in Chief Judge Gonzalez's prior Order, if defendants sold securities subject to a federal exemption from registration, then state registration requirements did not apply because Congress has prohibited the states from imposing registration requirements on federally exempt securities offerings.

**C.    State Securities Fraud**

Although Congress has prohibited the states from regulating the registration of certain classes of securities, states may continue to regulate the sale of securities through statutory and common-law causes of action for securities fraud. See Matsushita Elec. Indus. Co., Ltd. v. Epstein, 516 U.S. 367, 383-84 (1996) ("Congress plainly contemplated the possibility of dual litigation in state and federal courts relating to securities transactions"); Diamond Multimedia Sys., Inc. v. Superior Court, 19 Cal. 4th 1036, 1057 (Cal. 1999) ("The Securities Exchange Act of 1934 makes it clear that . . . federal law in this arena supplements, but does not displace state regulation and remedies"); see Zuri-Invest AG v. NatWest Fin. Inc., 177 F. Supp. 2d 189, 191 (S.D.N.Y. 2001) (denying motion for partial summary judgment of common-law fraud claim on preemption grounds). The only relevant limitation imposed by federal law is that "no person . . . shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of

his actual damages on the amount complained of."  15 U.S.C. § 78bb(a). Therefore, federal law does not bar the moving plaintiffs' claim for violation of state-law securities fraud statutes.

### 1.   California Law

Plaintiffs Bishop and Marinai are residents of California.  Corporations Code § 25400(d) prohibits a person selling securities from

> mak[ing], for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in light of the circumstances under which it was made, false and misleading with respect to any material fact . . . and which he knew or had reasonable ground to believe was so false or misleading.

See Cal. Corp. Code § 25500 (creating private cause of action for willful violation of § 25400(d)). Furthermore, Corporations Code § 25401 prohibits the sale of securities "by means of any written or oral communication which includes an untrue statement of a material fact[.]" See Cal. Corp. Code § 25501 (creating private cause of action for violation of § 25401, with exceptions for instances where the plaintiff knew about the facts of the untruth or the defendant exercised reasonable care).  Finally, California has a provision imposing joint and several liability on "[e]very person who directly or indirectly controls a person liable under Section 25501 . . . unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."  Cal. Corp. Code § 25504.

The Court finds that California's securities fraud provisions are analogous to § 10(b) and Rule 10b-5.  Therefore, the Court grants plaintiffs' motion for summary judgment on Bishop's and Marinai's causes of action for state-law securities fraud to the same extent (i.e., with regard to the same transactions) as the Court granted summary judgment on plaintiffs' cause of action for federal securities fraud.  And, the Court denies plaintiffs' motion for summary judgment on this cause of action to the same extent (i.e., with regard to the same transactions) as the Court denied summary judgment on the federal securities fraud claims.

### 2.   Oregon Law

Plaintiff Flaxel is a resident of Oregon.  That state's law makes it

> unlawful for any person, directly or indirectly, in connection with the purchase or sale of any security . . . whether through the issuance of analyses or reports or otherwise:

(1) To employ any device, scheme or artifice to defraud;
(2) To make any untrue statement of a material fact . . . ;
(3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person[.]

Or. Rev. Stat. § 59.135.  Oregon law further has a provision imposing joint and several liability on controlling persons.  Id. § 59.137(2)-(3).  Oregon's statutory cause of action for securities fraud is modeled after Rule 10b-5 and is to be interpreted consistently with that federal law.  Shivers v. Amerco, 670 F.2d 826, 831 (9th Cir. 1982); Aero Marine Engine, Inc. v. Transporter, Inc., Civil No. 05-1469-AS, 2007 WL 3128500, at *3 n.2 (D. Or. Oct. 23, 2007); Held v. Product Mfg. Co., 286 Or. 67, 71 (Or. 1979).

The Court finds that Oregon's securities fraud provisions are analogous to § 10(b) and Rule 10b-5.  Therefore, the Court grants Flaxel's motion for summary judgment on the cause of action for state-law securities fraud to the same extent (i.e., with regard to the same transactions) as the Court granted summary judgment on plaintiffs' cause of action for federal securities fraud.  And, the Court denies Flaxel's motion for summary judgment on this cause of action to the same extent (i.e., with regard to the same transactions) as the Court denied summary judgment on the federal securities fraud claims.

**D.      State Common-Law Fraud**

   1.      California Law

The elements of fraud under California law are "(a) misrepresentation; (b) defendant's knowledge of the statement's falsity; (c) intent to defraud (i.e., to induce action in reliance on the misrepresentation); (d) justifiable reliance; and (e) resulting damage."  Hunter v. Up-Right, Inc., 6 Cal. 4th 1174, 1184 (Cal. 1993) (citing Cal. Civ. Code § 1709).

Here, plaintiffs argue that, in making out their claim for federal securities fraud, they have established common-law fraud, as a matter of law.  The Court disagrees.  Specifically, California requires "knowledge of the statement's falsity".  In its scienter analysis, the Court found supra that defendants were deliberately reckless in making their material misrepresentations.  Plaintiffs have not shown that deliberate recklessness under the federal securities laws is equivalent to knowledge under California law.  For this reasons, the Court denies plaintiffs' motion for summary judgment on their cause of action for state-law fraud.

2.      Oregon Law

The elements of common-law fraud under Oregon law are:

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the bearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

Redden v. Disc. Fabrics, Inc., 290 Or. 375, 384 (Or. 1980) (quoting Rice v. McAlister, 280 Or. 125, 128 (Or. 1974)).  Again, plaintiff Flaxel incorporates by reference his arguments on federal securities fraud and claims that they are sufficient to make out a claim for common-law fraud under Oregon law.  However, Oregon also requires "the speaker's knowledge of [the representation's] falsity".  Flaxel has not shown that deliberate recklessness—the Court's finding on scienter above—is the same as knowledge under Oregon's cause of action for common-law fraud.  Therefore, the Court denies plaintiff Flaxel's motion for summary judgment on his cause of action for state-law fraud.

**E.      Negligent Misrepresentation (California Law)**

Under California law, "[t]he elements of negligent misrepresentation are (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage."  Apollo Capital Fund, LLC v. Roth Capital Partners, LLC, 158 Cal. App. 4th 226, 2007 WL 4443337, at *9 (Cal. Ct. App. Dec. 20, 2007); Shamsian v. Atl. Richfield Co., 107 Cal. App. 4th 967, 983 (Cal. Ct. App. 2003).  Again, plaintiffs argue that, in making out their claim for federal securities fraud, they have established negligent misrepresentation, as a matter of law.  This time, the Court agrees.  The Court's finding of deliberate recklessness on scienter is more than sufficient to establish that defendants were "without reasonable ground for believing" that their misrepresentations were true.[20]  Therefore, the Court grants plaintiffs' motion for summary judgment on Bishop's and Marinai's causes of action

---

[20] To be clear, the Court's findings on reliance in the federal securities fraud analysis supra include the findings that plaintiffs reasonably and justifiably relied on defendants' material misrepresentations.  See Livid Holdings, Ltd., 416 F.3d at 949-50 (analyzing adequacy of Rule 10b-5 complaint's allegations on reliance and damages by inquiring whether reliance was reasonable).

for negligent misrepresentation to the same extent (<u>i.e.</u>, with regard to the same transactions) as the Court granted summary judgment on plaintiffs' cause of action for federal securities fraud. And, the Court denies plaintiffs' motion for summary judgment on this cause of action to the same extent (<u>i.e.</u>, with regard to the same transactions) as the Court denied summary judgment on the federal securities fraud claims.[21]

**F.      Supplemental Briefing on Damages**

Having resolved liability on plaintiffs' motions for partial summary judgment, the Court finds that further briefing on the issue of damages is appropriate. Plaintiffs' arguments concerning damages are largely confined to those causes of action where the Court denied summary judgment (<u>e.g.</u>, federal and state securities registration, common-law fraud). Therefore, the Court requests that plaintiffs file a supplemental brief addressing the following questions:

> (1)      Whether, based on the Court's liability findings in this Order, the issue of damages must be presented to the factfinder, or can be resolved as a matter of law; and
> (2)      To the extent that damages can be resolved as a matter of law, what measure of damages would be appropriate under the applicable law.

Therefore, good cause appearing, within two (2) weeks of the date this Order is docketed, the Court requests that plaintiffs file a joint supplemental brief addressing the issue of damages. The brief shall not exceed twenty (20) pages. Plaintiffs shall devote at least five (5) pages to addressing the various theories of damages that courts have applied with respect to the causes of action on which this Court has granted summary judgment here. Plaintiffs may devote the remaining pages to a summary of the applicable facts and legal argument concerning the particular theory of damages that plaintiffs believe the Court should apply in this case.[22] If defendants wish

---

[21] For whatever reason, only plaintiffs Bishop and Marinai include negligent misrepresentation arguments in their memoranda in support of summary judgment. Flaxel moves for summary judgment on his negligent misrepresentation claim, but makes no argument in his brief on this cause of action. In the absence of argument, the Court finds that plaintiff Flaxel has not carried his burden as the movant for summary judgment and denies the motion as to this cause of action.

[22] In other words, the Court asks plaintiffs' counsel not merely to advocate for counsel's preferred theory of damages, but also to spend no more than one-fourth of its supplemental brief informing the Court of other theories of damages that the Court could apply. In the event that defendants choose to respond to plaintiffs' brief, plaintiffs will not be prejudiced by the Court's request because the Court is allowing plaintiffs to file a brief five pages longer than defendants' response.

1  to file a response to the supplemental brief, they must file that response within two (2) weeks of

2  the date that they are served with plaintiffs' brief.  Defendants' response shall not exceed fifteen

3  (15) pages.  The Court shall not grant defendants any extensions of time to file their response to

4  the supplemental brief.

5                                               **CONCLUSION**

6          The Court **GRANTS IN PART** plaintiffs' motions for partial summary judgment as

7  follows.

8          The Court **GRANTS** plaintiff Marinai's motion for partial summary judgment on the

9  causes of action for federal securities fraud, California securities fraud, and negligent

10  misrepresentation with respect to the following transactions:

11  —Both purchases of Soil Savers stock, and

12  —The December 11, 2002 purchase of Fuel FX stock for $50 thousand.

13          The Court **GRANTS** plaintiff Flaxel's motion for partial summary judgment on the causes

14  of action for federal securities fraud and Oregon securities fraud with respect to the following

15  transactions:

16  —The purchase of Soil Savers stock, and

17  —The December 10, 2002 purchase of Fuel FX stock for $50 thousand.

18          The Court **GRANTS** plaintiff Bishop's motion for partial summary judgment on the causes

19  of action for federal securities fraud, California securities fraud, and negligent misrepresentation

20  with respect to the purchase of Soil Savers of New York stock.

21          Where the Court has granted summary judgment, defendant Larry Johnson **IS**

22  **PERSONALLY LIABLE** with respect to transactions involving Soil Savers and Soil Savers of

23  New York.  Johnson **IS LIABLE** as a "controlling person" under federal and state securities laws

24  for transactions involving Fuel FX.

25          The Court **DENIES IN PART** the remainder of plaintiffs' motions.

26  //

27  //

28  //

1          IT IS SO ORDERED.

2

3     DATED:  January 25, 2008

4                                                          _____
                                                          Honorable Janis L. Sammartino
5                                                          United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28